Prisoner's Name:                    Donnie L. Harris, Jr.
Prisoner's DOC No:                  688359
Place of Confinement:               Oklahoma State Penitentiary
                                    McAlester, Oklahoma

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DONNIE L. HARRIS, JR.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV 20-282-RAW-KEW** |
| | ) | |
| **JIM FARRIS, Warden,** | ) | **(Capital Case)** |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254
## AND BRIEF IN SUPPORT

MEGHAN LeFRANCOIS, OBA # 32643
THOMAS D. HIRD, OBA # 13580
Assistant Federal Public Defenders
Western District of Oklahoma
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102
(405) 609-5975 (phone)
(405) 609-5976 (fax)
Meghan_LeFrancois@fd.org
Tom_Hird@fd.org

COUNSEL FOR PETITIONER DONNIE L. HARRIS, JR.

July 30, 2021

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

RECORD REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xix

PRIOR PROCEEDINGS (As per LCvR 9.2(a) and Form AO 241 (Rev. 06/13)) . . . . . . . . . . . xx

ATTACHMENT LIST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

GROUND ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The Trial Court's Refusal to Permit Mr. Harris the Opportunity to Present Expert Testimony Critical to His Defense Violated His Rights to Due Process of Law, to a Fair Trial and Reliable Sentencing Proceeding, to Compulsory Process, to the Effective Assistance of Counsel, and to Testify on His Own Behalf.

A.   Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.   A Medical Emergency Rendered CFI Smith Unable to Testify,
     but the Trial Proceeded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.   CFI Smith Would Have Provided Favorable and Material Testimony . . . . . . . 23

     1.   The Testimony CFI Smith Could Have Provided, Which Was
          Presented to OCCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     2.   The Testimony CFI Smith Could Have Provided, Which Has
          Not Been Presented to OCCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.   If This Court Finds the New Evidence Transforms the Claim into One
     the State Court Has Not Adjudicated on the Merits, § 2254(d)
     Does Not Preclude Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E.   In the Alternative, § 2254(d) Does Not Preclude Relief Because the
     State Court Decision Was Legally and Factually Unreasonable . . . . . . . . . . . 34

       1.      OCCA's Adjudication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

             a.      OCCA's Adjudication Was Legally Unreasonable . . . . . . . . . . 36

             b.      OCCA's Adjudication Was Factually Unreasonable . . . . . . . . . 46

GROUND TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

The Loss by the State of the Cigarette Lighter Alleged to Be the Ignition Source of the Fire Violated Mr. Harris's Constitutional Rights to Due Process, a Fair Trial, and a Meaningful Appeal with Effective Assistance of Counsel.

A.     The State Lost Critical Evidence During Trial and Direct Appeal . . . . . . . . . . 61

B.     The New Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

C.     Section 2254(d) Does Not Preclude Relief Because the State Court Adjudication Was Legally and Factually Unreasonable . . . . . . . . . . . . . . . . . . . 66

       1.      OCCA's Adjudication of the *Trombetta* Claim Was Legally and Factually Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

             a.      OCCA Unreasonably Applied *Trombetta* . . . . . . . . . . . . . . . . . 66

             b.      OCCA's Adjudication Was Factually Unreasonable . . . . . . . . . 68

       2.      There Was No Reasonable Basis for the State Court to Deny Relief on Mr Harris's *Cronic/Penson* Claim . . . . . . . . . . . . . . . . . . . . 71

D.     In the Alternative, If This Court Finds the New Evidence Transforms the Claim into One the State Court Has Not Adjudicated on the Merits, § 2254(d) Does Not Preclude Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

GROUND THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

The State's Failure to Disclose Favorable Impeachment Evidence Regarding a Key Trial Witness Violated Mr. Harris's Right to Due Process.

A.     Legal Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

B.     The *Brady* Violations Presented in State Court . . . . . . . . . . . . . . . . . . . . . . . 76

       1.      The State Failed to Disclose Information Regarding Agent Rust's History of Deceptive Investigative Practices . . . . . . . . . . . . . . . . . . . . . 76

C.     The *Brady* Violations Not Presented in State Court  . . . . . . . . . . . . . . . . . . . . . . . 79

      1.     The State Failed to Disclose Information Regarding Agent
          Rust's Disputed Investigation of a 2009 Case and to Correct
          False Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

D.     If This Court Finds the New Evidence Transforms the *Brady* Claim
      into One the State Court Has Not Adjudicated on the Merits, § 2254(d)
      Does Not Preclude Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

E.     In the Alternative, § 2254(d) Does Not Preclude Relief Because
      the State Court Adjudication Was Factually and Legally Unreasonable . . . . . . . 83

      1.     OCCA's Adjudication Was Based on Unreasonable
          Determinations of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

      2.     OCCA's Adjudication Was Contrary to and Involved an
          Unreasonable Application of Clearly Established Federal Law  . . . . . . . 92

GROUND FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

The State Violated Mr. Harris's Right to Due Process by Failing to Correct the False
Testimony of a Key Witness.

A.     The State Committed a *Napue* Violation When It Knowingly Allowed
      False, Material Testimony from Agent Rust Regarding His Credibility . . . . . . . 99

      1.     The State Knowingly Failed to Correct Agent Rust's
          False Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

      2.     The False Testimony Was Material  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

GROUND FIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Mr. Harris Was Deprived of the Effective Assistance of Trial Counsel in Violation
of His Sixth, Eighth, and Fourteenth Amendment Rights.

A.     Trial Counsel's Failure to Present Testimony from a Qualified
      Fire Expert and/or Preserve the Record on This Issue . . . . . . . . . . . . . . . . . . . . 101

      1.     If This Court Finds This Claim Was Not Adjudicated on the Merits,
          It Should Be Reviewed De Novo. If This Court Finds the Additional
          Evidence Transforms the Claim into One the State Court Has Not
          Adjudicated on the Merits, § 2254(d) Does Not Preclude Relief  . . . . . 105

2.    In the Alternative, § 2254(d) Does Not Preclude Relief Because
      the State Court Adjudication Was Legally and Factually
      Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

      a.    OCCA's Adjudication Was Legally and Factually
            Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

      b.    There Was No Reasonable Basis for the State Court to
            Deny Relief on Mr. Harris's Claim that Trial Counsel's
            Failure to Preserve the Issue for Record on Appeal Was
            Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

B.    Trial and Appellate Counsel's Failure to Investigate and Present
      Testimony from a Burn Expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

      1.    Trial Testimony and Argument About Ms. Ferguson's Burns . . . . . . . 111

      2.    Trial Testimony and Argument About Mr. Harris's Burns . . . . . . . . . . 113

      3.    Available Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

C.    Trial Counsel's Failure to Properly Utilize Available Evidence During
      Trial to Cross-Examine Witnesses on Critical Issues and Appellate
      Counsel's Failure to Raise This Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

      1.    Failure to Impeach Martha Johnson and Barry Johnson
            with Prior Inconsistent Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

      2.    Failure to Impeach Agent Rust with Prior Case Dismissal . . . . . . . . . 119

D.    Trial and Appellate Counsel's Failures to Investigate and Present
      Additional Mitigation Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

      1.    Trial Counsel's Failure to Investigate and Present Additional
            Mitigation Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

            a.    The Mitigation Evidence Trial Counsel Presented . . . . . . . . . 121

            b.    The Evidence Trial Defense Counsel Failed to Investigate
                  and Present: Evidence of a Fetal Alcohol Spectrum Disorder . . 128

            c.    If This Court Finds This Claim Was Not Adjudicated on the
                  Merits, It Should Be Reviewed De Novo . . . . . . . . . . . . . . . . . 134

iv

d.      In the Alternative, § 2254(d) Does Not Preclude Relief
        Because the State Court Adjudication Was Legally
        and Factually Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

        i.      Deficient-Performance Prong  . . . . . . . . . . . . . . . . . . . 135

                a.      OCCA's Adjudication Was Legally
                        and Factually Unreasonable . . . . . . . . . . . . . . . 135

        ii.     Prejudice Prong  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

                a.      OCCA's Adjudication Was Legally
                        and Factually Unreasonable . . . . . . . . . . . . . . . 150

    2.      Trial and Appellate Counsel's Failure to Present Additional
            Evidence of FASD, Including a Specific Diagnosis  . . . . . . . . . . . . . . 160

E.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

GROUND SIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Prosecutorial Misconduct Violated Mr. Harris's Sixth, Eighth, and Fourteenth
Amendment Rights.

A.      The Prosecutor Impugned Mr. Harris, His Counsel, and His Witness  . . . . . . . 163

B.      OCCA's Adjudication Was Legally and Factually Unreasonable . . . . . . . . . . 164

    1.      OCCA's Adjudication Was Legally Unreasonable . . . . . . . . . . . . . . 164

    2.      OCCA's Adjudication Was Factually Unreasonable . . . . . . . . . . . . . . 166

GROUND SEVEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

Mr. Harris's Execution Would Be Constitutionally Intolerable Because He Can
Make a Truly Persuasive Showing That He Is Actually Innocent.

A.      Newly Presented Evidence of Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

B.      Executing an Actually Innocent Person Violates the Eighth and Fourteenth
        Amendments to the Federal Constitution  . . . . . . . . . . . . . . . . . . . . . . . . . . 168

GROUND EIGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172

    The Accumulation of Errors Violated Mr. Harris's Rights to Due Process and a Fair
    Capital Sentencing.

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

## TABLE OF AUTHORITIES

### SUPREME COURT CASES

*Arizona v. Youngblood*,
    488 U.S. 51 (1988)................................................................................66, 67, 70, 73

*Berger v. United States*,
    295 U.S. 78 (1935)........................................................................................ 164

*Brady v. Maryland*,
    373 U.S. 83 (1963)...................................................................................... passim

*Brooks. v. Tennessee*,
    406 U.S. 605 (1972)................................................................................ 17, 34, 46

*Burger v. Kemp*,
    483 U.S. 776 (1987)......................................................................................... 41

*California v. Brown*,
    479 U.S. 538 (1987)....................................................................................... 153

*California v. Trombetta*,
    467 U.S. 479 (1984)................................................................................... passim

*Chambers v. Mississippi*,
    410 U.S. 284 (1973).......................................................... 15, 16, 32, 36, 37

*Cone v. Bell*,
    556 U.S. 449 (2009)......................................................................................84, 92

*Crane v. Kentucky*,
    476 U.S. 683 (1986)................................................................................ 15, 32, 35

*Cullen v. Pinholster*,
    563 U.S. 170 (2011).................................................................................... passim

*Darden v. Wainwright*,
    477 U.S. 168 (1986)........................................................................................165

*Davis v. Alaska*,
    415 U.S. 308 (1974)......................................................................................... 15

*Eddings v. Oklahoma*,
    455 U.S. 104 (1982)....................................................................................... 153

*Evitts v. Lucey*,
　　469 U.S. 387 (1985)............................................................................... passim

*Ferguson v. Georgia*,
　　365 U.S. 570 (1961)............................................................... 17, 34, 46

*Ford v. Wainwright*,
　　477 U.S. 399 (1986)................................................................... 172

*Gardner v. Florida*,
　　430 U.S. 349 (1977)............................................................... 41, 165

*Geders v. United States*,
　　425 U.S. 80 (1976)................................................................ 17, 34, 46

*Giglio v. United States*,
　　405 U.S. 150 (1972)............................................................. 43, 75, 96

*Graham v. Florida*,
　　560 U.S. 48 (2010)..................................................................... 170

*Gregg v. Georgia*,
　　428 U.S. 153 (1976)............................................................... 170, 171

*Harrington v. Richter*,
　　562 U.S. 86 (2011)................................................................... passim

*Harris v. Oklahoma*,
　　141 S. Ct. 139 (2020)..................................................................... 1

*Herrera v. Collins*,
　　506 U.S. 390 (1993)........................................... 168, 169, 170, 171

*Herring v. New York*,
　　422 U.S. 853 (1975)............................................................... 17, 34, 46

*Hinton v. Alabama*,
　　571 U.S. 263 (2014)................................................................... passim

*House v. Bell*,
　　547 U.S. 518 (2006)............................................................... 168, 170

*In re Davis*,
　　557 U.S. 952 (2009)................................................................... 168

*In re Winship*,
　　397 U.S. 358 (1970)............................................................. 43, 44, 55

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ................................................................................. 61

*Johnson v. Williams*,
    568 U.S. 289 (2013) ................................................................ 71, 109, 165

*Kennedy v. Louisiana*,
    554 U.S. 407 (2008) ............................................................................... 170

*Kimmelman v. Morrison*,
    477 U.S. 365 (1986) ............................................................................... 150

*Kyles v. Whitley*,
    514 U.S. 419 (1995) .......................................................................... passim

*Lockett v. Ohio*,
    438 U.S. 586 (1978) ........................................................ 98, 121, 150, 166

*Lockhart v. McCree*,
    476 U.S. 162 (1986) .........................................................................44, 157

*Medina v. California*,
    505 U.S. 437 (1992) ............................................................................... 171

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) ................................................................................. 47

*Mooney v. Holohan*,
    294 U.S. 103 (1935) ............................................................................... 171

*Morris v. Slappy*,
    461 U.S. 1 (1983) ................................................... 18, 32, 34, 38, 46

*Napue v. Illinois*,
    360 U.S. 264 (1959) ...................................................... 96, 98, 99, 100

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) ...............................................................................100

*Patterson v. New York*,
    432 U.S. 197 (1977) ............................................................................... 171

*Penry v. Lynaugh*,
    492 U.S. 302 (1989) ............................................................................... 153

*Penson v. Ohio*,
    488 U.S. 75 (1988) ........................................................................... 71, 72

*Pennsylvania v. Ritchie,*
 480 U.S. 39 (1987) ................................................................................. 75

*Porter v. McCollum,*
 558 U.S. 30 (2009) ........................................................................... passim

*Robinson v. California,*
 370 U.S. 660 (1962) ............................................................................. 171

*Rochin v. California,*
 342 U.S. 165 (1952) ............................................................................. 171

*Rock v. Arkansas,*
 483 U.S. 44 (1987) ........................................................................... passim

*Rompilla v. Beard,*
 545 U.S. 374 (2005) ......................................................................... passim

*Schlup v. Delo,*
 513 U.S. 298 (1995) ............................................................................. 170

*Sears v. Upton,*
 561 U.S. 945 (2010) ................................................... 120, 135, 143, 149, 152

*Strickland v. Washington,*
 466 U.S. 668 (1984) ......................................................................... passim

*Strickler v. Greene,*
 527 U.S. 263 (1999) ...................................................... 74, 75, 81, 83, 84

*Taylor v. Illinois,*
 484 U.S. 400 (1988) ......................................................................... passim

*Ungar v. Sarafite,*
 376 U.S. 585 (1964) ......................................................................... passim

*United States v. Agurs,*
 427 U.S. 97 (1976) ................................................................. 75, 94, 97

*United States v. Bagley,*
 473 U.S. 667 (1985) ......................................................................... passim

*United States v. Cronic,*
 466 U.S. 648 (1984) ......................................................................... passim

*United States v. Femia,*
 9 F.3d 990 (1st Cir. 1993) ..................................................................... 73

*United States v. Nixon*,
    418 U.S. 683 (1974).................................................................... 16

*United States v. Nobles*,
    422 U.S. 225 (1975).................................................................... 40

*United States v. Scheffer*,
    523 U.S. 303 (1998).............................................. 16, 32, 35, 36, 37

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982)............................................................. passim

*United States v. Young*,
    470 U.S. 1 (1985)..................................................................... 164

*Washington v. Texas*,
    388 U.S. 14 (1967).............................................................. passim

*Wiggins v. Smith*,
    539 U.S. 510 (2003)............................................................. passim

*Williams v. Taylor*,
    539 U.S. 362 (2000)............................................................. passim

*Wood v. Allen*,
    558 U.S. 290 (2010).................................................................... 47

*Woodson v. North Carolina*,
    428 U.S. 280 (1976)................................................................. 165

## FEDERAL CIRCUIT COURT CASES

*Anderson v. Sirmons*,
    476 F.3d 1131 (10th Cir. 2007) .............................120, 121, 151, 152

*Avila v. Quarterman*,
    560 F.3d 299 (5th Cir. 2009) ...................................................... 93

*Banks v. Reynolds*,
    54 F.3d 1508 (10th Cir. 1995) .................................................... 81

*Battenfield v. Gibson*,
    236 F.3d 1215 (10th Cir. 2001) ................................................ 158

*Black v. Workman*,
    682 F.3d 880 (10th Cir. 2012) ............................................. passim

*Bowen v. Maynard*,
    799 F.2d 593 (10th Cir. 1986) ....................................................................... 94

*Boyde v. Brown*,
    404 F.3d 1159 (9th Cir. 2005) ..................................................................... 169

*Bracey v. Superintendent Rockview SCI*,
    986 F.3d 274 (3d Cir. 2021)............................................................................ 81

*Cargle v. Mullin*,
    317 F.3d 1196 (10th Cir. 2003) ............................................................... passim

*Carriger v. Stewart*,
    132 F.3d 463 (9th Cir. 1997) ....................................................................... 169

*Clayton v. Gibson*,
    199 F.3d 1162 (10th Cir. 1999) ................................................................... 159

*Darks v. Mullin*,
    327 F.3d 1001 (10th Cir. 2003) ................................................................... 172

*Demarest v. Price*,
    130 F.3d 922 (10th Cir. 1997) ....................................................................... 31

*Douglas v. Workman*,
    560 F.3d 1156 (10th Cir. 2009) ...........................................................75, 97, 98

*Eaton v. Pacheco*,
    931 F.3d 1009 (10th Cir. 2019) ........................................... 35, 66, 84, 106, 121

*English v. Cody*,
    241 F.3d 1279 (10th Cir. 2001) ............................................................ 111, 160

*Fairchild v. Workman*,
    579 F.3d 1134 (10th Cir. 2009) ............................................................... passim

*Fero v. Kerby*,
    39 F.3d 1462 (10th Cir. 1994) .................................................................. 73, 93

*Fontenot v. Crow*,
    2021 WL 2933220 (10th Cir. 2021) ..........................................81, 82, 94, 99

*Gardner v. Galetka*,
    568 F.3d 862 (10th Cir. 2009) ....................................................................... 31

*Gersten v. Senkowski*,
    426 F.3d 588 (2d Cir. 2005)...................................................... 101, 108, 110, 136

*Gonzales v. McKune*,
    247 F.3d 1066 (10th Cir. 2001) ................................................................... 172

*Gordon v. Braxton*,
    780 F.3d 196 (4th Cir. 2015) ........................................... 47, 68, 84, 106, 134

*Grant (Donald) v. Royal*,
    886 F.3d 874 (10th Cir. 2018) ............................................................ 152, 159

*Grant (John) v. Trammell*,
    727 F.3d 1006 (10th Cir. 2013) ................................................................... 159

*Hamilton v. Mullin*,
    436 F.3d 1181 (10th Cir. 2006) ................................................................... 173

*Hanson v. Sherrod*,
    797 F.3d 810 (10th Cir. 2015) ..................................................................... 172

*Hawkins v. Mullin*,
    291 F.3d 658 (10th Cir. 2002) ....................................................................... 31

*Hooks v. Workman*,
    689 F.3d 1148 (10th Cir. 2012) ............................................................ 35, 151

*Howard v. Walker*,
    406 F.3d 114 (2d Cir. 2005).......................................................................... 45

*Jackson v. Calderon*,
    211 F.3d 1148 (9th Cir. 2000) ..................................................................... 169

*Jones v. Hess*,
    681 F.2d 688 (10th Cir. 1982) ....................................................................... 31

*Lindsey v. King*,
    769 F.2d 1034 (5th Cir. 1985) ......................................................... 94, 98, 118

*Littlejohn v. Trammell* (*Littlejohn I*),
    704 F.3d 817 (10th Cir. 2013) ................................................... 144, 149, 151

*Littlejohn v. Royal* (*Littlejohn II*),
    875 F.3d 548 (10th Cir. 2017) ............................................................ 144, 159

*Loyd v. Whitley*,
     977 F.2d 149 (5th Cir. 1992) ......................................................... 101, 110, 136

*Mayes v. Gibson*,
     210 F.3d 1284 (10th Cir. 2000) ............................................................ 121, 159

*McCormick v. Parker*,
     821 F.3d 1240 (10th Cir. 2016) .................................................................. 83, 93

*Middleton v. Dugger*,
     849 F.2d 491 (11th Cir.1988) ......................................................................... 153

*Milke v. Ryan*,
     711 F.3d 998 (9th Cir. 2013) ................................................................... passim

*Milone v. Camp*,
     22 F.3d 693 (7th Cir. 1994) ........................................................................... 169

*Neill v. Gibson*,
     278 F.3d 1044 (10th Cir. 2001) .............................................................. passim

*Nelson v. Moore*,
     470 F.2d 1192 (1st Cir. 1972) ......................................................................... 31

*Noel v. Norris*,
     322 F.3d 500 (8th Cir. 2003) ......................................................................... 170

*Raether v. Meisner*,
     608 F. App'x 409 (7th Cir. 2015) ................................................................ 115

*Richmond v. Embry*,
     122 F.3d 866 (10th Cir. 1997) ......................................................................... 44

*Riggs v. Williams,*
     87 F. App'x 103 (10th Cir. 2004) .................................................................. 67

*Ryder ex rel. Ryder v. Warrior*,
     810 F.3d 724 (10th Cir. 2016) ......................................................................... 45

*Short v. Sirmons*,
     472 F.3d 1177 (10th Cir. 2006) ................................................................ 40, 41

*Silva v. Woodford*,
     279 F.3d 825 (9th Cir.2002) ......................................................................... 153

*Smith v. Mullin*,
    379 F.3d 919 (10th Cir. 2004) ....................................................... 143, 151, 153

*Smith v. Roberts*,
    115 F.3d 818 (10th Cir. 1997) ....................................................................... 75

*Smith v. Sec'y of N.M. Dep't of Corr.*,
    50 F.3d 801 (10th Cir.1995) ........................................................................... 93

*Soffar v. Dretke*,
    368 F.3d 441 (5th Cir. 2004) ...................................................... 101, 108, 110, 136

*Spencer v. Murray*,
    5 F.3d 758 (4th Cir. 1993) ........................................................................... 169

*Stockton v. Angelone*,
    70 F.3d 12 (4th Cir. 1995) ........................................................................... 169

*Stouffer v. Reynolds*,
    168 F.3d 1155 (10th Cir. 1999) .................................................................... 150

*Trevino v. Davis*,
    829 F.3d 328 (5th Cir. 2016) ....................................................... 138, 139, 141

*Turner v. Calderon*,
    281 F.3d 851 (9th Cir. 2002) ...................................................................... 169

*United States v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992) .................................................................. 93, 94

*United States v.Caballero*,
    277 F.3d 1235 (10th Cir. 2002) ..................................................................... 99

*United States v. Charley*,
    189 F.3d 1251 (10th Cir. 1999) ..................................................................... 40

*United States v. Deutsch*,
    475 F.2d 55 (5th Cir. 1973) ........................................................................... 95

*United States v. Diaz*,
    189 F.3d 1239 (10th Cir. 1999) ..................................................................... 39

*United States v. Femia*,
    9 F.3d 990 (1st Cir. 1993) ............................................................................. 73

*United States v. Galecki*,
    932 F.3d 176 (4th Cir. 2019) ......................................................................... 45

xv

*United States v. Garcia,*
    793 F.3d 1194 (10th Cir. 2015) ............................................................. 82, 99, 100

*United States v. Golyansky,*
    291 F.3d 1245 (10th Cir. 2002) .......................................................................... 40

*United States v. Gonzales,*
    164 F.3d 1285 (10th Cir. 1999) .......................................................................... 40

*United States v. Henry,*
    749 F.2d 203 (5th Cir. 1984) ............................................................................. 96

*United States v. Rivera,*
    900 F.2d 1462 (10th Cir. 1990) ........................................................................ 172

*United States v. Sampson,*
    496 F.3d 1 (1st Cir. 2007) ............................................................................... 169

*United States v. Sarracino,*
    340 F.3d 1148 (10th Cir. 2003) .......................................................................... 41

*United States v. Serrano,*
    406 F.3d 1208 (10th Cir. 2005) .......................................................................... 16

*United States v. West,*
    828 F.2d 1468 (10th Cir. 1987) .......................................................................... 39

*United States v. Wynne,*
    993 F.2d 760 (10th Cir. 1993) ........................................................................... 39

*Williams v. Stirling,*
    914 F.3d 302 (4th Cir. 2019) ..................................................................... passim

*Wilson v. Sirmons,*
    536 F.3d 1064 (10th Cir. 2008) ................................................................. passim

*Workman v. Mullin,*
    342 F.3d 1100 (10th Cir 2003) ........................................................................ 173

*Young v. Workman,*
    383 F.3d 1233 (10th Cir. 2004) .......................................................................... 41

## FEDERAL DISTRICT COURT CASES

*Abdul-Salaam v. Beard*,
    2008 WL 2704605 (M.D. Pa. 2008) ............................................................ 73

*Cherrix v. Braxton*,
    131 F. Supp. 3d 756 (E.D. Va. 2001) ........................................................ 170

*United States v. Padilla*,
    2011 WL 1103876 (D.N.M. 2017) ............................................................. 94

## STATE COURT CASES

*Com. v. Tucceri*,
    589 N.E. 2d 1216 (Mass. 1992) ................................................................. 81

*Harris v. State*,
    450 P.3d 933 (Okla. Crim. App. 2019) ................................................. passim

*Harris v. State*,
    No. PCD-2015-419 (Okla. Crim. App. July 30, 2020) ................................ 1, 61

*Harris (Jimmy) v. State*,
    84 P.3d 731 (Okla. Crim. App. 2004) .......................................................... 51

*Simpson v. State*,
    230 P.3d 888 (Okla. Crim. App. 2010) ..................................................... 158

*State v. Laurie*,
    653 A.2d 549 (N.H. 1995) ......................................................................... 96

*Vaughn v. United States*,
    93 A.3d 1237 (D.C. 2014) .......................................................................... 95

## FEDERAL STATUTES

28 U.S.C. § 2254(d) ......................................................................... passim

## STATE STATUTES

12 O.S. 2011, § 668 ..................................................................... 48, 50

Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*,
    Title 22, Ch. 18, App. (2019) ......................................... 105, 134, 158

## FEDERAL RULES

Fed. R. Civ. P. 15(a)(2) ...................................................................... 2

## OTHER AUTHORITIES

American Bar Association Guidelines for the Appointment and Performance of Defense
Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (rev. Feb. 2003)
("ABA Guidelines")................................................................................. passim

Centers for Disease Control and Prevention (CDC), *Fetal Alchol Spectrum Disorders (FASDs)*,
https://www.cdc.gov/ncbddd/fasd/facts.html (last visited July 18, 2021)...................... 120

## ARTICLES

Valena E. Beety, Jennifer D. Oliva,
*Evidence on Fire*, 97 N.C. L. Rev. 483 (2019)...................................................... 101, 102

N.N. Brown et al.,
*A Proposed Model Standard for Forensic Assessment of Fetal Alcohol Spectrum
Disorders*, 38 J. Psychiatry & L. 383 (2010).................................................. 141

Larry Burd & William Edwards,
*Fetal Alcohol Spectrum Disorders Implications for Attorneys and the Courts*,
Crim. Just., Fall 2019........................................................................................141

John Matthew Fabian, PSY. D., J.D, ABPP et. al.,
*Life, Death, and IQ: It's Much More Than Just A Score: Understanding and Utilizing
Forensic Psychological and Neuropsychological Evaluations in Atkins Intellectual
Disability/Mental Retardation Cases*, 59 Clev. St. L. Rev. 399 (2011) ........................ 142

Stephen P. Garvey,
*Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*,
98 Colum. L.Rev. 1538 (Oct. 1998) .................................................................44

## **RECORD REFERENCES**
Record references will be designated as follows:

| | |
|---|---|
| O.R. | Three-volume consecutively paginated Original Record in Case No. CF-2012-113 followed by page number; |
| Supp. O.R. | Two-volume consecutively paginated Supplemental Original Record in Case No. CF-2012-113 followed by page number; |
| Tr. | Transcript of seven-volume jury trial held Dec. 9-18, 2013, followed by volume and page number; |
| (Date) Tr. | Hearing transcripts preceded by date and followed by page number; |
| Prelim. Hrg. Tr. | Transcript of preliminary hearing held June 28, 2012 followed by page number; |
| Defense Ex. | Jury trial (unless other proceeding specified) defense exhibit followed by exhibit number; |
| State's Ex. | Jury trial (unless other proceeding specified) state exhibit followed by exhibit number; |
| Court's Ex. | Jury trial court exhibit followed by exhibit number; |
| Sent. Tr. | Transcript of formal sentencing held Feb. 12, 2014 followed by page number; |
| Att. | Attachment to habeas petition (unless other document specified) followed by attachment number; |
| App. for Evid. Hrg. | Notice of Extra Record Evidence Supporting Propositions II, III, IV and XIV of Brief of Appellant and/or Alternatively Application for Evidentiary Hearing on Sixth Amendment Claims, *Harris v. State*, No. D-2014-153 (Okla. Crim. App. Mar. 30, 2017). |

## PRIOR PROCEEDINGS

(As per LCvR 9.2 (a) and Form AO 241 (Rev. 06/13))

1.  (a)   Name/location of court:          LeFlore County District Court
                                           100 S. Broadway
                                           Poteau, OK 74953

    (b)   Case No.:                        CF-2012-113

2.  (a)   Date of conviction:              December 17, 2013

    (b)   Date of sentencing:              February 12, 2014

3.  Length of sentence:                    Death sentence

4.  Convicted of multiple counts/crimes?   No

5.  Crime:                                 Murder in the First Degree- Felony Murder

6.  (a)   Plea entered:                    Not Guilty

    (b)   Explanation for different pleas: N/A

    (c)   Kind of trial:                   Jury

7.  Defendant testify at any hearing?      No

8.  Was conviction appealed?               Yes

9.  (a)   Court appealed to:               Oklahoma Court of Criminal Appeals

    (b)   Case No.:                        D-2014-153

    (c)   Result:                          Judgment and sentence affirmed

    (d)   Date of result:                  September 26, 2019

    (e)   Case citation:                   *Harris v. State*, 450 P.3d 933 (Okla. Crim.
                                           App. 2019)

    (f)   Grounds raised:

I. The trial court's failure to provide Mr. Harris a complete record on appeal violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights;

II. The trial court's refusal to permit Mr. Harris the opportunity to present expert testimony critical to his defense violated his constitutional rights to a fair trial and reliable sentencing proceeding, compulsory process, effective assistance of counsel, to testify on his own behalf, and due process of law;

III. The loss and/or destruction of material evidence prior to and after Mr. Harris's trial violated his constitutional rights to due process and effective assistance of appellate counsel;

IV. The state's failure to disclose exculpatory impeachment evidence regarding its key trial witness violated Mr. Harris's right to due process and adversely impacted his right to a meaningful appeal and mandatory sentence review;

V. The trial court committed reversible error by allowing the state to introduce inadmissible bad character evidence of unrelated, unadjudicated other crimes and/or bad acts during the first stage of trial;

VI. The trial court abused its discretion by admitting inadmissible hearsay evidence in violation of Mr. Harris's right to a fair trial and reliable sentencing under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution;

VII. Prosecutorial misconduct deprived Mr. Harris of his rights to due process, a fair trial, and a reliable sentencing under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

VIII. The admission of State's Exhibit 9 without first requiring the state to prove chain of custody violated Mr. Harris's rights to due process and a fair trial and reliable sentencing;

IX. The trial court's denial of Mr. Harris's motion for a mistrial following repeated "disruptive" outbursts from Kristi Ferguson's family in the presence of the jury deprived him of a fair trial and reliable sentencing.

X. The omission of the mandatory instruction defining mitigating circumstances from the packet provided to the jury violated Mr. Harris's rights to due process and a fair trial and reliable sentencing proceeding;

XI. Mr. Harris's death sentence must be vacated or modified because the admission of improper victim impact evidence violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution;

XII. The evidence was insufficient to support the "great risk of death" aggravating circumstance resulting in a violation of Mr. Harris's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution;

XIII.  The heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad as it is currently being applied in Oklahoma.  Its use in this case violated Mr. Harris's rights in violation of the Eighth and Fourteenth amendments of the United States Constitution;

XIV.  Mr. Harris was deprived of the effective assistance of counsel in violation of his Sixth, Eighth, and Fourteenth amendment rights;

XV.  The verdict of death was influenced by passion and prejudice and other arbitrary factors preventing the jury from making a reasoned moral response to the evidence;

XVI.  The death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II §§ 7, 9 and 20 of the Oklahoma Constitution;

XVII.  The accumulation of error in this case deprived Mr. Harris of due process of law and a reliable sentencing.

| | | | |
|---|---|---|---|
| (g) | Seek further review by a higher state court? | | No |
| (h) | Was a petition for certiorari filed? | | Yes |
| | (1) Case No.: | | No. 19-8229 |
| | (2) Result: | | Denied |
| | (3) Date of result: | | June 22, 2020 |
| | (4) Case citation: | | *Harris v. Oklahoma*, 141 S. Ct. 139 (2020) (mem.) |

10.  Other than direct appeals listed above, are there any other petitions, applications, or motions concerning this conviction in any state court?                                                                    Yes

| | | | |
|---|---|---|---|
| 11. | (a) | (1) Name of Court: | Oklahoma Court of Criminal Appeals |
| | | (2) Case No.: | D-2014-153 |
| | | (3) Date of filing: | March 30, 2017 |
| | | (4) Nature of proceeding: | Notice of Extra-Record Evidence Supporting Propositions II, III, IV and XIV of Brief of Appellant and/or Alternatively Application for Evidentiary Hearing on Sixth Amendment Claims |

(5) Grounds raised:

A. Unavailable expert witness and related ineffective assistance of counsel.
B. Loss and/or destruction of evidence.
C. The State's failure to disclose exculpatory evidence.
D. Trial counsel's failure to obtain and present additional mitigating evidence.

(6) Receive hearing?                No

(7) Result:                         Denied

(8) Date of result:                 September 26, 2019

(b)  If any other petition, application, or motion was filed, give the same information.

(1) Name of Court:                  Oklahoma Court of Criminal Appeals

(2) Case No.:                       D-2014-153

(3) Date of filing:                 March 30, 2017

(4) Nature of proceeding:           Motion for New Trial and/or Request for Evidentiary Hearing Based on Newly Discovered Evidence and Brief in Support

(5) Grounds raised:                 A. Newly discovered evidence.

(6) Receive hearing?                No

(7) Result:                         Dismissed for lack of jurisdiction

(8) Date of result:                 September 26, 2019

(c)  If any other petition, application, or motion was filed, give the same information.

(1) Name of Court:                  Oklahoma Court of Criminal Appeals

(2) Case No.:                       PCD-2015-419

(3) Date of filing:                 April 5, 2018

| (4) Nature of proceeding: | Application for Post-Conviction Relief |
|---|---|
| (5) Grounds raised: | I.  Newly discovered evidence indicates the State knowingly failed to disclose the fact that evidence was missing before Mr. Harris's trial began, violating Mr. Harris's right to due process and a fair trial.<br>II.  The cumulative impact of errors identified on direct appeal and in post-conviction rendered the proceedings resulting in Mr. Harris's death sentence arbitrary, capricious, and unreliable.  The death sentence in this case constitutes cruel and unusual punishment and a denial of due process of law and must be reversed or modified to life imprisonment or life without parole. |
| (6) Receive hearing? | No |
| (7) Result: | Denied |
| (8) Date of result: | July 30, 2020 |

If any other petition, application, or motion was filed, give the same information.

| (1) Name of Court: | Oklahoma Court of Criminal Appeals |
|---|---|
| (2) Case No.: | PCD-2015-419 |
| (3) Date of filing: | April 5, 2018 |
| (4) Nature of proceeding: | Motion for Evidentiary Hearing and Discovery on Post-Conviction Claims |
| (5) Grounds raised: | |
| (6) Receive hearing? | No |
| (7) Result: | Denied |
| (8) Date of result: | July 30, 2020 |

If any other petition, application, or
motion was filed, give the same
information.

| | |
|---|---|
| (1) Name of Court: | Oklahoma Court of Criminal Appeals |
| (2) Case No.: | D-2014-153 |
| (3) Date of filing: | September 26, 2018 |
| (4) Nature of proceeding: | Notice to Court Regarding Missing Evidence (Possibily [sic] State's Trial Exhibit 9) and Request to Remand to the LeFlore County District Court |
| (5) Grounds raised: | |
| (6) Receive hearing? | No |
| (7) Result: | Denied |
| (8) Date of result: | September 26, 2019 |

If any other petition, application, or
motion was filed, give the same
information.

| | |
|---|---|
| (1) Name of Court: | LeFlore County District Court |
| (2) Case No.: | CF-2012-113 |
| (3) Date of filing: | May 28, 2021 |
| (4) Nature of proceeding: | Motion for Withdrawal of State's Trial Exhibit 9 |
| (5) Grounds raised: | |
| (6) Receive hearing? | No |
| (7) Result: | Granted |
| (8) Date of result: | June 3, 2021 (filed June 9, 2021) |

| | | |
|---|---|---|
| d) | Appeal to highest state court having jurisdiction? | N/A; all filed in highest state court except Motion for Withdrawal of State's Trial Exhibit 9, which was granted. |

| | | |
|---|---|---|
| 12. | State grounds on which being held in violation of Constitution, laws, or treaties of United States: | See attached petition. |
| 13. | Additional questions about petition | See attached petition. |
| 14. | Previously filed petition, application, or motion in federal court regarding conviction? | None aside from those filed in relation to the instant case. |
| 15. | Any petition or appeal pending in any court regarding the conviction challenged in this petition? | No |
| 16. | (a-d) Attorney at preliminary hearing, arraignment and plea, trial, sentencing: | Peter Astor and James Bowen Oklahoma Indigent Defense System Capital Trial Division 610 South Hiawatha Sapulpa, OK 74066 |
| | (e)   Attorney on appeal: | Kristi Christopher Capital Post-Conviction Division Oklahoma Indigent Defense System P.O. Box 926 Norman, OK 73070 |
| | (f)   Attorney for Post-Conviction: | Bobby Lewis Homicide Direct Appeals Division Oklahoma Indigent Defense System P.O. Box 926 Norman, OK 73070 |
| | (g)   Appeal from any ruling in a post-conviction proceeding: | N/A |
| 17. | Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? | No |
| 18. | Timeliness of petition: If judgment became final over one year ago, explain why statute of limitations does not bar petition. | N/A |

## TABLE OF ATTACHMENTS

The attachments to the habeas petition are listed below.  Some attachments have been previously filed in the record, and for the Court's convenience, are attached hereto, as listed.

| Attachment No. | Document |
|---|---|
| Attachment 1 | *Harris v. State*, 450 P.3d 933 (Okla. Crim. App. 2019) |
| Attachment 2 | Post-Conviction Opinion Denying Application for Post-Conviction Relief and Related Motions, *Harris v. State*, PCD-2015-419 (Okla. Crim. App. July 30, 2020) (unpublished) |
| Attachment 3 | Report of David Smith, CFI (Pretrial), dated Sept. 3, 2013 (Court's Ex. 2 at Trial) |
| Attachment 4 | Affidavit of Attorney Peter Astor, dated Mar. 15, 2017 (App. for Evid. Hrg., Att. 2) |
| Attachment 5 | Affidavit and Report (dated Nov. 21, 2016) and CV of David Smith, CFI (Direct Appeal) (App. for Evid. Hrg, Att. 1) |
| Attachment 6* | Report (dated July 26, 2021) and CV of David Smith, CFI (Habeas) |
| Attachment 7 | Documents Produced by State Regarding OSFM Investigation and Reprimand of Agent Rust (12/23/15 Hrg., State's Exs. 1 and 2) |
| Attachment 8 | Documents Produced by State Regarding Multicounty Grand Jury Unit Investigation of Agent Rust (Motion for New Trial, Att. 4) |
| Attachment 9* | Emails from Assistant Attorney General Ashley Willis Regarding Multicounty Grand Jury Unit Investigation of Agent Rust, dated Feb. 26, 2021 to May 6, 2021) |
| Attachment 10* | Motion for Withdrawal of State's Trial Exhibit 9, *State v. Harris*, CF-2012-113 (LeFlore County Dist. Ct. May 28, 2021) |
| Attachment 11* | Order Granting Defendant's Motion for Withdrawal of State's Trial Exhibit 9, *State v. Harris*, CF-2012-113 (LeFlore County Dist. Ct. June 9, 2021) |
| Attachment 12* | Affidavit of Investigator Mark Jacobs, dated July 30, 2021 |

xxv

| Attachment 13* | Affidavit of Paralegal Angela Beery, dated July 30, 2021 |
|---|---|
| Attachment 14 | Notice to Court and Request for Evidentiary Hearing Regarding Missing Evidence, *Harris v. State*, No. D-2014-153 (Okla. Crim. App. Nov. 23, 2015) |
| Attachment 15* | Affidavit of Investigator Kim Marks, dated July 26, 2021, Attaching as Ex. 1: Documents Related to *State v. Kisselburg*, CF-2009-493 (LeFlore County Dist. Ct. May 17, 2010) |
| Attachment 16* | Affidavit of Paralegal Angela Beery, dated July 30, 2021, Attaching as Ex. 1: Statement of Martha Johnson and Ex. 2: Statement of Barry Johnson |
| Attachment 17* | Report (dated July 26, 2021) and CV of Kenneth Lyons Jones, M.D. |
| Attachment 18 | Affidavit of Investigator Steve Leedy, dated Jan. 4, 2017 (App. for Evid. Hrg., Att. 6) |
| Attachment 19 | Affidavit of Kathy LaFortune, J.D., Ph.D, dated Jan. 20, 2017 (App. for Evid. Hrg., Att. 7) |
| Attachment 20 | Affidavit of Jeanne Russell, Ed. D., dated Mar. 20, 2017 (App. for Evid. Hrg., Att. 14) |
| Attachment 21 | Affidavit (dated May 30, 2016), CV, and Report (dated May 20, 2016) of John Fabian, Psy.D., J.D., ABPP (App. for Evid. Hrg., Att. 15) |
| Attachment 22 | Affidavit of Donnie Harris, Sr., dated Mar. 3, 2016 (App. for Evid. Hrg., Att. 8) |
| Attachment 23 | Affidavit of Krystal Green Thompson, dated Mar. 18, 2016 (App. for Evid. Hrg., Att. 9) |
| Attachment 24 | Affidavit of Casey McKosky, dated Mar. 3, 2016 (App. for Evid. Hrg., Att. 10) |
| Attachment 25 | Affidavit of Kenny Ray Smith, dated Feb. 26, 2016 (App. for Evid. Hrg., Att. 11) |

*These attachments have not been presented to the Oklahoma Court of Criminal Appeals.

## STATEMENT OF THE CASE

On March 13, 2012, Petitioner, Donnie L. Harris, Jr., was charged in LeFlore County District Court, Case No. CF-2012-113, with murder in the first degree – felony murder during the commission of arson in the first degree. O.R. I 1. Trial was held on December 9-18, 2013 before the Honorable Jonathan K. Sullivan, and the jury found Mr. Harris guilty of first degree murder. O.R. II 365-66; Tr. VII 1384-85. The jury recommended a sentence of death after finding both alleged aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel and 2) the defendant knowingly created a great risk of death to more than one person. O.R. I 26-27, O.R. II 381-82; Tr. VII 1594. On February 12, 2014, Judge Sullivan formally sentenced Mr. Harris to death. O.R. 403-09; Sent. Tr. 7.

Following six remands to the trial court due to record issues, on September 26, 2019, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed Mr. Harris's conviction and sentence on direct appeal, denied his notice of extra-record evidence and/or application for evidentiary hearing and his notice regarding missing evidence and request to remand, and dismissed his motion for new trial. *Harris v. State*, 450 P.3d 933 (Okla. Crim. App. 2019), appended hereto as Att. 1. On June 22, 2020, the United States Supreme Court denied his petition for writ of certiorari. *Harris v. Oklahoma*, 141 S. Ct. 139 (2020) (mem.). On July 30, 2020, OCCA denied his Application for Post-Conviction Relief. Opinion Denying Application for Post-Conviction Relief and Related Motions, *Harris v. State*, No. PCD-2015-419 (Okla. Crim. App. July 30, 2020), appended hereto as Att. 2.[1]

_____

[1]On August 27, 2020, this Court appointed the Federal Public Defender for the Western District of Oklahoma to assist in the preparation, filing, and presentation of a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 5. The Court issued a Scheduling Order directing Mr. Harris's petition for writ of habeas corpus be due on July 30, 2021. Doc. 10 at 1. Due to the

(continued...)

## STATEMENT OF THE FACTS

On March 9, 2012, Kristi Ferguson died from injuries she sustained in a February 18-19, 2012 house fire at 707 Veterans Avenue in Talihina, Oklahoma (LeFlore County). Tr. IV 714, 723-24; Tr. V 1053. Ms. Ferguson lived in the house with her boyfriend, Donnie Harris, Jr. ("Mr. Harris"); his father, Donnie Harris, Sr. ("Harris, Sr."); Mr. Harris's younger brother, Kevin Harris ("Kevin"); Kevin's girlfriend, Casey McKosky; and Kevin and Ms. McKosky's infant daughter. Tr. IV 724, 1255. Witnesses explained Mr. Harris and Ms. Ferguson "separated and got back together, and separated and got back together" throughout their seven-year relationship. Tr. IV 866; Tr. V 1084; Tr. VII 1514-15. A neighbor, Jenny Turner, testified Ms. Ferguson had been staying with her for approximately two months at the time of the fire, following a fight with Mr. Harris.[2] Tr. IV 866-87. However, Mr. Harris's aunt, Anna Brown, testified that approximately two weeks before the fire, Mr. Harris and Ms. Ferguson wanted to get married and go to counseling. Tr. VI 1166-67. She saw

---

[1](...continued)
ongoing COVID-19 pandemic, on March 12, 2021, Mr. Harris filed a Motion for Equitable Tolling of Statute of Limitations for Petition for Writ of Habeas Corpus and Brief in Support. Doc. 11. On May 27, 2021, this Court denied Mr. Harris's motion but found "Petitioner has shown that he has been pursuing his rights diligently, and the extraordinary circumstances of the global pandemic have impeded his ability to file a timely habeas petition." Doc. 16 at 7. The Court found, "After Petitioner has filed his petition and upon a proper showing, the Court will 'freely give leave' to amend the original petition pursuant to Fed. R. Civ. P. 15(a)(2)." Doc. 16 at 7. Mr. Harris intends to seek leave to amend his petition accordingly.

[2]In its opinion, OCCA recounted evidence Ms. Turner provided that "the relationship between Appellant and Ferguson was tumultuous, that Appellant had made a number of menacing and threatening statements to and about Ferguson, and that Ferguson had sought a protective order against Appellant." *Harris*, 450 P.3d at 942. This included OCCA's unreasonable determination that "Turner . . . recalled that a week before the fire, Appellant tried to run over Ferguson in his car." *Id.* Ms. Turner's testimony was that Mr. Harris "tried to run me [Ms. Turner] over." Tr. IV 877-79. She did not call the police. Tr. IV 879.

Mr. Harris and Ms. Ferguson approximately every two to three days, and they seemed to get along and seemed happy. Tr. VI 1168, 1171.

Mr. Harris's brother, Shaun Harris ("Shaun"),[3] testified the night of the fire, he went to Whitesboro[4] with Mr. Harris and Ms. Ferguson to give someone a ride. Tr. V 1081. They were there approximately thirty minutes. Tr. V 1081. After they got back to Shaun's house, Mr. Harris, Ms. Ferguson, and the man to whom they gave a ride went to a bar called the Alley Bar; Shaun saw them pull in. Tr. V 1083.

Harris, Sr. testified he fell asleep in the living room at his home around 9:30 or 10:00 p.m. on February 18, 2012. Tr. VI 1178-79. At that time, Mr. Harris and Ms. Ferguson were not home. Tr. 1179. He did not wake up when they came home. Tr. VI 1179. At approximately 11:00 p.m., Harris, Sr. was awoken by Mr. Harris and Ms. Ferguson running back and forth "right by [him]" between Mr. Harris's bedroom and the kitchen trying to extinguish a fire. Tr. 1179-81. Harris, Sr. "jumped up and run [sic] to the kitchen, tried to find a pan, a bucket, a bowl; anything we could catch some water in." Tr. VI 1180-81. He woke Kevin up to help. Tr. VI 1181. The fire was confined initially to Mr. Harris's bedroom. However, by the time Harris, Sr. exited the house to wait for the fire department, there was "a little circle" of fire outside the bedroom door. Tr. VI 1182-83. Harris, Sr. did not see Ms. Ferguson on fire or hear her say Mr. Harris set her on fire. Tr. VI 1182. Before leaving the house, Harris, Sr. did not realize Ms. Ferguson had been burned and she did not

---

[3]The trial transcript spells Shaun Harris's name "Shawn."

[4]Whitesboro, Oklahoma is approximately ten miles from Talihina. Google Maps, https://google.com/maps/ (last visited July 24, 2021).

say anything about being burned. Tr. VI 1182-83. She later said "it hurt" but did not say Mr. Harris set her on fire. Tr. VI 1184.

Kevin testified he and Ms. McKosky went to bed around 9:40 or 10:00 p.m. Tr. VI 1206. Not long after getting into bed, both Kevin and Ms. McKosky heard Mr. Harris and Ms. Ferguson "laughing and giggling" outside. Tr. VI 1207, 1213, 1265-66. Upon hearing the laughter, Kevin got out of bed, looked outside, and observed Mr. Harris and Ms. Ferguson in the yard beyond Mr. Harris's white Chrysler vehicle. Tr. VI 1207, 1213. Ms. McKosky observed Mr. Harris and Ms. Ferguson from her bedroom window "out by the car hugged up together." Tr. VI 1266. Kevin and Ms. McKosky then fell asleep. Tr. VI 1267. Ms. McKosky was awakened by "a commotion like glass shattering," and Harris, Sr. beating on their bedroom door saying there was a fire. Tr. VI 1267. Ms. McKosky woke Kevin, who ran out the bedroom door, and Ms. McKosky got dressed. Tr. VI 1215, 1267. Kevin returned and "grabbed our comforter off the bed to help smother the fire out." Tr. VI 1227, 1252, 1268. He also tried to stomp the fire out. Tr. VI 1227, 1252. Ms. McKosky carried their baby outside and called 911 while the others attempted to extinguish the fire. Tr. VI 1269-70. Ms. McKosky did not think anyone had been burned. Tr. VI 1272. From the time she awoke until the she went outside, she never heard Ms. Ferguson yell or scream. Tr. VI 1272.

When Kevin first entered Mr. Harris's bedroom, the fire was confined to a "circle of fire" behind the bedroom door near a small marble table. Tr. VI 1217-19, 1222-23, 1251. The fire spread quickly across some clothes on the floor to the curtains. Tr. VI 1224, 1226, 1251-52. Kevin joined his father, brother, and Ms. Ferguson in their attempts to extinguish the fire by "running for water." Tr. VI 1227. Kevin determined that pans of water from the kitchen would not be enough to extinguish the fire, so he went outside to fill a bucket with water from the hose. Tr. VI 1227-28.

When Kevin was outside filling the bucket, Ms. Ferguson ran out of the house and said, "I'm burned, I'm burned." Tr. VI 1228. Before she said that, Kevin did not realize she had been burned. Tr. VI 1228. Kevin never heard Ms. Ferguson say Mr. Harris burned her. Tr. 1229. Kevin assured Ms. Ferguson that the ambulance was on the way and returned inside to continue fighting the fire. Tr. VI 1228-30. After determining the fire was too hot, Kevin went back outside. Tr. VI 1230. Mr. Harris then "ran around the house and he said, 'Where'd Kristi go?'" Tr. VI 1230. Kevin told Mr. Harris she was "behind the house," and Mr. Harris "ran back that way."[5] Tr. VI 1230.

Martha Johnson[6] and her son Barry Johnson ("Barry"),[7] who lived behind the Harris home, testified that they woke up to a commotion on their porch.[8] Tr. VI 840-41, 881. Ms. Johnson testified that she heard loud banging on the door. Tr. VI 840. Barry heard the doorbell ring and "somebody on the front porch screaming." Tr. IV 840, 881. When Barry opened the door, Ms. Johnson saw Mr. Harris standing outside the door and Ms. Ferguson sitting in a chair on the porch. Tr. IV 841-42. Barry saw them both sitting on the porch. Tr. IV 881. The Johnsons testified that Ms. Ferguson said

---

[5]Although the witnesses in the house provided written statements, none of their interviews were recorded. Tr. V 1122, 1127. LeFlore County DA Investigator Jody Thompson testified that he "anticipated to" record these interviews, but "[w]hen I pushed play, the batteries didn't work. I checked our field bag, no extra batteries . . . ." Tr. V 963.

[6]Ms. Johnson is the mother of Jenny Turner, who testified Ms. Ferguson was staying at her home before the fire. Tr. IV 865, 867. Ms. Johnson testified she had "started hanging around with [Ms. Ferguson], like, everyday or every other day for about – maybe about a year, a little over a year." Tr. IV 860.

[7]Ms. Johnson and Barry provided written witness statements on February 19. Tr. V 1120. DA investigators interviewed the Johnsons together on February 23 in a recorded interview; they were not separated for this interview. Tr. V 1119, 1124-25. DA Investigator Travis Saulsberry agreed it is "police procedure that usually [he]'ll talk to people separately." Tr. V 1125.

[8]Ms. Johnson testified this occurred around 11:30 p.m., and Barry testified it occurred between 1:00 and 2:00. Tr. IV 840, 881.

5

Mr. Harris had set her on fire.[9] Tr. IV 842, 881. Mr. Harris and Ms. Ferguson came into their home while Barry called 911. Tr. IV 882. Ms. Harris appeared to only be wearing a bra and was badly burned. Tr. IV 843. They testified Ms. Ferguson smelled like gasoline.  Tr. IV 843, 884. According to Ms. Johnson, "there was a lot of excitement and we were all talking at the same time, and every time Kristi tried to talk," Mr. Harris "kept telling her, 'Kristi, shut the fuck up. . . . You're going to get me in fucking trouble.'"[10] Tr. IV 843-44, 847. He sounded "scared, excited." Tr. IV 844. The State introduced audio recordings of six 911 calls,[11] including two from Mr. Harris at the Johnson home, frantically pleading for help, and one from Barry. State's Ex. 4; Tr. IV 845-46. Although Ms. Ferguson can be heard in the background, she cannot be heard saying Mr. Harris hurt her or that he was responsible for the fire. State's Ex. 4. Barry testified Mr. Harris "followed [Ms. Ferguson] out to the EMT bus and he kept telling her, 'I love you,' and 'I'm sorry.'"[12] Tr. IV 885.

LeFlore County EMS paramedic Keith Lickly transported Ms. Ferguson from the Johnson house by ambulance. Tr. IV 894, 896. He testified that as he was transporting Ms. Ferguson from the house to the ambulance, Mr. Harris was running alongside them telling Ms. Ferguson "over and over again he was sorry. He kept saying, 'We took it too far' and kept saying that he loved her . . . ." Tr. IV 897. Mr. Lickly informed Ms. Ferguson that she would need to be flown to a burn center.

---

[9]Their accounts of what Ms. Johnson said differed. Ms. Johnson testified Ms. Ferguson said, "Look what he done to me. He put gas on me and started me on fire." Tr. IV 842. Barry testified she said "he had lit me on fire." Tr. IV 881.

[10]Barry did not testify to hearing these statements.

[11]Due to technical difficulties, there was no "paper log or something that tells us the times these calls came in and what phone numbers they came from." Tr. V 988-89.

[12]Ms. Johnson testified Mr. Harris was saying, "Kristi, don't say a fucking thing. Don't say anything. You'll get us both in trouble." Tr. IV 851. Neither Barry nor the paramedic testified to hearing this.

Tr. IV 897. Mr. Harris "kept trying to ask . . . to go with [them]." Tr. IV 897. After Mr. Lickly closed the doors to the ambulance, Mr. Harris "kept yelling he was sorry . . . and he kept saying that he was all she had and that he had to go with her." Tr. IV 898. Ms. Ferguson told Mr. Lickly not to let Mr. Harris inside because he had thrown "kerosene" on her and set her on fire.[13] Tr. IV 899, 909-10. Mr. Lickly testified that "[f]rom everything that [he] could see, [Mr. Harris] was concerned about Kristi." Tr. IV 917. He did not get the impression Mr. Harris was saying "I'm sorry because I did this to you." Tr. IV 917.

After being informed he could not ride with Ms. Ferguson in the ambulance, Mr. Harris walked to Melvin Bannister's house. Tr. IV 751. Mr. Bannister testified Mr. Harris knocked on the door and asked to use his phone. Tr. IV 751. He testified Mr. Harris said he and Ms. Ferguson had had a fight. Tr. IV 751. Mr. Bannister testified "it's been a long time – but he said their house caught on fire by some candles . . . . And she got caught on fire and he needed to find out where they were life flightin' her to." Tr. IV 751. After making calls and figuring out where she was taken, Mr. Harris "tried to find a way to get to her."[14] Tr. IV 751-52. Mr. Bannister did not remember Mr. Harris asking him to take Mr. Harris to Ms. Ferguson, but noted that his conversation with Mr. Harris was "a long time ago." Tr. IV 754-55. Mr. Bannister testified he told Mr. Harris he and his fiancée would take Mr. Harris to Ms. Ferguson "if we could, . . . but . . . we couldn't; none of our vehicles would make it" and he did not have a driver's license. Tr. IV 752, 755. Mr. Bannister characterized Mr. Harris as "concerned."[15] Tr. IV 754.

---

[13]He testified he specifically heard her say "kerosene." Tr. IV 910.

[14]Fire trucks were blocking the Harrises' vehicles so they could not leave. Tr. 747, 1135-36.

[15]Mr. Harris left his shirt at Mr. Bannister's; it was "ripped or something," so Mr. Bannister

(continued...)

7

On February 19, at approximately 4:00 a.m., Mr. Harris contacted the Talihina Police Department and asked to speak to Officer Justin Klitzke. Tr. IV 729-30. Mr. Harris told Officer Klitzke where he was and that Officer Klitzke could pick him up there and they could talk. Tr. IV 730. Officer Klitzke picked Mr. Harris up and transported him to the police department. Tr. IV 730-31. Officer Klitzke observed a burn on the top of Mr. Harris's hand.[16] Tr. IV 730. Mr. Harris agreed to speak to Officer Klitzke. Tr. IV 731. Officer Klitzke spoke to Mr. Harris for five to ten minutes, "ask[ing] him . . . somewhere along the lines of what have you been up to tonight and stuff like that" but then "he was informed that the fire marshal would be right there" and so he stopped questioning him.[17] Tr. IV 731.

Office of the State Fire Marshal ("OSFM") Agent Tony Rust arrived and obtained a hand-written statement[18] and diagram of the house from Mr. Harris. Tr. IV 731, 763-64; State's Exs. 7, 8. In his statement to Agent Rust, Mr. Harris described going to Whitesboro with Ms. Ferguson and Shaun, picking up a man in Whitesboro, and then going with the man and Ms. Ferguson to the Alley Bar. State's Ex. 7 at 1-2. He explained he drove the man back to Whitesboro and then he and Ms. Ferguson "took the long way home around toward Honobi which was anoter 30 min we cruzed and

---

[15](...continued)
had given him another shirt. Tr. IV 753. Mr. Bannister washed Mr. Harris's shirt and gave it to Investigator Saulsberry. Tr. IV 753-54.

[16]DA Investigator Saulsberry testified Mr. Harris's only burn was on top of his left hand Tr. V 1102. DA Investigator Thompson also testified he observed an injury "on the top left portion of Mr. Harris's hand." Tr. V 944. Mr. Harris's hair, beard, and the hair on the left side of his arm were singed. Tr. V 955.

[17]This interview was not recorded. Officer Klitzke testified there is no video or audio equipment at the Talihina Police Department to record interviews. Tr. IV 743-44.

[18]Like Mr. Harris's interview with Officer Klitzke, Mr. Harris's interview with Agent Rust was not recorded. Tr. III 661-62.

talked even ran out of gas and I brough my brothers four wheeler gas just in case [sic][.]" State's Ex. 7 at 2. When they returned to town, Ms. Ferguson asked if she could stay with him. State's Ex. 7 at 2. When they got home, they "stood in the yard for a while talking." State's Ex. 7 at 2. His dad was asleep in the chair and his "brother and his girl and kid was in theire room [sic]." State's Ex. 7 at 2. He explained:

> [A]s soon as I went in to my bed room I started to pick up the room Kristi told me not to worry And she was tired and in an instant there was a fire I noticed a small fire and then jumped to a blaze it was on her clothes happend so fast I grabed a blanket and tried to smother it the blanket did not help I think it melted or cought fire she was on the floor I rolled her and hit the fire with shirts or what I thought would work finley I pulled her clothes off that helped the most I know that thats whout you probly should do but I did not think that at the time . . . . [sic]

State's Ex. 7 at 2-3. He explained Ms. Ferguson went into the living room while he woke everyone up and they threw water on the fire. State's Ex. 7 at 3. He and Ms. Ferguson went to their neighbors'. State's Ex. 7 at 3. He "did not know how to help her her skin was peeled [sic] [.]" State's Ex. 7 at 3. After the ambulance came, he went to his

> buddy Melvin to get a ride to the hospitle the hospitle said she was not coming there and I would have to wait I find out where she was going after calling and calling I found a hospital in Oklahoma City that said she was there my friend Melvin is older so he said he would have to take me in the morning if he thought he could make it then I called the police . . . . [sic]

State's Ex. 7 at 3-4. Agent Rust testified he read Mr. Harris's statement and then repeatedly said, "You're not telling me the truth," to which Mr. Harris replied, "I didn't splash gasoline on her and set her on fire." Tr. IV 765. Agent Rust "asked him where did the gas come from, and he told me he had a half gallon Crown Royal bottle full of gas in his bedroom." Tr. IV 794-95. Agent Rust arrested Mr. Harris "because of the circumstances, the [gasoline] odor on him, and . . . what I'd been told." Tr. IV 765-66. Agent Rust collected a cigarette lighter from Mr. Harris's jeans pocket. Tr. IV

9

766; State's Ex. 9. Officer Klitzke transported Mr. Harris to the hospital because the jail could not treat his wounds. Tr. IV 747-48.

On February 24, 2012, LeFlore County District Attorney Investigator Travis Saulsberry[19] interviewed Mr. Harris.[20] Mr. Harris continued to deny intentionally lighting a fire in his bedroom. Mr. Harris repeated many details from his written statement and provided additional details when asked. Investigator Saulsberry testified, "[A]fter he says there's a flame, he said it was a stupid thing, but for the last two, three, four weeks, he'd had a Crown Royal bottle with gasoline in his bedroom."[21] Tr. V 1097. He said it was on a table just inside his bedroom door with the cap on. Tr. V 1097. He did not know if Ms. Ferguson kicked the bottle over. Tr. 1097. When discussing the cause of the fire with Investigator Saulsberry, Mr. Harris offered the possibilities that candles[22] or his space heater could have started the fire.[23] Tr. V 1097, 1107. Upon further questioning, he also

---

[19]Investigator Saulsberry had known "all of" the Ferguson family, including Ms. Ferguson, for ten to twelve years and was friends with her mother and stepfather. Tr. V 1123.

[20]Investigator Saulsberry recorded the interview. The recording was not introduced during the trial, but the recorded interview was included in the record as Court's Exhibit 1.

[21]Although Investigator Saulsberry did not provide this detail, Mr. Harris explained in his interview that he had the bottle in his room because he was burning trash. Court's Ex. 1 at 16:20. He told Investigator Saulsberry that Officer Klitzke had been called on him burning trash and told him to put the fire out. Mr. Harris brought the gas inside and it had been there since. Court's Ex. 1 at 16:30. Consistent with this explanation, Officer Klitzke testified that sometime before the night of the fire, he had found Mr. Harris burning trash behind his house. Tr. IV 735. Officer Klitzke testified he told Mr. Harris he "didn't need to be burning trash outside city limits," and Mr. Harris stopped. Tr. IV 736. Officer Klitzke believed he had "a spray can of some sort in his hand" but did not recall what it was. Tr. IV 736.

[22]Ms. Brown testified Ms. Ferguson loved candles. Ms. Brown did not like the fact that they had so many in their room around Mr. Harris's baby. Tr. 1156-57.

[23]The insurance investigator discovered a power strip and space heater in the room. Tr. IV 821-22, 830, 835; Defense Ex. 4I.

10

suggested Ms. Ferguson threw the bottle. Tr. V 1110. Investigator Saulsberry testified that he asked, "[W]hat if we find gasoline on your shirt?" and Mr. Harris "brings up it must've been from the car earlier. He said they'd run out of gas, which had never previously been mentioned in any of the statements."[24] Tr. V 1109. When asked if he knew Ms. Ferguson and Shaun were having "a fling," Mr. Harris said it had been going on for a couple weeks and he had a feeling about it; he was more upset with his brother than with Ms. Ferguson. Tr. V 1100, 1138. Investigator Saulsberry testified he told Mr. Harris, "I'll bet it's killing you being here in this time and not having a cigarette." Tr. V 1109. Mr. Harris told him he did not smoke and had a lighter because he bought himself and Ms. Ferguson matching lighters.[25] Tr. V 1109-10; Tr. VI 1136.

Agent Rust testified about his fire investigation. Agent Rust prepared his written origin and cause report on February 20, 2012, four days before conducting his on-site investigation on February 24, 2012. Tr. IV 799. Agent Rust discovered a portion of a broken bottle and a Crown Royal label in Mr. Harris's bedroom. Tr. IV 783, 815. State's Exs. 24-27. Agent Rust testified he was not aware there was a "burnt up power strip" or a space heater in Mr. Harris's bedroom until the trial. Tr. IV 821, 822, 835; Defense Ex. 4I. However, Agent Rust believed "the only viable cause of the burns that Kristi Ferguson sustained was as a result of having . . . gas poured upon her and then ignited by open flame." Tr. IV 805.

---

[24]As described above, Mr. Harris specifically included this in his written statement to Agent Rust. State's Ex. 7 at 2.

[25]Investigator Saulsberry testified Ms. Ferguson's lighter was not recovered; however, he admitted that if it was with her, it would have burned up in the fire, and Ms. Turner's home, where Ms. Ferguson had been staying, was never searched. Tr. VI 1136.

Dr. Mason Jett, who treated Ms. Ferguson at the Burn Center at Integris Baptist Hospital in Oklahoma City, testified her lungs were injured and she was not able to talk after she reached the burn center. Tr. V 1051-52. Dr. Eric Pfeifer of the Oklahoma Medical Examiner's Office listed Ms. Ferguson's cause of death as "[p]neumonitis and pneumonia secondary to multiple burns." Tr. V 1066. Dr. Pfeifer agreed that Ms. Ferguson's burns were "consistent with being doused with a flammable liquid that was then lit on fire," but that they would also be "consistent with falling into an accelerant that then suddenly catches fire" and "lots of other circumstances that a person could find themselves with accelerant on them, and a spark or fire and they go up." Tr. V 1067-68.

Mr. Harris planned to present testimony from Certified Fire Investigator ("CFI") David Smith, who lives in Arizona, to discredit Agent Rust's conclusions and credibility, and to provide other plausible explanations for the cause of the fire. Court's Ex. 2, appended hereto as Att. 3. However, the weekend before trial, CFI Smith suffered a medical emergency and was unable to testify. O.R. II 259-62. Mr. Harris repeatedly requested a mistrial or continuance to allow time for CFI Smith to recover or to hire a similarly qualified expert, but the judge denied the requests. Tr. VI 1280-81.

In second stage, the State presented testimony from Drs. Pfeifer and Jett regarding Ms. Ferguson's injuries and pain. Tr. VII 1403-14. Mr. Harris presented multiple lay witnesses, through whom the jury heard Mr. Harris's mother, Linda Harris, died of an aneurysm in 2011, and that her sudden death was hard on the family emotionally and financially. Tr. VII 1432-33, 1439, 1441, 1445-46, 1478-79. These witnesses also testified that Mr. Harris's life has value for various reasons – including that he had found God, had a young daughter, and was a good, helpful, and kind person – and that they did not want him to receive a death sentence. Tr. VII 1434-37, 1442-43, 1447-49,

12

1453-54, 1469-70, 1473, 1475, 1479-81, 1483, 1485-87. Mr. Harris also presented two experts: a social worker to testify about his life history and a psychologist to testify about his IQ. The jury did not hear evidence that Mr. Harris has a Fetal Alcohol Spectrum Disorder.

Additional facts will be presented as they relate to Mr. Harris's claims.

## SUMMARY OF THE ARGUMENT

Trial counsel's strategy was to undermine the State's theory that Mr. Harris intentionally started a fire. However, Mr. Harris was repeatedly prevented from effectively undermining this theory throughout his state court proceedings. Mr. Harris's fire expert suffered a medical emergency that rendered him unable to testify at trial, and the judge declined to grant a mistrial or continuance. As a result, that expert was unable to examine the cigarette lighter Mr. Harris had when he was arrested, which was alleged to be the ignition source for the fire. By the direct appeal, the State had lost the bulk of the evidence, including the lighter, rendering it unavailable for the defense expert to evaluate. Now that the lighter is available, expert examination has determined it did not start an ignitable liquid fire. Unable to present his own fire expert witness at trial, Mr. Harris was also prohibited from effectively cross-examining the State's fire marshal (who is under investigation for perjury in relation to testimony he gave at a post-trial hearing in this case regarding the missing evidence), due to the State's withholding of *Brady* material and the State's failure to correct the fire marshal's false testimony. Defense counsel also failed to properly utilize available evidence in cross-examination of key witnesses. Counsel failed to investigate and present additional available evidence Ms. Ferguson's and Mr. Harris's burns were inconsistent with the State's theory that he doused her in gasoline and set her on fire. After Mr. Harris was, predictably, convicted following

13

these errors, defense counsel failed to present evidence that Mr. Harris has a Fetal Alcohol Spectrum

Disorder to convince the jury to spare his life.

## GROUND ONE

**THE TRIAL COURT'S REFUSAL TO PERMIT MR. HARRIS THE OPPORTUNITY TO PRESENT EXPERT TESTIMONY CRITICAL TO HIS DEFENSE VIOLATED HIS RIGHTS TO DUE PROCESS OF LAW, TO A FAIR TRIAL AND RELIABLE SENTENCING PROCEEDING, TO COMPULSORY PROCESS, TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND TO TESTIFY ON HIS OWN BEHALF.[26]**

Defense counsel's "strategy to defend Mr. Harris against the State's charges at trial centered

around discrediting Agent Rust's conclusions and credibility through the testimony of C.F.I. Smith.

C.F.I. Smith's testimony was, in essence, Mr. Harris's entire defense." Notice of Extra-Record

Evidence Supporting Propositions II, III, IV and XIV of Brief of Appellant and/or Alternatively

Application for Evidentiary Hearing on Sixth Amendment Claims ("App. for Evid. Hrg."), *Harris*

*v. State*, No. D-2014-153 (Okla. Crim. App. Mar. 30, 2017), Att. 2 at ¶ 5. *See* O.R. II 259 ("The

defense retained David Smith, a fire and arson expert who, through his investigation, will dispute

the investigation conducted by Rust concerning the source of the fire and whether Mr. Harris

intentionally set the fire."); Tr. IV 820 (defense counsel telling Agent Rust on the stand, "You do

not admit that you did a poor investigation. I'm trying to to [sic] show this jury that you did a poor

investigation."). Despite that, when a medical emergency rendered Certified Fire Investigator

---

[26]Mr. Harris raised this claim as Proposition II on pages 12-24 of his direct-appeal brief and on pages 3-7 of his application for evidentiary hearing. However, with this petition, he presents a new report from CFI Smith to support the claim, which he has not yet presented in state court. Should this Court find this "new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, [it] must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild v. Workman*, 579 F.3d 1134, 1149 (10th Cir. 2009).

("CFI") David Smith unavailable to testify in Mr. Harris's defense, the court allowed the trial to proceed without his testimony.

## A.     Legal Argument.

The trial court's refusal to permit Mr. Harris the opportunity to present CFI Smith's testimony violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, to a fair trial and reliable sentencing proceeding, to compulsory process, to the effective assistance of counsel, and to testify on his own behalf.

An accused has constitutional due process rights to a fair trial and reliable sentencing hearing, which include the rights to present a defense and to the effective assistance of counsel. U.S. Const. Amends. V, VI, VIII, and XIV. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi* [410 U.S. 284 (1973)] or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 23 . . . (1967); *Davis v. Alaska*, 415 U.S. 308 . . . (1974), the Constitution guarantees criminal defendants "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984)).

In *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (citing *Chambers*, 410 U.S. at 302), the Court found, "Few rights are more fundamental than that of an accused to present witnesses in his own defense . . . . Indeed, this right is an essential attribute of the adversary system itself." The Court explained:

> "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or

15

> speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or the defense."

*Id.* at 408-09 (*quoting United States v. Nixon*, 418 U.S. 683 (1974)). "The right to offer testimony is thus grounded in the Sixth Amendment . . . ." *Id.* at 409.

In *Washington v. Texas*, 388 U.S. 14, 18-19 (1967), the Court held "the right of an accused to have compulsory process for obtaining witnesses in his favor, guaranteed in federal trials by the Sixth Amendment, is so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment." The Court found:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. The right is a fundamental element of due process of law.

*Id.* at 19. *See also United States v. Serrano*, 406 F.3d 1208, 1214-15 (10th Cir. 2005).

"Of course, the right to present relevant testimony is not without limitation." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987). "The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' But restrictions . . . may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55-56 (quoting *Chambers*, 410 U.S. at 295). *See United States v. Scheffer*, 523 U.S. 303, 308 (1998). Further, a defendant "must at least make some plausible showing of how [a witness's] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

16

In addition to providing the right to compulsory process, the Sixth Amendment also provides

a right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under

*Strickland*, the "[g]overnment violates the right to effective assistance when it interferes in certain

ways with the ability of counsel to make independent decisions about how to conduct the defense."

*Id.* at 686 (collecting cases). The Court has held:

> The right to the assistance of counsel has been understood to mean that there can be
> no restrictions upon the function of counsel in defending a criminal prosecution in
> accord with the traditions of the adversary factfinding process that has been
> constitutionalized in the Sixth and Fourteenth Amendments. For example, in
> *Ferguson v. Georgia*, 365 U.S. 570 . . . [(1961)], the Court held constitutionally
> invalid a state statute that, while permitting the defendant to make an unsworn
> statement to the court and jury, prevented defense counsel from eliciting the
> defendant's testimony through direct examination. Similarly, in *Brooks. v.
> Tennessee*, 406 U.S. 605 . . . [(1972)], the Court found unconstitutional a state law
> that restricted the right of counsel to decide 'whether, and when in the course of
> presenting his defense, the accused should take the stand.' *Id.*[] at 613. The right to
> the assistance of counsel has thus been given a meaning that ensures to the defense
> in a criminal trial the opportunity to participate fully and fairly in the adversary
> factfinding process.

*Herring v. New York*, 422 U.S. 853, 857-58 (1975) (finding New York denied defendant Sixth

Amendment right to assistance of counsel where statute granted judges the power to deny closing

argument). *See also Geders v. United States*, 425 U.S. 80, 91 (1976) (finding trial court's order

preventing defendant from consulting counsel during overnight recess between his direct- and cross-

examination deprived petitioner of Sixth Amendment right to assistance of counsel). *See also United

States v. Cronic*, 466 U.S. 648, 658-59 & n.24 (1984) (no showing of prejudice required where state

interference prevents counsel from performing effectively). In *Hinton v. Alabama*, 571 U.S. 263, 274

(2014), the Supreme Court found counsel's performance deficient with respect to his failure to

obtain an adequate expert. In doing so, the Court recognized the frequency of wrongful convictions

based on "invalid forensic testimony" and that "this threat is minimized when the defense retains

a competent expert to counter the testimony of the prosecution's expert witnesses." *Id.* at 276.

Regarding requests for continuances, the Supreme Court has held:

The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process . . . . Contrawise, a myopic insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defend with counsel an empty formality. [Citation omitted.] There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 376 U.S. 585, 589 (1964). *See also Morris v. Slappy*, 461 U.S. 1, 12 (1983)

(quoting *Ungar*, 376 U.S. at 589) ("[O]nly an unreasoning and arbitrary 'insistence upon

expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of

counsel.").

The "Compulsory Process Clause of the Sixth Amendment, which grants a defendant the

right to call 'witnesses in his favor,' a right that is guaranteed in the criminal courts of the States by

the Fourteenth Amendment," also includes a defendant's right to testify. *Rock*, 483 U.S. 44, 52

(1987) (quoting *Washington*, 388 U.S. at 17-19). "In fact, the most important witness for the defense

in many criminal cases is the defendant himself." *Id.*

**B.    A Medical Emergency Rendered CFI Smith Unable to Testify, but the Trial Proceeded.**

In his pretrial witness and exhibit list, Mr. Harris listed CFI Smith as a witness and his

written report as an exhibit.[27] In his report, CFI Smith cast doubt upon the credibility of the State's

---

[27]Although the record indicates this pleading was never filed in the district court, trial counsel provided this witness and exhibit list to the State on November 14, 2013. App. for Evid. Hrg., Att. 2 (appended as Att. 4) at ¶ 6. The State received CFI Smith's report on September 3, 2013.

(continued...)

theory that Mr. Harris poured gasoline from a Crown Royal bottle on Ms. Ferguson and lit her on

fire with the cigarette lighter taken from his jeans pocket when he was arrested. The jury never heard

CFI Smith's critical testimony.[28]

On Monday, December 9, 2013 – the first day of jury selection – trial counsel received a

phone message from CFI Smith's office. O.R. II 259; Att. 4 at ¶ 7. Upon contacting CFI Smith, trial

counsel learned the following:

> [O]ver the weekend [prior to jury selection] Mr. Smith [who lives in Arizona]
> developed a major internal injury, which was ultimately diagnosed as deep vein
> thrombosis in one of his legs. He is now under a doctor's care, taking medication to
> dissolve the blood clot (heparin) and cumiden [sic] - a blood thinner - to prevent
> more blood clots, and OxyContin for pain management. Further his doctor has
> eliminated any type of travel, indefinitely, as such travel is likely fatal, in his
> condition.

O.R. II 259. On December 10, 2013, the second day of voir dire, counsel informed the court and the

State of these circumstances. O.R. II 260; Tr. II 500-01. On December 11, 2013, the third day of voir

dire, counsel informed the court they had spoken to CFI Smith and his secretary, and that his

secretary would be faxing a letter from his doctor to trial counsel. Tr. III 663. Counsel then

explained they could not present Mr. Harris's defense without CFI Smith's being present to testify.

Tr. III 664. When counsel informed the court they could not provide effective assistance of counsel

without CFI Smith's presence and suggested the possibility of the case being overturned if Mr.

---

[27](...continued)
9/4/13 Tr. 39-40; O.R. I 173; Att. 4, Ex. 1 at 4. On direct appeal, the State acknowledged "it does
appear the State, as well as the trial court, were aware that the defendant wished to call CFI Smith
to testify as an expert witness in this case." Brief of Appellee at 21 n.24, *Harris v. State*, No. D-
2014-153 (Okla. Crim. App. July 25, 2017) ("Brief of Appellee") (citing 8/29/13 Tr. 21; 9/4/13 Tr.
39-40). CFI Smith's pretrial report and CV are Court's Exhibits 2 and 3.

[28]The jury also did not have access to his report, admitted as Court's Exhibit 2.

Harris was forced to trial without CFI Smith's testimony, the trial court responded, "That's not the court's concern." Tr. III 664. Counsel announced their intention to file a written motion for mistrial. Tr. III 665.

On December 12, 2013 – the day the State began presenting its case – trial counsel filed a motion for mistrial (with a note from CFI Smith's doctor attached) and requested a ruling prior to the presentation of any State's evidence. O.R. II 259-62; Tr. IV 710. Counsel argued that any ruling preventing Mr. Harris from offering the in-person testimony of CFI Smith or another similarly qualified expert on arson and fire causation to "dispute the investigation conducted by Rust concerning the source of the fire and whether Mr. Harris intentionally set the fire" would violate Mr. Harris's constitutional rights to due process, a fair trial, compulsory process, and effective assistance of counsel. O.R. II 259-61. Judge Sullivan explained he had "perused it [the mistrial motion] really briefly" and had "not had time to study it" so would "reserve [his] ruling on that until a later time." Tr. IV 711. Despite trial counsel's announcement that the defense was "unable to announce ready [for trial] in that case," the trial began as scheduled. Tr. IV 711. Counsel reurged Mr. Harris's motion for mistrial at the conclusion of Agent Rust's testimony, explaining "Agent Rust's testimony is, essentially, the reason we need our own . . . physical expert to testify." Tr. IV 838. Counsel again reurged the motion after paramedic Lickly testified. Tr. IV 919-20. Judge Sullivan announced he had not "got to spend much time with [the mistrial motion] yet, but [he would] try to do so over the evening" and would hear the motion "maybe in the morning." Tr. IV 920.

The next day, Friday, December 13, 2013, trial counsel expanded on the arguments presented in their written motion. Tr. V 921-35. Judge Sullivan said, "I don't know the doctor," and asked if defense counsel did. Tr. V 931. When counsel said they did not, the judge asked, "So we don't know

20

whether . . . this [the doctor's note] is feigned or not?" Tr. V 931. The judge said, "We don't know whether Mr. Smith has a DVT or doesn't have a DVT . . . ." Tr. V 931. He stated, "I've been told by many folks in this courtroom, for twenty-five dollars they can get a one-liner written by doctors that say they can or can't do all kind of things." Tr. V 932. Judge Sullivan said, "I don't think there's any way that we can know today whether he can be here Monday or not," Tr. V 934, to which counsel responded, "That's the dilemma." Tr. V 934. Judge Sullivan opined, "Because the clot can very well dissolve. They typically dissolve in a matter of days. . . . [E]verybody's different." Tr. V 934. Judge Sullivan ruled, "I'm not going to find from this information that this witness is unavailable" and informed counsel that they could reurge the request upon providing additional medical records confirming CFI Smith's medical condition. Tr. V 934-35. The court did not ask the State for its position, and the State did not offer it. Tr. V 921-35. Trial counsel reurged their request for mistrial again after State's witness nurse Rhonda Norman's testimony and just prior to State's witness Dr. Mason Jett's testimony. Tr. V 1042-43. Again, the State was not asked and did not offer a position, and Judge Sullivan denied the motion. Tr. V 1042-43.

On the next day of trial, Monday, December 16, 2013, trial counsel reurged the motion for mistrial with additional evidence. Tr. V 1078-79. Counsel provided CFI Smith's medical records (approximately forty pages) and a sworn affidavit from CFI Smith confirming he had been hospitalized for deep vein thrombosis, was on a number of medications including a strong narcotic pain reliever, and had medical orders not to travel.[29] Tr. V 1078-79; O.R. II 264-310. Rather than

---

[29]Counsel filed these documents as supplemental evidence in support of Mr. Harris's motion for mistrial. Tr. VI 1143-44; O.R. II 264-310.

addressing this additional evidence and issuing a ruling on Mr. Harris's motion, Judge Sullivan permitted the State to finish its case.

After the State rested its case, counsel again reurged Mr. Harris's motion for mistrial and requested to make CFI Smith's written report part of the record as an offer of proof. Tr. VI 1143-1151; Court's Exs. 2-3. Judge Sullivan explained, "I haven't had the benefit of getting to look at the records yet, but I assume they verify the existence of the clot or the deep vein thrombosis?" Tr. VI 1148. Defense counsel responded, "They do verify it," and informed the court that CFI Smith was "scheduled to go back to the doctor for more tests or to see what progress has been on the 18th. . . . [H]owever, there's good [sic] chance we'll be done by then." Tr. VI 1148. The court explained:

> I think in all actuality, this is the fourth trial setting for this case and the court's continued it three additional times for the defendant. And the court – I mean, if you could tell me he could be here tomorrow or even if he could be here Wednesday, I certainly don't mind a short amount of time. The problem that we run into if we get any later than Wednesday is if we're going to have a difficult time getting it done before the end of the year.

Tr. VI 1149-50. The judge explained, "I'm going to review the records before I make a formal ruling on the motion." Tr. VI 1150.

After presenting the four defense witnesses, counsel again requested a mistrial. Tr. VII 1277-80. Again, the State offered no position. In reiterating the reasons CFI Smith was critical to Mr. Harris's defense, counsel argued CFI Smith's absence violated Mr. Harris's constitutional right to testify on his own behalf. Tr. VII 1277-78. Counsel argued:

> [T]he defendant . . . feels like he cannot testify and cannot take the stand because now, since we've been deprived of that expert, none of what he says can be corroborated to satisfaction. So, essentially, his thought is the jury won't believe him and rightfully so because they don't have any fire expert who can explain what he observed, what he wrote on his statement, and what the other witnesses have observed.

22

Tr. VII 1278. After noting that he "ha[d] done a cursory review of the records" and CFI Smith's affidavit stated his doctor had instructed him not to travel during December and "so even a short reasonable continuance of the case wouldn't solve our problem," Judge Sullivan denied Mr. Harris's mistrial motion without further explanation. Tr. VII 1279-80. After the jury found Mr. Harris guilty, trial counsel again reurged their motion for mistrial and requested the bill of particulars to be stricken. Tr. VIII 1387-88. Judge Sullivan denied these requests without further discussion or opinion from the State.[30] Tr. VIII 1389.

**C.      CFI Smith Would Have Provided Favorable and Material Testimony.**

**1.      The Testimony CFI Smith Could Have Provided, Which Was Presented to OCCA.**

In his pretrial report, CFI Smith offered the following opinions "to a reasonable degree of scientific certainty": 1) "The public authorities' investigation failed to follow recognized practices

---

[30]In an affidavit obtained on direct appeal, lead trial counsel Peter Astor described off-the-record conversations between himself, his co-counsel, LeFlore County Assistant District Attorney ("ADA") Margaret Nicholson, and Judge Sullivan. Att. 4 at ¶¶ 8, 10. Mr. Astor explained:

At some point, not long after we found out about C.F.I. Smith's condition, someone raised the possibility of C.F.I. Smith testifying remotely. However, there was never any serious discussion regarding this topic. The conversation did not even progress to the point where we talked about whether LeFlore County had the facilities to make this type of testimony possible. . . . It is my recollection that ADA Nicholson ultimately stated that she was not in favor of any type of remote testimony. Because remote testimony was never really a viable option, we did not discuss the issue on the record, and it did not factor into Judge Sullivan's rulings on the subject.

*Id.* at ¶ 8. Mr. Astor explained that in another off-the-record conversation, he "suggested the possibility of continuing Mr. Harris's case until January and having the jurors we had already death qualified to return as an alterative to having to begin jury selection over again from scratch." *Id.* Mr. Astor recalled that "ADA Nicholson did not object or see any legal impediment to this option. However, ultimately, Judge Sullivan did not accept this as a possible solution to the problem." *Id.*

and methodologies resulting in opinions that are scientifically flawed."; 2) "The identity of a competent ignition source and an ignition scenario has not been established."; and 3) "Alternate hypothesis' [sic] have not been formulated or tested as required during a scientific based fire analysis." Att. 3 at 4-5. CFI Smith explained:

- The methodology utilized by a trained investigator . . . as outlined in [the National Fire Protection Association (NFPA) Document 921, *A Guide for Fire and Explosion Investigation*] and mandated by federal and many state courts, is the scientific method of fire investigation. . . .

- The fact that a fire investigation was completed (with an arrest) absent a scene diagram, valid process of elimination, identification of first fuel ignited, identification of the competent ignition source, specific location of the fire and most important, a fire cause, falls below the standard of care utilized by professional fire investigators as outlined in NFPA 921. . . .

- The fact that a suspected arson had occurred involving a quantity of gasoline (ignitable liquid) allegedly being thrown by a suspect and the suspect's clothing not being properly preserved for laboratory analysis, likewise falls below the standard of care. . . . It is scientifically impossible for the suspect to distribute an ignitable liquid, without the liquid being absorbed by clothing and therefore being detectible. The clothing (improperly packaged) was examined approximately three months after being submitted. The "suspect" bottle, retrieved a week after the incident, was submitted for analysis at a later time. The fact that the clothing was improperly packaged (non-air-tight) allows for the possibility of cross contamination between that clothing and the gasoline container after collection and prior to analysis. . . . [31]

- [A] small amount of gasoline produces a large volume of combustible vapor. If gasoline is distributed at one location, vapors from that gasoline may be easily ignited a distance away. . . . The energy required to ignite gasoline

---

[31]Agent Rust submitted six items to the Oklahoma State Bureau of Investigation for testing: 1) socks, 2) jeans, 3) shoes, 4) T-shirt, 5) underwear (all worn by Mr. Harris when he was arrested) and 6) broken glass from Crown Royal bottle and fire debris. Tr. IV 783-85, 786-87; Tr. V 993. For the socks, T-shirt, and underwear, "[n]o ignitable liquids were detected." Tr. V 993. The jeans and shoes "had a chemical profile associated with gasoline, however, not all chemical components required for the identification of gasoline were identified. Therefore, these samples are considered inconclusive for the presence of gasoline." Tr. V 993-94. Regarding the broken glass and fire debris, the report stated, "Sample contains an ignitable liquid in the gasoline class." Tr. V 994.

vapor is minimal (.24 millijoule) and therefore almost all potential sources of ignition present within the vapor plume are competent. The ignition device in this matter (competent ignition source) is opined to be a cigarette lighter present in the defendant's pocket at the time of his arrest. No data is present to indicate empirical testing of that theory, i.e., examination for soot particles, etc. Likewise, cognitive testing to identify alternate sources of ignition energy and to scientifically eliminate those other potential sources has not been accomplished. As an example, data is present indicating that extension power cords servicing appliances were present on the floor of the bedroom. No data is present eliminating the ignition of gasoline vapor by a parting arc as a result of two cords separating or as a result of a lamp being "turned off". The only ignition scenario formulated, involves the intentional throwing of gasoline on the victim, followed by ignition of those vapors by a hand held cigarette lighter (notwithstanding the fact that the senior Harris saw Ms. Ferguson run from the burning room in an unburned state and obtain water before returning to the room). Analysis discloses a complete lack of a scientific basis for that scenario. In fact scientific data is present to contradict that theory. Reports, photographs and testimony indicates that thermal injuries were present to the left side of Donnie Harris. . . . Those injuries are diametrically opposite of those expected from a right hand dominant person such as Donnie Harris and consistent with his claim of "putting the fire out" on her body. . . .

• [T]he origin of a fire must be established before a cause can be opined. In this matter, an origin was established without Agent Rust locating the origin (didn't enter the bedroom) and a cause was assigned without the knowledge of the potential ignition sources present. An arrest was affected based on the lack of evidence, with a Search Warrant days later being issued to find evidence that fit with the original "theory". These practices fall below the standard of care governing professional fire investigations.

*Id.* at 2-6.

Direct-appeal counsel also retained CFI Smith. CFI Smith issued another report stating that after reading trial testimony, "it is my opinion that the fact a qualified fire investigator was not present to assist Mr. Harris at his trial has resulted in a conviction based on expert testimony that utilized 'junk science' as its basis." App. for Evid. Hrg., Att. 1 (appended hereto as Att. 5), Ex. 2 at 9. CFI Smith noted that Agent Rust testified "[h]is total fire investigation education and training amounted to one 80 hour course, provided by the 'International Fire Safety Training Association

25

(sic).'" *Id.* at 10 ("(sic)" in original). CFI Smith explained that while the International Fire Service Training Association (housed at Oklahoma State University) was involved with the publication of "fire service training manuals worldwide" it does not "provide or conduct training programs." *Id.* CFI Smith noted several "flaws" in Agent Rust's testimony, *id.* at 9, including but not limited to the following: 1) reliance on the "scientifically debunked" "myth of 'alligator char,'" *id.* at 10; 2) improper application of the "Heat Release Rate (HRR)," *id.* at 10-11; 3) failure to identify, examine, and eliminate all other viable ignition sources at the scene before concluding the cigarette lighter was the ignition source, when "[n]umerous ignition sources were present within the room to include electrically powered appliances (heater, power strip,[32] etc.)", *id.* at 11; 4) incorrect size of bottle alleged to contain gasoline,[33] *id.*; 5) preparation of origin and cause report four days before examining the scene and after the fire department had responded to two or three additional fires

---

[32]CFI Smith explained, "Rust admitted that the power strip and heater (located by the insurance fire investigator after Rust left) were never observed by him." Att. 5, Ex. 2 at 11.

[33]CFI Smith explained:

Rust testified that a half gallon of gasoline was used in setting the fire. No data is present to justify that testimony. Testimony centered on a Crown Royal bottle, in which volume isn't measured in Imperial Units. If the bottle had been a 1.75 liter bottle and filled to capacity, its volume was less (.4623 gallon) than testified to.

Att. 5, Ex. 2 at 11.

caused by "hotspots,"[34] *id.* at 11-12; and 5) inadequate and improper documentation, collection, and retention of evidence. *Id.* at 14-17.

CFI Smith also opined that Investigator Saulsberry's testimony regarding the fire was scientifically flawed and inaccurate:

> Saulsberry testified that ". . . when you look at Kristi, you don't have to have a lot of experience to see that there was an accelerant used". He indicated that the basis for his opinion was that ". . . I blew myself up with gasoline". The circumstances of his "accident" (as testified to) indicated a flash fire with radiant heat burns. That scenario cannot be compared to the theory of gasoline being "poured" on Kristi and then ignited. (Volume V, Page 1131).
>
> Saulsberry testified that Kristi is quoted as telling an attending Emergency Medical Technician (EMT) that kerosene was thrown on her. Although it was established that those properties are different than gasoline, the significance of those differences were not brought to the attention of the jury. A qualified fire investigator would testify that if the ambient temperature was below 100ºF, kerosene would not be ignited by the quick application of an open flame (cigarette lighter). (Volume IV, Page 1133).

*Id.* at 12.

---

[34]CFI Smith explained:

Rust testified that he prepared his origin and cause report 4 days prior to examining the scene. (Volume IV, Page 799). That fact when viewed juxtaposed to the Talihina Assistant Fire Chief's testimony that the fire department had to respond 2 or 3 more times the day after the fire to extinguish or put out "hotspots" (Volume IV, page 719), indicates Rust didn't <u>ever</u> investigate the same fire that resulted in the arrest of Harris. Each fire "re-kindle" with resulting "hot spots" would provide unique fire patterns because of that activity, and those fire patterns cannot be "time–stamped". Therefore, Rust was observing and "investigating" 3 or 4 fires without an ability to decipher which fire patterns resulted from which fire. His resulting opinion is not only not scientific but ludicrous that he rendered an opinion that the "fire" was intentional, with that opinion encompassing 3 or 4 fires in which 2 or 3 are known to be accidental rekindle.

Att. 5, Ex. 2 at 12.

27

CFI Smith concluded "it remains my opinion that **the State's investigation failed to follow recognized practices and methodologies resulting in opinions that are scientifically invalid.**"

*Id.* at 18. He explained:

> This case and subsequent trial was decided upon Direct and Physical Evidence, when that Direct evidence supplied by Rust was unreliable and the Physical Evidence was lost/misplaced/destroyed. *Plainly stated, during my 45 years as a professional fire investigator, this is one of the most egregious examples of investigator incompetence and misconduct that I have ever witnessed.*

*Id.* (emphasis added).

### 2.      The Testimony CFI Smith Could Have Provided, Which Has Not Been Presented to OCCA.

Habeas counsel obtained a new affidavit from CFI Smith, appended hereto as Att. 6. This affidavit showed the following:

- Had CFI Smith been present at trial, he could have examined State's Exhibit 9, the lighter alleged to be the source of ignition for the fire. He has now examined the lighter under a microscope[35] and concluded "to a reasonable degree of scientific certainty that this lighter was not used to ignite an ignitable liquid fire," as

> NO soot was present on any lighter surface. Likewise, microscopic examination disclosed clean and intact lint present on the flame guard and striker wheel. Some soot deposit and a definite absence of unburned lint is expected if the device is used as an ignition source of an ignitable liquid (in this matter opined to be gasoline). Gasoline vapor must be present at the flame interface for ignition. The vapor cloud . . . will flash back to the source of the vapor. It will likewise produce a black soot that will stick to nearby surfaces due to the relative difference in temperature. It is not possible for the soot to dissipate over time. The immediate release of heat is easily sufficient to ignite available lint.

---

[35]CFI Smith examined the lighter with the same microscope he would have used on the lighter at trial or on appeal. CFI Smith explained, "The USB microscope plugs into my computer and then I can see the object of my examination on the computer screen, and I can take microscopic photographs or video recordings." Att. 6 at 2.

Att. 6 at 2-5.

- In urging a mistrial based on CFI Smith's absence, trial counsel explained CFI Smith could explain "what they observed . . . with regard to the spot of fire that Kevin had testified to." Tr. VII 1277. CFI Smith could have explained:

> a defined single spot or circle of fire is inconsistent with throwing or pouring and igniting gasoline. It is, however, consistent with an accidental fire (electrical, etc.) since accidental fires . . . start at one location. If gasoline had been thrown or poured as the State alleged, there likely would have been gasoline in multiple places . . . .

Att. 6 at 6-7.

- CFI Smith could have undermined the testimony of Bradley Rogers, OSBI criminalist, suggesting that there was gasoline present on Mr. Harris's jeans and shoes. Agent Rogers explained that Mr. Harris's jeans and shoes "had a chemical profile associated with gasoline, however, not all chemical components required for the identification of gasoline were identified. Therefore, these samples are considered inconclusive for the presence of gasoline." Tr. V 993-94. Regarding this inconclusive result, Mr. Rogers opined, "You would not expect to find patterns similar to what I found in clothing that has not been exposed to gasoline." Tr. V 996. *See also* Tr. V 1028. CFI Smith could have testified

> "inconclusive" does not even meet the threshold for "probable" used by the scientific community for testimony; instead, it means "possible." In fact, contrary to Mr. Rogers' testimony, the components he identified in the clothing are also present in many carpets, plastics, and even athletic shoe soles.

Att. 6 at 6.

- Trial counsel argued that "if our expert were allowed to be here, he could . . . explain actually what [the witnesses] observed and what they saw with regard to the power strip; with regard to the surges and electrical problems . . . ." Tr. VII 1277.

> Casey McKosky testified that if they "ran too many things it would throw the breakers." Tr. VI 1258. She explained "[i]t would usually happen if we ran, like, the air conditioner and the microwave or bigger appliances like that." Tr. VI 1259. She explained they would have "problems with [window air conditioner units]"; "[i]t shut the electric off and melt (sic) the adapters." Tr. VI1259. She testified that Mr. Harris "ran an extension cord out the door also to the one right outside in the living room" because "[t]hey wouldn't have enough plug-ins to plug in all their stuff." Tr. VI 1261-62.  Mr. Harris and

Ms. Ferguson had a lamp, TV, DVD player, VCR, and a heater plugged into a power strip. Tr. VI 1262. Ms. Brown testified that because the house did not have central heat and air, she gave Mr. Harris and Ms. Ferguson a space heater "and told them to be careful with it around [his daughter], and to also turn it off at night because the cord got warm and I was afraid something might happen while they were sleeping." Tr. VI 1169.

Att. 6 at 7. CFI Smith could have provided context for the electrical dangers in the house:

> [B]reakers or fuses . . . can be easily bypassed, resulting in abnormal heat and a subsequent fire. Circuits that are "overloaded" shut down due to the protection device (breaker or fuse) functioning as intended. That is a warning to those present that an electrical problem exists. . . . Microwaves, heaters, etc. are high amp draw appliances and if their use results in a circuit "shutdown", it demonstrates an obvious electrical overload situation. Popping sounds when these appliances are used also demonstrates an obvious electrical overload situation. A power strip may handle the amperage of a TV, DVD player, and VCR. However, the additional use of a high amp appliance, i.e., heater may easily result in overheating of the supply conductors and a fire. A typical interior household extension cord will overheat when used with too many appliances or with a high amp appliance. This is a result of "too much electricity through too small wires". This is a very common fire cause for that reason. Their use is particularly dangerous when run tight around corners, under doors, etc., or wrapped in a coil, which also results in resistance heating. Resistance heating is taking place if an electrical cord is noted to "be warm" to the touch. I would have testified that a melted adapter is indicative of a loose connection (fit) resulting in an electrical resistance heating and a potential fire.

*Id.* at 7-8.

• In reurging the motion after paramedic Lickly testified, defense counsel explained, "If we . . . were allowed to exercise our right to compulsory process and have our expert here, he would testify to – he would be able to explain the soot that was found in her mouth and the redness that was in her throat as something other than a person who had been intentionally set on fire." Tr. IV 919-20. CFI Smith could have testified that "the presence of soot and redness simply means exposure to hot fire gases while alive; it does not indicate what caused the fire or whether it was intentional, natural, or accidental.

Att. 6 at 6.

30

- CFI Smith could have testified that it was not proper for the glass bottle and the fire debris to have been combined for testing when collected.

*Id.* at 6. Had CFI Smith been permitted to testify, he could have provided this additional material and favorable evidence at the trial, which has not been presented in state court.

**D.    If This Court Finds the New Evidence Transforms the Claim into One the State Court Has Not Adjudicated on the Merits, § 2254(d) Does Not Preclude Relief.[36]**

This claim is subject to a § 2254(d) analysis only if this federal claim is the same claim as a claim "adjudicated on the merits" by Oklahoma courts. *See Pinholster*, 563 U.S. at 181; *id.* at 186 n.10 & 187 n.11. The Tenth Circuit has held:

> To be sure, not every new piece of evidence makes a claim a new one. *See, e.g., Gardner v. Galetka*, 568 F.3d 862, 881, 882 (10th Cir. 2009) (applying AEDPA deference to a state court determination on an ineffective assistance of counsel claim where new evidence submitted in federal court "would likely only have added color" to the claim presented in state court, and the difference between the new evidence and that presented in state court was "purely a matter of degree"). In *Hawkins v. Mullin*, 291 F.3d 658 (10th Cir. 2002), we noted that a habeas petitioner will be allowed to present "'bits of evidence'" to a federal court that were not presented to the state court that first considered his claim, without converting the claim into a new one. 291 F.3d at 670 (quoting *Demarest v. Price*, 130 F.3d 922, 932 (10th Cir. 1997)); *Jones v. Hess*, 681 F.2d 688, 694 (10th Cir. 1982) (quoting *Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972)). But at a certain point, when new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, we must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits.

*Fairchild*, 579 F.3d at 1148-49. If this Court finds that the new information from CFI Smith, described above, does more than "'add[] color' to the claim presented in state court" and instead "so changes [the] legal landscape that the state court's prior analysis no longer addresses the substance

---

[36] Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust this claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

of the petitioner's claim," this Court "must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Id.* (citations omitted).

The trial court's refusal to permit Mr. Harris the opportunity to present CFI Smith's testimony violated his rights to due process, to a fair trial and reliable sentencing proceeding, and to compulsory process. *See Chambers*, 410 U.S. at 284; *Washington*, 388 U.S. at 18-19, 23; *Crane*, 476 U.S. at 690; *Taylor*, 484 U.S. at 408-09. Mr. Harris's right to present the testimony of CFI Smith did not "bow to accommodate other legitimate interests in the criminal trial process.'" *Rock*, 483 U.S. at 55. Instead, the restriction was "arbitrary or disproportionate." *Id*. *See Scheffer*, 523 U.S. at 308. The restriction appears to have been based on the court's desire to complete the trial before the current jury term expired – that is, "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris*, 461 U.S. at 12 (quoting *Ungar*, 376 U.S. at 589); Tr. VI 1150.

Mr. Harris can make a "plausible showing of how [CFI Smith's] testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. Among his other critical testimony, CFI Smith could have examined the lighter alleged to have been the ignition source and testified it did not start an ignitable liquid fire. Att. 6 at 2-5. CFI Smith also could have undermined the testimony of OSBI Agent Brad Rogers. None of Mr. Harris's clothing tested positive for the presence of gasoline, but the State repeatedly highlighted Agent Rogers's testimony[37] that while Mr. Harris's jeans and shoes were inconclusive for the presence of gasoline, "[y]ou would not expect to find patterns similar to what I found in clothing that has not been

---

[37]The State argued in closing that Agent Rogers's "interests are being precise, mathematical and scientific." Tr. VI 1321.

exposed to gasoline." Tr. V 996. In its opening statement, the State said: "They took his jeans and they had his jeans scientifically tested, and I anticipate that the evidence will show that there were vapors of a gasoline class on those jeans." Tr. IV 699. In closing, the State argued:

> [T]he shoes and the jeans that came from Donnie Harris that were taken by Tony Rust contained a chemical profile associated with gasoline, and we went through great detail on determining what he means by that, and he explained that to you. He said there's not enough of the indicators to say scientifically gasoline, but we have all these similarities; just not enough number that I'm going to commit myself to say gasoline, but they were all there.
> What else did he say? They're not in the rest of our clothes. It's not something that's normally found in fabric unless it's put there by gasoline. Is there anything similar in chemical profile to gasoline? No. It's in its own class.

Tr. VI 1322. Without an expert to dispute this point, defense counsel conceded Mr. Harris had gasoline on his jeans. Tr. VII 1355 ("He's got a little bit of gas on some jeans[.]"); Tr. VII 1376 ("Now, how did the gas get on Mr. Harris's jeans and his shoes and all that? Well, he was running back and forth trying to get that fire out . . . ."). CFI Smith's testimony that inconclusive merely means "possible" and that "contrary to Mr. Rogers' testimony, the components he identified in the clothing are also present in many carpets, plastics, and even athletic shoe soles" was material and favorable. Att. 6 at 6. It was particularly material and favorable in conjunction with CFI Smith's pretrial finding that "[i]t is scientifically impossible for the suspect to distribute an ignitable liquid, without the liquid being absorbed by clothing and therefore being detectible" Att. 3 at 5. CFI Smith also could have provided additional testimony supporting the possibility of an electrical fire, explaining how the various electrical dangers in Mr. Harris's house and room could have led to such a fire, and that the circle of fire Kevin observed was consistent with such a fire. Att. 6 at 6-7.

The trial court's refusal to permit Mr. Harris the opportunity to present CFI Smith's testimony also violated his rights to the effective assistance of counsel. *Strickland*, 466 U.S. at 687.

33

Counsel's inability to present the testimony of CFI Smith "interfere[d] . . . with the ability of counsel

to make independent decisions about how to conduct the defense." *Id.* at 686. *See also Herring*, 422

U.S. 858 (citing *Ferguson*, 365 U.S. at 570; *Brooks*, 406 U.S. at 605); *Geders*, 425 U.S. at 91;

*Cronic*, 466 U.S. at 653-62; *Hinton*, 571 U.S. at 274; *Ungar*, 376 U.S. at 589; *Morris*, 461 U.S. at

12. This failure prejudiced Mr. Harris. *Strickland*, 466 U.S. at 694.

Finally, the inability to present testimony from a fire science expert was so devastating to

Mr. Harris's case that it had a chilling effect on his right to testify on his own behalf. *See Rock*, 483

U.S. 44, 52 (1987) (quoting *Washington*, 388 U.S. at 17-19). As counsel explained at trial, Mr.

Harris believed "none of what he says can be corroborated to satisfaction. So, essentially, his

thought is the jury won't believe him and rightfully so because they don't have any fire expert who

can explain what he observed, what he wrote on his statement, and what the other witnesses have

observed." Tr. VII 1278.

**E.    In the Alternative, § 2254(d) Does Not Preclude Relief Because the State Court Decision Was Legally and Factually Unreasonable.**[38]

---

[38]This Court should consider CFI Smith's new report (Att. 6) even though it has not been presented in state court. In *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), the Supreme Court held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." However, the Tenth Circuit has explained that in *Pinholster*,

> [d]issenting Justice Sotomayor "assume[d] that the majority d[id] not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself." [*Pinholster*, 131 S.Ct.] at 1417 n.5 (Sotomayor, J., dissenting). But this assumption would not help Defendant, because he has no acceptable excuse for not developing the facts in state court.

*Black v. Workman*, 682 F.3d 880, 895-96 (10th Cir. 2012). That is not the case here. While Mr. Harris's case was on direct appeal, he sought an evidentiary hearing and he sought aggressively to locate and obtain the lighter for examination by CFI Smith to fully develop this claim, but the state

(continued...)

34

Under 28 U.S.C. § 2254(d), a petitioner must

> demonstrate that the state court's resolution of his claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [Citations omitted.] . . . If clearly established federal law exists, a state-court decision is "contrary to" it "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." [Citation omitted.] A state-court decision is an "unreasonable application" of clearly established federal law when the state court "identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case." [Citations omitted.]

*Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (citations omitted).

If this Court finds the claim presented here is the same as that adjudicated on the merits by OCCA, it should still consider the claim de novo because it overcomes the limitations imposed by 28 U.S.C. § 2254(d)(1), (2).[39] OCCA's adjudication was both legally and factually unreasonable.

## 1. OCCA's Adjudication.

The court found the trial judge did not abuse his discretion in refusing to allow CFI Smith's testimony, citing *Washington v. Texas*, 388 U.S. 14 (1967), *Crane v. Kentucky*, 476 U.S. 683 (1986), *Taylor v. Illinois*, 484 U.S. 400 (1988), *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), and *United States v. Scheffer*, 523 U.S. 303, 1997. *See Harris*, 450 P.3d at 944-48. OCCA's decision was contrary to and involved unreasonable applications of clearly established federal law, and was based on unreasonable determinations of fact. 28 U.S.C. § 2254(d)(1), (2).

---

[38](...continued)
courts precluded him from doing so. *See* Ground 2.

[39]If this Court finds Mr. Harris overcomes the limitations of § 2254(d) , "§ 2254(d) deference doesn't apply; review is de novo; and *Pinholster* doesn't preclude" the Court's consideration of CFI Smith's new report. *Eaton v. Pacheco*, 931 F.3d 1009, 1019 (10th Cir. 2019) (citations omitted).

### a.     OCCA's Adjudication Was Legally Unreasonable.

OCCA explained Mr. Harris "must show (1) that the court prevented him from obtaining or presenting evidence; (2) that the court's action was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose; and (3) that the excluded evidence 'would have been relevant and material, and . . . vital to the defense.'" *Harris*, 450 P.3d at 945 (quoting *Washington*, 388 U.S. at 16). OCCA's findings regarding the second and third prongs were legally unreasonable.

First, OCCA found, "As to the first two *Washington* criteria, Appellant was not barred from presenting Smith's testimony as punishment for failing to follow procedure, or as a result of some arbitrary rule. A defendant's right to present a defense is not unlimited; it is subject to reasonable restrictions." *Harris*, 450 P.3d at 945 (citing *Scheffer* 523 U.S. at 308). While OCCA accurately stated the holding of *Scheffer*, its finding of no arbitrariness was an unreasonable application of *Scheffer*, and was contrary to *Washington, Rock*, and *Chambers*.

The Supreme Court elaborated upon *Washington*'s arbitrariness requirement in *Scheffer*, which OCCA cited, and *Rock* and *Chambers*, which OCCA did not cite. *Scheffer* 523 U.S. at 308; *Rock*, 483 U.S. at 55; *Chambers*, 410 U.S. at 295. In *Scheffer*, the Court found, "A defendant's right to present evidence is not unlimited, but rather is subject to reasonable restrictions. . . . A defendant's interest in presenting such evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process.'" 523 U.S. at 308 (citing, e.g., *Taylor*, 484 U.S. at 410, *Rock*, 483 U.S. at 55, *Chambers*, 410 U.S. at 295). "But restrictions . . . may not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 55-56. Making a conclusory finding that Mr. Harris was "not barred from presenting Smith's testimony as punishment for failing to follow procedure, or as a result of some arbitrary rule," *Harris*, 450 P.3d

at 945, OCCA did not explain what "legitimate interests in the criminal trial process" Mr. Harris's "right to present relevant testimony" "bow[ed] to accommodate." *Rock*, 483 U.S. at 55 (quoting *Chambers*, 410 U.S. at 295) (internal quotation marks omitted). Instead, OCCA merely explained that Mr. Harris had not made a formal request for a continuance, and that if he had, the court would have properly denied it on the information it had at the time. *Harris*, 450 P.3d at 945. OCCA also explained that defense counsel did not "make a record of any alternative remedies that were considered, such as having Smith testify remotely, and why no alternative to Smith's physical presence was feasible." *Id.* (citation omitted).

Contrary to OCCA's conclusory finding, the trial court's refusal to allow the time necessary for Mr. Harris to present CFI's testimony was "arbitrary" or "disproportionate." *Rock*, 483 U.S. at 55-56. Mr. Harris's "right to present" CFI Smith's testimony did not "bow to accommodate other legitimate interests in the criminal trial process." *Scheffer*, 523 U.S. at 308 (citation and internal quotation marks omitted). Instead, the court's refusal to grant a mistrial or continuance appears to have been based on its desire to complete the trial before the current jury term expired. Tr. VI 1150 ("The problem that we run into if we get any later than Wednesday is if we're going to have a difficult time getting it done before the end of the year."). This interest is arbitrary or disproportionate, unlike those at issue in *Scheffer*, *Rock*, and *Chambers* (ensuring only reliable evidence is introduced), *Washington* (preventing perjury); and *Taylor* ("minimiz[ing] the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony"). *Scheffer*, 523 U.S. at 309, *Rock*, 483 U.S. at 61, *Chambers,* 410 U.S. at 301; *Washington*, 388 U.S. at 21; *Taylor*, 484 U.S. at 411.

OCCA's finding of no arbitrariness and that "[d]efense counsel did not formally request a continuance, but if he had, it would properly have been denied on the information provided to the court at the time" was contrary to *Ungar*, 376 U.S. at 589, and *Morris*, 461 U.S. at 12. The trial court's "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violate[d] the right to the assistance of counsel." *Morris,* 461 U.S. at 12 (quoting *Ungar*, 376 U.S. at 589). In *Ungar*, the Court held, "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." 376 U.S. at 850. Here, counsel explained that the defense's only guilt-stage expert had suffered a medical emergency. Neither the trial court nor the State disputed Mr. Harris's contention that CFI Smith's testimony was critical to his defense or questioned the credibility or veracity of CFI Smith's proffered testimony. The State offered no counter-argument to Mr. Harris's requests for mistrial or continuance. The judge's denial appeared to be based on the length of time it would take for CFI Smith's medical condition to improve so he could testify, or for Mr. Harris's counsel to retain a substitute expert. After learning neither could occur before the end of December, the court denied the request without further comment. Given "the circumstances present" in this case, including "the reasons presented to the trial judge at the time the request [was]

denied," the continuance denial was "so arbitrary as to violate due process."[40] *Ungar*, 376 U.S. at 589.

OCCA's decision also involved an unreasonable application of *Taylor*. OCCA accurately explained that in *Taylor*, "the Court concluded that barring Taylor's defense witness was an acceptable sanction under the circumstances, because the Sixth Amendment 'does not confer the right to present testimony free from the legitimate demands of the adversarial system.'" *Harris*, 450 P.3d at 945 (citing *Taylor*, 484 U.S. at 412-13). However, *Taylor*'s reasoning made clear that preclusion of evidence is disfavored but is appropriate where counsel deliberately seeks a tactical advantage – a situation that did not occur in Mr. Harris's case. In *Taylor*, the Court upheld the preclusion of a defense witness "as a sanction for failing to identify a defense witness in response to a pretrial discovery request." 484 U.S. at 401-02. The *Taylor* Court explained:

> Petitioner does not question the legitimacy of a rule requiring pretrial disclosure of defense witnesses, but he argues that the sanction of preclusion of the testimony of a previously undisclosed witness is so drastic that it should never be imposed. *He argues, correctly, that a less drastic sanction is always available. Prejudice to the prosecution could be minimized by granting a continuance or a mistrial* to provide time for further investigation . . . .

_____

[40]"In determining whether a denial of a motion for continuance is arbitrary or unreasonable, [the Tenth Circuit] consider[s] various factors, including: (1) the diligence of the party requesting the continuance; (2) the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; (4) the need asserted for the continuance and the harm that appellant might suffer as a result of the district court's denial of the continuance." *United States v. Diaz*, 189 F.3d 1239 (10th Cir. 1999) (citing *United States v. Wynne*, 993 F.2d 760, 767 (10th Cir. 1993)). These factors weigh heavily in Mr. Harris's favor. "By far the most important factor to consider . . . is the defendant's need for a continuance and the prejudice resulting from its denial." *United States v. West*, 828 F.2d 1468, 1471 (10th Cir. 1987).

*Id.* at 413 (emphasis added). The Court disagreed that "the sanction of preclusion of the testimony

of a previously undisclosed witness is so drastic that it should never be imposed," *id.*, but made clear

it should be limited to certain cases inapposite to Mr. Harris's. The Court reasoned:

> A trial judge may certainly insist on an explanation for a party's failure to comply
> with a request to identify his or her witness in advance of trial. If that explanation
> reveals that the omission was willful and motivated by a desire to obtain a tactical
> advantage that would minimize the effectiveness of cross-examination and the ability
> to adduce rebuttal evidence, it would be entirely consistent with the purposes of the
> Compulsory Process Clause simply to exclude the witness' testimony.

*Id.* at 415 (citing *United States v. Nobles*, 422 U.S. 225 (1975)). The Court reiterated:

> It would demean the high purpose of the Compulsory Process Clause to construe it
> as encompassing an absolute right to an automatic continuance or mistrial to allow
> presumptively perjured testimony to be presented to a jury. We reject petitioner's
> argument that a preclusion sanction is never appropriate no matter how serious the
> defendant's discovery violation may be.

*Id.* at 416. Here, CFI Smith's medical emergency certainly was not "willful and motivated by a

desire to obtain a tactical advantage." *Id.* at 415. His testimony was not "presumptively perjured,"

nor did Mr. Harris violate discovery rules. *Id.* at 416.

Consistent with *Taylor*, the Tenth Circuit

> has held that it would be a "rare case where, absent bad faith, a district court should
> exclude evidence rather than continue the proceedings." *United States v. Golyansky*,
> 291 F.3d 1245, 1249 (10th Cir. 2002). We have noted that the sanction of exclusion
> of a *witness's expert testimony* is "almost never imposed 'in the absence of a
> constitutional violation or statutory authority for such exclusion.'" *United States v.
> Charley*, 189 F.3d 1251, 1262 (10th Cir. 1999) (quoting *United States v. Gonzales*,
> 164 F.3d 1285, 1292 (10th Cir. 1999)).[41]

---

[41]In the context of discovery violation sanctions, the Tenth Circuit has found, "While we do
not hold that bad faith is an absolute condition to exclusion, 'we agree with those circuits that have
treated bad faith as an important factor . . . .'" *Short v. Sirmons*, 472 F.3d 1177, 1188-89 (10th Cir.
2006) (citations omitted). *See also id.* at 1186 (citing *Taylor*, 484 U.S. at 415) (explaining "few
rights are more fundamental than that of an accused to present witnesses in his own defense and the
(continued...)

*United States v. Sarracino*, 340 F.3d 1148, 1170 (10th Cir. 2003) (emphasis added). Mr. Harris's case – where his only first-stage expert suffered a medical emergency and his counsel promptly informed the court – is not the "rare case" where the "district court should [have] exclude[d] evidence rather than continue the proceedings." *Id.* (citation and internal quotation marks omitted). There was no "constitutional violation or statutory authority" for the exclusion of CFI Smith's testimony. *Id.*

Furthermore, in *Taylor*, "the Court focused on the necessity of balancing interests." *Young v. Workman*, 383 F.3d 1233, 1239 (10th Cir. 2004) (quoting *Taylor*, 484 U.S. at 414-15). The Court found that in addition to the defendant's right to offer the testimony of favorable witnesses, "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." *Taylor*, 484 U.S. at 414-15. Here, contrary to *Taylor*, the trial court did not appear to engage in such a balancing of interests. Instead, the court seemed singularly interested in completing the trial before the expiration of the jury term.[42]

---

[41](...continued)
preclusion of material defense witnesses from testifying is the severest sanction for discovery violations" and that "if the delay 'was *willful and motivated by a desire to obtain a tactical advantage* . . . ,' exclusion would be 'entirely consistent' with the purposes of the Compulsory Process Clause").

[42]Balancing the interests in *Short*, the Tenth Circuit found, "[T]he fact that he was facing the death penalty is very significant." 472 F.3d at 1189 (citing, e.g., *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."); *Burger v. Kemp*, 483 U.S. 776, 785 (1987) ("Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.")).

41

Further, OCCA made legally unreasonable findings regarding the materiality of CFI Smith's testimony. OCCA found that Mr. Harris "must show . . . (3) that the excluded evidence 'would have been relevant and material, and . . . vital to the defense.'" *Harris*, 450 P.3d at 945 (quoting *Washington*, 388 U.S. at 16). OCCA also found, "Considering the limited utility of Smith's critique, and the strong evidence of Appellant's guilt, we find no reasonable probability that Smith's presence would have affected the outcome of the trial." *Harris*, 450 P.3d at 948 (citing *Valenzuela-Bernal*, 458 U.S. at 873-74). These findings were contrary to and unreasonable applications of *Washington* and *Valenzuela-Bernal*. Contrary to OCCA's finding, *Washington* does not require that the evidence be "vital to the defense." *Id.* (citation and internal quotation marks omitted). Instead, the *Washington* Court, in laying out the background of the case, explained, "It is undisputed that [the witness's] testimony would have been relevant and material, and that it was vital to the defense." 388 U.S. at 16. The Court did not hold that to show a violation of the right to compulsory process, a defendant must show the evidence is vital to the defense.

In *Valenzuela-Bernal*, the Court addressed the *Washington* Court's finding of "a violation of [the Compulsory Process Clause] when the defendant was arbitrarily deprived of 'testimony [that] would have been *relevant* and *material*, and . . . *vital* to the defense." 458 U.S. at 867. The Court found, "This language suggests that respondent . . . must at least make some plausible showing of how [witnesses'] testimony would have been both material and favorable to his defense." 458 U.S. at 867. The Court explained, "When we turn from *Washington* to other cases in what might loosely be called the area of constitutionally guaranteed access to evidence, we find *Washington*'s intimation of a materiality requirement more than borne out." *Id.* at 867-68 (citing, e.g., *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The *Valenzuela-Bernal* Court held, "A violation of these provisions [the

Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment] requires some showing that the evidence lost would be both material and favorable to the defense." *Id.* at 873. The Court explained, "As in other cases concerning the loss of material evidence," the materiality standard requires "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *Id.* at 873-74 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Mr. Harris only needed to show that CFI Smith's testimony was material and favorable to the defense – not that it was vital.

OCCA's finding that CFI Smith's testimony would not have been material was contrary to or involved an unreasonable application of *Valenzuela-Bernal* and was contrary to *In re Winship*, 397 U.S. 358, 364 (1970). OCCA found:

> We find Smith's role to be somewhat attenuated. He was not an eyewitness to the events giving rise to the charge, nor was he offered as a crucial witness in mitigation of sentence. He could not provide expert guidance as to Appellant's capacity to understand the nature and consequences of his acts. [Citations omitted.] Rather, Smith's opinions only tangentially relate to Appellant's guilt or innocence because they merely call into question the thoroughness of investigator Rust . . . .

*Harris*, 450 P.3d at 947-48. OCCA found, "Appellant has not shown this Court that Smith himself could have been any more effective in disputing Rust's theory. . . . The State was only required to dispel any reasonable doubt about its theory; it was not required to disprove all other conceivable ones." *Id.* at 947. OCCA reiterated, "Smith's conclusion is simply that Rust didn't consider alternative scenarios; Smith never offered any of his own. . . ." *Id.* at n.7. OCCA held, "Considering the limited utility of Smith's critique, and the strong evidence of Appellant's guilt, we find no reasonable probability that Smith's presence would have affected the outcome of the trial." *Id.* at 948 (citing *Valenzuela-Bernal*, 458 U.S. at 873-74).

43

OCCA's findings are contrary to *In re Winship*, 397 U.S. at 364, where the Court stated, "[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Contrary to *Winship*, OCCA unreasonably shifted the burden of proof from the State to Mr. Harris. Under *Winship*, in order for the jury to acquit Mr. Harris, it needed only have reasonable doubt about the State's case; Mr Harris was not required to offer his own theory. Agent Rust was the only fire investigator to testify at Mr. Harris's trial regarding an alleged arson, and calling into question his findings was the defense strategy. Doing so could have created reasonable doubt in the mind of a juror.[43] *Wiggins*, 539 U.S. 510, 537 (2003). OCCA's finding that CFI Smith's testimony casting doubt on the State's theory would not have been material or relevant is contrary to *Winship*.

Further, in finding Smith's role to be "somewhat attenuated" because he "was not an eyewitness" or "a crucial witness in mitigation of sentence," and in finding that he "never offered any of his own [theories]," *Harris*, 450 P.3d at 947-48, OCCA unreasonably limited evidence that is material and favorable under *Valenzuela-Bernal*. Under *Valenzuela-Bernal*, "material evidence is that which is exculpatory – evidence that if admitted would create reasonable doubt that did not exist without the evidence." *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) (citing

---

[43]Further, the prejudice resulting from the denial of CFI Smith's testimony bled into the sentencing stage. Had counsel presented an expert like CFI Smith, there is a reasonable probability such a witness would have created residual doubt. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (noting "residual doubts" by a jury during guilt phase are effective grounds for argument in capital-sentencing phase). Residual doubt is a powerful factor influencing juries to vote for less than death. Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L.Rev. 1538, 1563 (Oct. 1998). This evidence would have also undermined the aggravators.

*Valenzuela-Bernal*, 458 U.S. at 868). In reviewing compulsory process claims, courts have found *defense expert testimony* to be material and favorable under *Valenzuela-Bernal* where it could have created a reasonable doubt. *See Howard v. Walker*, 406 F.3d 114, 132-33 (2d Cir. 2005) (finding trial court's exclusion of a defense expert witness violated the defendant's Sixth Amendment right to compulsory process where "the omitted evidence, particularly as it would have been provided by a medical expert, 'create[d] a reasonable doubt that did not otherwise exist'" and "was both material and favorable to Howard's case"); *United States v. Galecki*, 932 F.3d 176, 184-88 (4th Cir. 2019) (finding defense expert's exclusion from trial violated Sixth Amendment compulsory process rights because "the court improperly denied them the opportunity to present favorable, material evidence" that would have allowed the jury to "entertain[]reasonable doubt").

In a footnote, OCCA cursorily found[44] that regarding Mr. Harris's claims "that defense counsel was prevented from providing effective assistance," and that "the court's ruling had a 'chilling effect' on Appellant's decision about whether to testify," "Appellant does not elaborate on these claims or cite any authority to support them.[45] Because we find the court's ruling was within its discretion, we need not consider these arguments further." *Harris*, 450 P.3d at 948 n.9. OCCA's finding that "the court's ruling was within its discretion" is legally unreasonable for the reasons

---

[44]"AEDPA's deferential standard applies not only to claims the state court squarely addressed, but also to claims it reached only cursorily." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724 (10th Cir. 2016). "'Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'" *Id.* at 740 (quoting *Harrington v. Richter*, 562 U.S. 86, 98 (2011)).

[45]This finding was legally and factually unreasonable, as defense counsel elaborated upon these claims and cited *Strickland*, 466 U.S. at 668, and *Cronic*, 466 U.S. at 656. *See* Brief of Appellant at 23-24, *Harris v. State*, No. D-2014-153 (Okla. Crim. App. Mar. 30, 2017) ("Brief of Appellant").

already stated, *supra* at 34-45, and factually unreasonable for the reasons stated below, *infra* at 46-60.

Further, there was "no reasonable basis for the state court to deny relief" on these claims. *Richter*, 562 U.S. at 98. OCCA's characterization of CFI Smith's absence as the result of "unfortunate circumstances and [Mr. Harris's] own tactical decisions" indicates one basis for denial would be a finding of no deficient performance. Such a finding would be contrary to *Strickland*, 466 U.S. at 686-87; *Herring*, 422 U.S. at 858; *Ferguson*, 365 U.S. at 570; *Brooks*, 406 U.S. at 605; *Geders*, 425 U.S. at 91; *Cronic*, 466 U.S. at 653-62; *Hinton*, 571 U.S. at 274; *Ungar*, 376 U.S. at 589; and *Morris*, 461 U.S. at 12. *See also infra* at 60; Ground 5(A). Another possible basis is a lack of prejudice. Such a finding would be contrary to *Strickland*. 466 U.S. at 694 (finding *Strickland* prejudice standard "finds its roots in the test for materiality" provided by *Valenzuela-Bernal*, 458 U.S. at 872-74); *supra* at 42-45; Ground 5(A). There was also no reasonable basis for OCCA to deny Mr. Harris's claim that his right to testify was denied. *Rock*, 483 U.S. at 52. OCCA's denial of these claims likely rested on the same unreasonable factual determinations as those underlying its adjudication of the due process and compulsory process claim and the related ineffective-assistance of counsel claim. *See infra* at Ground 5(A).

### b.   OCCA's Adjudication Was Factually Unreasonable.

In addition to being legally unreasonable, OCCA's decision that the trial court did not abuse its discretion in refusing counsel the opportunity to present CFI Smith's testimony was based on unreasonable determinations of fact.[46] § 2254(d)(2). Under § 2254(d)(2), a petitioner is entitled to

---

[46]OCCA's deficient fact-finding in this case can support a finding that either § 2254(d)(2) is satisfied or that there was no adjudication on the merits. Where, as here, "a state court

(continued...)

federal review of a claim decided on the merits in state court if the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Although the Supreme Court has cautioned that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance," *Wood v. Allen*, 558 U.S. 290, 301 (2010), it has also made clear that "deference does not imply abdication of judicial review" and that it does not "by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

---

[46](...continued)
unreasonably refuses to permit further development of the facts of a claim . . . we do not offend the principles of comity, finality, and federalism that animate AEDPA deference because the state court has passed on the opportunity to adjudicate [the] claim on a complete record." *Gordon v. Braxton*, 780 F.3d 196, 202 (4th Cir. 2015) (internal citations and quotation marks omitted). In such cases, the materially incomplete record can support a finding that the claim was not adjudicated on the merits, removing it from the AEDPA framework altogether. *See id.* at 202. *See also Milke v. Ryan*, 711 F.3d 998, 1007 (9th Cir. 2013) (noting unreasonable determinations of fact "come in several flavors, one of them being where the fact-finding process itself is defective or . . . based on an unconstitutionally incomplete record") (internal citations and quotation marks omitted).

OCCA found:

> Defense counsel did not formally request a continuance,[47] but if he had, it would properly have been denied on the information provided to the court at the time. If a continuance is requested due to an absent witness, the proponent must inform the court of "the probability of procuring [the absent witness's] testimony within a reasonable time, and what facts [counsel] believes the witness will prove, and that he believes them to be true." 12 O.S.2011, § 668. Defense counsel did none of these things.

*Harris,* 450 P.3d at 945 (citation omitted). First, defense counsel did "inform the court of 'the probability of procuring [the absent witness's] testimony within a reasonable time, and what facts [counsel] believes the witness will prove.'" *Harris,* 450 P.3d at 945 (quoting 12 O.S.2011, § 668). Unfortunately, due to CFI Smith's ongoing medical emergency, it was impossible for counsel to predict when he would be available; the court acknowledged as much. On December 11, defense

---

[47]The record indicates defense counsel requested a continuance. Defense counsel said on the record:

> [U]nless the court would consider continuing – and before I make any request, . . . I also want to inform the court that he can go to the doctor on the 18th and they could say you're not yet, you can't travel yet, you can't travel by car, you can't travel by air, period. They could just as easily say that as you're all well and you can go wherever you want . . . .

Tr. VI 1148-49. In an affidavit obtained on direct appeal, defense counsel Astor explained that he suggested the court continue Mr. Harris's trial to January and order the jury panel that had already been qualified to return. Att. 4 at ¶ 10. Mr. Astor recalled that ADA Nicholson "stated that she did not object or see any legal impediment to this option. However, ultimately, Judge Sullivan did not accept this as a possible solution to the problem." *Id.* The trial court clearly understood trial counsel to have requested a continuance; the court found, "I think in all actuality, this is the fourth trial setting for this case and the court's continued it three additional times for the defendant. And the court – I mean, if you could tell me he could be here tomorrow or even if he could be here Wednesday, I certainly don't mind a short amount of time." Tr. VI 1149-50. The court later reiterated "even a short reasonable continuance of the case wouldn't solve our problem." Tr. VI 1279. OCCA acknowledged, "the trial court considered a continuance as a possible option." *Harris*, 450 P.3d at 961 n.36.

counsel explained CFI Smith's secretary would be faxing a letter from his doctor "essentially saying you can't travel, period, until further notice." Tr. III 663. In their written motion, counsel explained:

> Presently, counsel cannot say when or if Mr. Smith will be in any condition to travel or testify on behalf of Mr. Harris. It is clear he will not be able to testify on December 16th, or any time during that week . . . . Since it is unknown when or even if Mr. Smith will ever be able to testify, counsel has no other alternative but to seek out another expert . . . . This requires finding another expert and submitting a request for expert funds from the agency's directors. . . . It is unknown how long it will take the new expert to complete his investigation and issue a report and be prepared to testify.

O.R. II 260. The trial court recognized that "I don't think there's any way we can know today whether he [CFI Smith] can be here Monday or not." Tr. V 934. The court acknowledged "everybody's different" in terms of when a blood clot is resolved. Tr. V 934. Counsel informed the court that CFI Smith was "scheduled to go back to the doctor for more tests or to see what progress has been on the 18th. . . . [H]owever, there's good [sic] chance we'll be done by then." Tr. VI 1148. Defense counsel "inform[ed] the court that [CFI Smith] can go to the doctor on the 18th and they could say you're not yet, you can't travel yet . . . . They could just as easily say that you're all well and you can go wherever you want . . . ." Tr. VI 1148-49. The court reiterated, "[M]y understanding it depends on whether it's dissolved or not, and I think all bodies do that in different time frames." Tr. VI 1149. The court and defense counsel had the following exchange:

| THE COURT: | [T]he court certainly wants the defendant to be able to present any facts that he may have that are in his favor, present his defense in full. But I think what you're telling me is you can't tell me when that can happen? |
| MR. BOWEN: | I can't tell you. . . . I'm unable to discern the future just like all the rest of us are. I will keep you updated on anything that occurs . . . . |

Tr. VI 1149. Finally, the trial court explained that because CFI Smith's affidavit stated his doctor had instructed him not to travel during December, "even a short reasonable continuance of the case

wouldn't solve our problem." Tr. VII 1279.  Counsel's affidavit provided on direct appeal states, "At the time, we did not know when or if C.F.I. Smith would recover from his medical condition." Att. 4 at ¶ 9. Contrary to OCCA's finding, counsel informed the court to the best of their ability regarding when CFI Smith's testimony would be procured; as the trial court repeatedly acknowledged, it was impossible to do so with any specificity or certainty.

Counsel also informed the court "what facts [counsel] believes the witness will prove." *Harris*, 450 P.3d at 945 (quoting 12 O.S.2011, § 668). Throughout the trial, when defense counsel moved for a mistrial and/or continuance, they described the various testimony CFI Smith would provide. Tr. V 922, 1042; Tr. VII 1277-78. In their written motion, counsel explained CFI Smith "will dispute the investigation conducted by Rust concerning the source of the fire and whether Mr. Harris intentionally set the fire." O.R. II 259. Counsel explained "said testimony is absolutely critical to Mr. Harris's defense." O.R. II 259. Defense counsel later "reurge[d] [the motion] with an offer of proof as to what Mr. Smith would testify to had he been allowed to testify."[48] Tr. VI 1146. The court admitted this offer of proof – CFI Smith's report – as Court's Exhibit 2.[49]

---

[48]Respondent acknowledged:

The defendant explained why he felt he needed the testimony of CFI Smith both orally before the court and in writing in his Motion for Mistrial and also relied upon CFI Smith's documented analysis of the fire and his CV as his offer of proof (O.R. 259-310; Tr. 664, 1145-46; Court's Exs. 2-3).

Brief of Appellee at 21 n.25.

[49]As an officer of the court, counsel's offer of proof should satisfy the requirement that he inform the court "that he believes [the facts CFI Smith would have proved] to be true." 12 O.S.2011, § 668. *See* Tr. VI 1146; Att. 3.

OCCA also unreasonably found, "Nor did defense counsel make a record of any alternative remedies that were considered, such as having Smith testify remotely, and why no alternative to Smith's physical presence was feasible." *Harris*, 450 P.3d at 945 (citation omitted). OCCA's finding that counsel did not "make a record of . . . why no alternative to Smith's physical presence was feasible" is an unreasonable determination of fact. In their written motion, counsel clearly explained:

> It is clear [CFI Smith] will not be able to testify on December 16th, or any time during that week, *due to his medical condition and the fact that he is taking strong narcotics for pain*. He cannot walk and is confined to a scooter to move around. . . .
>
> Should the Court in this case require counsel to either proceed with a telecommunications testimony of a critical expert witness in the central issue in this case, *while he is seriously ill and more importantly under the influence of narcotics by order of his physician*, OR waive presentation of expert witness testimony altogether places both defense counsel and defendant in an untenable situation.

O.R. II 260-61 (emphasis added). *See also* Tr. VI 1279 (court's acknowledgment after reviewing the medical records that CFI Smith was prescribed a narcotic pain reliever).[50]

---

[50]The record also indicates counsel objected to remote testimony because they believed Mr. Harris's right to compulsory process and the effective assistance of counsel entitled him to in-person testimony. Tr. III 663-64; Tr. IV 925-27; O.R. 259-61. OCCA cited *Harris (Jimmy) v. State*, 84 P.3d 731, 740 n.3 (Okla. Crim. App. 2004); there, as summarized by OCCA, "live video testimony [was] employed in [a] capital murder trial where, ten days into the trial, terrorist attacks shut down air travel nationwide." *Harris (Jimmy)* is inapposite to this case. There, OCCA explained:

> [W]e find no evidence to support Appellant's claim that he was somehow "forced" to agree to this procedure. To the contrary, the record shows that defense counsel elected not to use compulsory process to obtain the Texas witnesses' attendance via car or bus, and chose instead to arrange for the video presentation.

*Harris (Jimmy)*, 84 P.3d at 740 n.3. Here, counsel never agreed to such a procedure. Further, in *Harris (Jimmy)*, OCCA explained, "Of the ten defense witnesses presented in the guilt stage, the two who testified by video were former employers of the [defendant and victim] who gave background on their employment history and how their relationship appeared at the time." *Id.* Neither witness was the single guilt-stage defense expert witness in an alleged arson case. OCCA cited no federal law to support the suggestion that CFI Smith's remote testimony would have satisfied his

(continued...)

51

OCCA unreasonably found, "In our view, this is a case of unfortunate timing, with defense counsel ultimately unwilling to try to mitigate his predicament. By the time the trial court received the barest details of Smith's situation, the State's case-in-chief was well under way." *Harris*, 450 P.3d at 946. OCCA's finding that "[b]y the time the trial court received the barest details of Smith's situation, the State's case-in-chief was well under way" was an unreasonable determination of fact. *Id.* On Monday, December 9, 2013 – the first day of jury selection – trial counsel received a phone message from CFI Smith's office. O.R. II 259; Att. 4 at ¶ 7. Upon contacting CFI Smith, trial counsel learned the following:

> [O]ver the weekend [prior to jury selection] Mr. Smith [who lives in Arizona] developed a major internal injury, which was ultimately diagnosed as deep vein thrombosis in one of his legs. He is now under a doctor's care, taking medication to dissolve the blood clot (heparin) and cumiden [sic] - a blood thinner - to prevent more blood clots, and OxyContin for pain management. Further his doctor has eliminated any type of travel, indefinitely, as such travel is likely fatal, in his condition.

O.R. II 259. On December 10, 2013, the second day of voir dire, trial counsel informed the court and the State of these circumstances. O.R. II 260; Tr. II 500-01. Counsel were not able to provide detailed medical records from the expert – who was in the midst of his medical emergency – until December 13, 2013, the second day of the State's case. Tr. V 1078-79, O.R. II 264-310. However, throughout the trial, they made diligent efforts to keep the trial court apprised of the details as they received them. OCCA acknowledged that "on December 13, the trial court discussed relevant case law, and expressed considerable understanding of the medical condition that Smith had apparently experienced." *Harris*, 450 P.3d at 946. That the trial court apparently disbelieved defense counsel,

---

[50](...continued)
compulsory process, due process, and other rights.

despite their being officers of the court, when they provided updates about CFI Smith's medical situation does not mean that the trial court only had "the barest details of Smith's situation." *Id.*

Further, defense counsel was not "unwilling to try to mitigate his predicament." *Id.* Upon learning of CFI Smith's medical emergency, counsel promptly informed the court. In their written motion counsel explained CFI Smith was "seriously ill" and "under the influence of narcotics" and thus unable to testify remotely. OR. II 261. Counsel tried to "mitigate his predicament" by moving for a mistrial or continuance until CFI Smith or another arson expert could testify on Mr. Harris's behalf. O.R. II 259-61. *See Taylor*, 484 U.S. at 413 (characterizing a mistrial or continuance as "a less drastic sanction" than the exclusion of evidence). On direct appeal, trial counsel Astor explained that he suggested the court continue Mr. Harris's trial to January and order the jury panel that had already been qualified to return as an alternative to a mistrial. Att. 4 at ¶ 10.  Mr. Astor recalled that ADA Nicholson "stated that she did not object or see any legal impediment to this option. However, ultimately, Judge Sullivan did not accept this as a possible solution to the problem." *Id.* Trial counsel explained in his direct-appeal affidavit:

> By the time Judge Sullivan denied the motion, there was not enough time to locate an expert and complete the necessary paperwork for my office to approve funds for another expert. Had Judge Sullivan granted a mistrial or a continuance, I would have asked my agency for a substitute expert.

*Id.* at ¶ 9. It is unclear how else defense counsel could have "tr[ied] to mitigate his predicament." *Harris*, 450 P.3d at 946.

Similarly, OCCA unreasonably noted "Appellant's apparent refusal to seriously consider viable alternatives (such as remote testimony)." *Id.* at 948. Again, remote testimony was not "viable" due to CFI Smith's serious illness and medications, OR. II 261, and according to defense counsel, ADA Nicholson, too, "was not in favor of any type of remote testimony," "there was never any

53

serious discussion regarding this topic," and "it did not factor into Judge Sullivan's rulings on the subject," Att. 4 at ¶ 8. There is no indication in the record of the State's or the trial court's position on the possibility of remote testimony.

OCCA unreasonably determined, "Appellant was not denied a fair opportunity to use Smith's contribution to this case. . . . He had no palpable alternative explanation for how the fire started."[51] *Harris*, 450 P.3d at 946. On the contrary, CFI Smith reported, "As an example, data is present indicating that extension power cords servicing appliances were present on the floor of the bedroom. No data is present eliminating the ignition of gasoline vapor by a parting arc as a result of two cords separating or as a result of a lamp being 'turned off'." Att. 3 at 6.  On direct appeal, he reiterated:

> Numerous ignition sources were present within the room to include electrically powered appliances (heater, power strip, etc.), however, data is present indicating that they were never even seen by Rust nor examined for failure and subsequently were never eliminated as the ignition source. An accidental ignition sequence of a gasoline spill coming in contact with the interior of the power strip or operating space heater, although a viable scenario, was never considered.

Att. 5, Ex. 2 at 11 (citing Tr. IV 810).

This was a "palpable alternative explanation," *Harris*, 450 P.3d at 946, particularly given the testimony of other witnesses. Casey McKosky testified that the house was "older" and it only had outlets for plugs with two prongs, not those with three. Tr. VI 1257. Because "a lot of [their] appliances would've had three prongs" on their plugs, they had to use adapters. Tr. VI 1257-58. She explained that "[i]f we ran too many things it would throw the breakers." Tr. VI 1258. She explained, "It would usually happen if we ran, like, the air conditioner and the microwave or bigger

---

[51]Similarly, OCCA unreasonably determined, "Smith's conclusion is simply that Rust didn't consider alternative scenarios; Smith never offered any of his own . . . ." *Harris*, 450 P.3d at 947 n.7. As explained *infra*, CFI Smith did offer his own.

appliances like that, but it'd shut down his room – Little Donnie's[52] room and his mom's room." Tr. VI 1259. She explained they would have "problems with [window air conditioner units]"; "[i]t shut the electric off and melt [sic] the adapters." Tr. VI 1259. "It shut off quite often." Tr. VI 1259. She sometimes heard "a quick popping sound" from the outlet when they used the microwave. Tr. VI 1260-61. She testified that Mr. Harris "ran an extension cord out the door also to the one right outside in the living room" because "[t]hey wouldn't have enough plug-ins to plug in all their stuff." Tr. VI 1261-62. Mr. Harris and Ms. Ferguson had a lamp, TV, DVD player, VCR, and a heater plugged into a power strip. Tr. VI 1262. Mr. Harris's aunt, Ms. Brown, testified that because the house did not have central heat and air, she gave Mr. Harris and Ms. Ferguson "that heater and told them to be careful with it around [his daughter], and to also turn it off at night because the cord got warm and I was afraid something might happen while they were sleeping." Tr. VI 1169. She "bought it at a garage sale and . . . knew it had to be a real old heater because it had a Western Auto tag on it when I bought it and it had been years since we had a Western Auto in Talihina." Tr. VI 1170. Counsel argued that "if [CFI Smith] were allowed to be here, he could . . . explain actually what [the witnesses] observed and what they saw with regard to the power strip; with regard to the surges and electrical problems . . . ." Tr. VII 1277. Mr. Harris did not need to prove his theory; instead, he needed only to create reasonable doubt. *See Winship*, 397 U.S. at 364. Contrary to OCCA's finding, CFI Smith could have provided a "palpable alternative explanation." *Harris*, 450 P.3d at 946.

OCCA unreasonably found, "The gist of Smith's two-page report is that Rust was unable to independently establish, through physical evidence (*i.e.*, ignoring what eyewitnesses told him), a

---

[52]Mr. Harris's nickname was "Little Donnie." Tr. VI 1255.

probable scenario for how and where the fire began."[53] *Harris*, 450 P.3d at 946. This was an unreasonable determination of fact. First, contrary to this finding, Agent Rust was not "told" anything by "eyewitnesses," as he did not talk to them; instead, he obtained written witness statements from "[t]he other agencies" after he arrested Mr. Harris.  Tr. IV 765-66, 795, 800. DA Investigator Thompson testified he never discussed with Agent Rust "the types of witnesses to talk to or the questions to ask of them." Tr. V 967-69. Further, CFI Smith did not suggest that Agent Rust should have "ignor[ed] what eyewitnesses [said]," *Harris,* 450 P.3d at 946; instead, he suggested that, as a fire marshal, he should have followed "the standard of care governing professional fire investigations." Att. 3 at 6.

Similarly, OCCA unreasonably found, "While it may generally be the task of the Fire Marshal to investigate the cause of a fire with unknown or suspicious origin, Smith's expert opinion seems to fault Rust for paying attention to important primary evidence: the statements of Appellant and Ferguson, the only eyewitnesses to the fire's beginnings." *Harris*, 450 P.3d at 947. Again, CFI Smith did not "fault Rust for paying attention" to these alleged statements, *id.*; he faulted him for disregarding the scientific fire evidence when his role in the case was as a fire marshal. *See* Tr. V 966 (Investigator Saulsberry's testimony that "I was going to let [Agent Rust] handle the fire

---

[53]OCCA notes that "[t]he possibility of an accidental ignition source is one thing; but how Ferguson ended up with gasoline all over her body is a different matter entirely. One can speculate about electrical sparks or upended candles, but one must still account for . . . the kinds of burns Ferguson exhibited and the statements she made . . . ." *Harris*, 450 P.3d at 947 n.7. "Smith never offered any of his own [conclusions], including how Ferguson came to be covered in gasoline." *Id.* As explained in Grounds 5(B) and (C), had counsel adequately cross-examined witnesses and hired a burn expert, they could have effectively argued Ms. Ferguson was not "covered in gasoline" and cast doubt upon her alleged statements. Their failures to do so were ineffective.

investigation part of it. I'm not trained in that."); Tr. IV 796 (Agent Rust's testimony that he "[was] doing [his] part and those other officers were talking to witnesses").

OCCA unreasonably found:

Appellant has not shown this Court that Smith himself could have been any more effective in disputing Rust's theory. . . . If Smith had attended the trial, defense counsel still would have cross-examined Rust, in presumably the same manner, in the State's case-in-chief. Smith's testimony would have been somewhat cumulative . . . . We conclude that the material aspects of Smith's proffered expert opinion were sufficiently presented through the cross-examination of Agent Rust.

*Harris*, 450 P.3d at 947-48. These were unreasonable determinations of fact. CFI Smith would have provided critical testimony defense counsel did not elicit from Agent Rust on cross-examination. "As a Principal member of the technical committee responsible for writing the [National Fire Protection Association (NFPA) Document 921, *A Guide for Fire and Explosion Investigation*]," CFI Smith could have testified that "the document is the authoritative text utilized as the standard of care for professional fire investigators, as well as the court system throughout the United States." Att. 3 at 2. He could have explained the methodology required by NFPA 921, and he could have provided and explained his conclusions that 1)"The public authorities' investigation failed to follow recognized practices and methodologies resulting in opinions that are scientifically flawed."; 2) "The identity of a competent ignition source and an ignition scenario has not been established."; and 3) "Alternate hypothesis' [sic] have not been formulated or tested as required during a scientific based fire analysis." *Id.* at 4-5. He could have explained problems with improper packaging and delayed laboratory analysis of Mr. Harris's clothing. *Id.* at 5. He could have explained that the lighter should have been examined for "soot particles" to empirically test the State's theory that the lighter was the ignition source. *Id.* at 6. CFI Smith could have explained Mr. Harris's thermal injuries "are diametrically opposite of those expected from a right hand dominant person such as Donnie Harris

57

and consistent with his claim of 'putting the fire out' on her body." *Id.* However "extensive" counsel's cross-examination of Agent Rust was, *Harris*, 450 P.3d at 947, Agent Rust did not provide any of this testimony CFI Smith could have provided. When Agent Rust was on the stand, defense counsel told him, "You do not admit that you did a poor investigation. I'm trying to to [sic] show this jury that you did a poor investigation." Tr. IV 820. As defense counsel testified at a remanded hearing on direct appeal, by cross-examining Agent Rust, "all I can do is set a foundation. Who I needed was David Smith to come in and say, 'Yes. You're absolutely right and this is why it's below standard.'" 12/23/15 Tr. 67.

Further, had CFI Smith been present at the trial, he could have rebutted not only Agent Rust's methodology, but also his testimony. *See* Att. 5, Ex. 2 at 2 ("At the time of my illness, I was prepared to offer consultation assistance as well as expert testimony regarding the origin and cause of the subject fire, as well as assistance in expert rebuttal testimony of the state fire experts."). For example, he could have addressed Agent Rust's testimony that "'deep char' and 'alligator char' indicates a 'very hot fire.'" *Id.* at 10. He could have explained that "[i]n reality, char is typically a function of the type of wood and the duration of the fire rather than a relative heating. The myth of 'alligator char' being an indicator of a 'hot and or fast' fire was scientifically debunked and the findings widely published before 1992." *Id.* He could have explained to the jury:

> Rust testified that he prepared his origin and cause report 4 days prior to examining the scene. . . . That fact when viewed in juxtaposition to the Talihina Assistant Fire Chief's testimony that the fire department had to respond 2 or 3 more times the day after the fire to extinguish or put out "hotspots" . . . indicates that Rust didn't <u>ever</u> investigate the same fire that resulted in the arrest of Harris.

*Id.* at 12. CFI Smith also could have commented on Investigator Saulsberry's testimony contrasting his personal experience with fire with Mr. Harris's case. *Id.* at 12. Regarding Ms. Ferguson's alleged

statement to paramedic Lickly that Mr. Harris threw kerosene on her, CFI Smith could have explained that kerosene "would not be ignited by the quick application of an open flame (cigarette lighter)." *Id.*

OCCA's finding that "Smith's testimony would have been somewhat cumulative, since he had conducted no tests or examinations, and had no specific, evidence-based alternative theories of his own" was factually unreasonable. *Harris,* 450 P.3d at 947. Had he testified, he would have been able to conduct an examination on, at minimum, the most important piece of evidence. On direct appeal, CFI Smith explained, "Because I was not present to testify [at] Mr. Harris's trial, I was never able to view the physical evidence collected in the case." Att. 5, Ex. 2 at 13. He

> was particularly interested in the lighter [State's Exhibit 9] because it would provide forensic evidence to validate or negate the state's claim of it being "the murder weapon". Specifically, if used to set the fire in a gasoline enriched atmosphere, sooting would be present on the surfaces of the lighter as a result of the immediate ignition of the gasoline vapor. As well, if not used to set the fire and within his pants pocket at the time of gasoline vapor ignition, the lighter would be void of sooting. This evidence of "sooting" would have been relatively easy to observe and establish with a magnifying glass or low power microscope and is a test that I would have conducted if allowed.

*Id.* at 16. On direct appeal, "after a hearing on the whereabouts of the lighter, the court made a finding that the lighter, like the fire evidence and clothes, has been lost or destroyed." *Id. See* Ground 2; Supp. O.R. II 47. CFI Smith explained:

> After reviewing the photograph, I did not observe any evidence indicating the presence of sooting. However, I am unable [to] determine the presence or absence of sooting to any degree of scientific certainty without physical access to the evidence. Unlike the other missing evidence, the lighter was actually admitted during Mr. Harris's trial. Had I been permitted to testify, I would have been able to address conclusively whether the physical characteristics of [the] lighter collected from Mr. Harris supported the State's conclusion that the lighter had been used to start a gasoline fire.

Att. 5, Ex. 2 at 17.

OCCA found that "through unfortunate circumstances and his own tactical decisions, [Mr. Harris] was unable to use impeachment evidence in a way that he now considers optimal." *Harris*, 450 P.3d at 948. This was an unreasonable determination of fact. Mr. Harris's desire to present a single first-stage expert witness in an arson case with a flimsy investigation – and to present that expert when he was not under the influence of narcotics – can hardly be characterized as a "tactical decision[]." *Id.* And OCCA's comment that Mr. Harris was "unable to use impeachment evidence in a way that he now considers optimal" suggests counsel has at some point wavered on the best way to use CFI Smith's testimony or impeach Agent Rust. *Id.* On the contrary, defense counsel steadfastly and consistently objected to the trial's moving forward without CFI Smith's testimony.

## GROUND TWO
**THE LOSS BY THE STATE OF THE CIGARETTE LIGHTER ALLEGED TO BE THE IGNITION SOURCE OF THE FIRE VIOLATED MR. HARRIS'S CONSTITUTIONAL RIGHTS TO DUE PROCESS, A FAIR TRIAL, AND A MEANINGFUL APPEAL WITH EFFECTIVE ASSISTANCE OF COUNSEL.**[54]

After six remands by OCCA on direct appeal, Supp. O.R. II 34-35, Mr. Harris established that the State had lost the bulk of the evidence collected during its investigation.[55] In particular, the

---

[54] Mr. Harris addressed the evidence lost by the State in Proposition III of his direct appeal brief. Here, he limits the claim to the missing cigarette lighter alleged by the State to be the ignition source, raised in his direct appeal brief on pages 25-36. With this petition, Mr. Harris presents a report from CFI Smith to support the claim, Att. 6, which he has not yet presented in state court. Should this Court find this "new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, [it] must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild*, 579 F.3d at 1149.

[55] The evidence missing during Mr. Harris's trial or appeal included the cigarette lighter taken from his pocket upon arrest, broken glass and a mostly intact Crown Royal label collected from the Harris home after the fire, the clothes Mr. Harris was wearing when he was arrested, and several pieces of Ms. Ferguson's jewelry. Supp. O.R. I 13; Supp. O.R. II 44-47; 5/13/16 Tr. 13-16. Despite several remands by OCCA, this evidence was never produced and no credible explanation
(continued...)

State's loss of the cigarette lighter it claimed ignited the fire violated Mr. Harris's rights under the

Fifth, Sixth, Eighth, and Fourteenth Amendments. Negligent at best, the State's failure to preserve

key evidence throughout Mr. Harris's capital murder proceedings, rendering him unable until now

to test such a crucial item as the alleged ignition source for the fire, amounts to the "extreme

malfunction[] in the state criminal justice system" that federal habeas review is "designed to guard

against." *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring).

A.      **The State Lost Critical Evidence During Trial and Direct Appeal.**

Various pieces of evidence went missing at different times in the course of Mr. Harris's case.

Agent Rust testified at trial and during state appellate proceedings regarding the evidence missing

from the trial. According to Agent Rust, after collecting the broken glass, Crown Royal label, and

Mr. Harris's clothing from the crime scene and delivering it to OSBI, he traveled to retrieve the

evidence from the OSBI lab on May 21, 2012, and delivered it to LeFlore County District Attorney

Investigator Jody Thompson on May 22, 2012. P.H. Tr. 110-12, 129-30; Tr. IV 783-864; 12/23/15

Tr. 26. Although Agent Rust did not obtain a receipt or release from Investigator Thompson, Agent

---

[55](...continued)
was provided as to why it could not be located. Supp. O.R. I 13; Supp. O.R. II 44-47. OCCA
acknowledged "[t]he fact that evidence was lost before trial" in its post-conviction opinion. Opinion
Denying Application for Post-Conviction Relief and Related Motions at 3, *Harris v. State*, No. PCD-
2015-419 (Okla. Crim. App. July 30, 2020), appended hereto as Att. 1. In addition, appellate counsel
pointed to the unreliability stemming from the loss of a pretrial transcript of a hearing that both
parties recounted as being "lengthy" and substantial, and the many errors and omissions in the trial
transcripts, including over 100 "inaudibles," repeated references to "unidentified" jurors during voir
dire, and instances of nonsensical transcription, Brief of Appellant at 8-12, as well the omission from
the record of an important jury instruction regarding the burden of proof and non-unanimity needed
for mitigating circumstances, *id*. at 64-65.

Rust purportedly noted the delivery in his day runner.[56] 12/23/15 Tr. 28-29. At the remand hearing,

Agent Rust provided his May 21, 2012 receipt from OSBI (showing his receipt of Mr. Harris's

clothes and broken glass with Crown Royal label), and the portion of his day runner supposedly

documenting his activity on May 21-22, 2012. 12/23/15 Tr. Defendant's Exhibit 2-3.[57] Investigator

Thompson testified he has never seen the evidence and did not receive it from Rust on May 22,

2012, or any other day. 12/23/15 Tr. 114-15, 120.

---

[56] When presented with the May 22, 2012, notation in Agent Rust's day planner, ADA Nicholson expressed an opinion that the entry had either been forged or altered at a later date and suggested a possibility of pursuing charges against Agent Rust. 12/23/15 Tr. 12, 16. In her narrative to the court, ADA Nicholson advised the court that the absence of a receipt in her files documenting Agent Rust's transfer of the fire evidence and clothes to her office supported a conclusion that Agent Rust never gave this evidence to Investigator Thompson. 12/23/15 Tr. 5. Investigators Travis Saulsberry and Thompson both agreed that the office policy required them to obtain a receipt upon receiving evidence from another agency. 12/23/15 Tr. 108, 122.

[57] Agent Rust's entire day runner for 2012 was also admitted as State's Exhibit 2 at the 12/23/15 evidentiary hearing, appended hereto (along with State's Exhibit 1) as Att. 7. Consistent with the persistent loss of materials in this case, the trial court failed to transmit the exhibits from that hearing, OCCA had to remand the case again, and ultimately a copy of the exhibits was separately filed in OCCA. Supp. O.R. II 34-35. The original day runner was sent to the FBI. Supp. O.R. II 44. ADA Nicholson requested the Attorney General's Office Multicounty Grand Jury Unit review and prosecute allegations of perjury against Agent Rust. Motion for New Trial, Att. 4, appended hereto as Att. 8. OSBI Agent Shawn Ward found the day runner entry at issue was inconsistent with the other entries in its level of detail and spacing. *Id.* at 0249-50. Investigator Thompson's timesheet showed Investigator Thompson was not at work at the DA's office on May 22, 2012. *Id.* at 1-0029. Cell phone records did not show any calls between Investigator Thompson and Agent Rust on May 22, 2012 and otherwise contradicted Agent Rust's day runner entry. *Id.* at 1-0180-81, 1-0184, 1-0194, 1-0203, 1-0213, and 1-0237-39. A decision regarding the prosecution of Agent Rust apparently remains to be made. Application for Post-Conviction Relief, *Harris v. State*, No. D-2014-153 (Okla. Crim. App. Apr. 5, 2018), Att. 5 (Apr. 4, 2018 email from Assistant Attorney General Tom Helm: "I will let you know once a prosecution decision has been made."); May 6, 2021 email from Assistant Attorney General Ashley Willis, appended hereto as Att. 9: "I spoke with someone in the Grand Jury unit and there is no more additional information on Tony Rust other than what has already been provided."

In lieu of the above pieces of evidence themselves, photographs were entered as exhibits.[58] The lighter itself, in contrast, was entered into the trial record over objection as State's Exhibit 9, but later went missing. Defense counsel's expert, CFI Smith, did not get to examine the lighter, as he was rendered unable to travel to Oklahoma due to a medical emergency just prior to trial, *see* Ground 1, but provided a pretrial report explaining, "The ignition device in this matter (competent ignition source) is opined to be a cigarette lighter present in the defendant's pocket at the time of his arrest." Att. 3 at 6.

The State seized on the lighter's grave importance throughout the trial. The State said in its opening statement, "And you'll hear his explanation for why he had a lighter and it will make just about as much sense to you as the rest of what I think he had to say." Tr. IV 699-700. In closing, the State argued:

> What's our source of ignition? A lighter in the pocket of a nonsmoker. I don't smoke. I don't carry a lighter. I don't know about you. Well – because he says, Travis says, "Hey it must be killing you to be in jail for a couple of days and not being able to smoke." "Oh, I don't smoke." Wait a minute. You have this lighter – and are we making up the lighter? No. Because we have the lighter. Donnie says, "Yeah, I have a lighter." Why do you have a lighter if you don't smoke? "Well, I bought one at the same time I bought it for her. We have matching ones." The non-smoker carries a matching lighter. . . . So every day for two months he's sticking a lighter in his pocket when he doesn't smoke. Doesn't make sense. Part of the chain. . . . You have a causal chain here.

---

[58] Although the transcript of the December 4, 2013 pretrial hearing was lost, both Mr. Astor and ADA Nicholson recalled entering into a stipulation at that hearing permitting ADA Nicholson to admit photographs and OSBI reports in lieu of the broken glass, label, and clothing. However, Mr. Astor specifically stated he would not have agreed to stipulate unless the State had provided him an assurance the evidence existed and was still accessible. 12/23/15 Tr. 63. Mr. Astor's decision to stipulate to photographs of the glass and label as substitutions for the actual physical evidence was also based on being advised by ADA Nicholson, Investigator Thompson, or Investigator Saulsberry that "the smell of gasoline on the clothes, even on the bottle I believe, was overwhelming." Mr. Astor agreed this seemed an odd statement from DA employees who have since claimed they have never seen the evidence. 12/23/15 Tr. 64-65.

Tr. VI 1336-37. The State later reiterated Mr. Harris "set her on fire with a lighter that he had, the lighter that we took." Tr. VI 1344. In its second closing argument, the State again emphasized, "He's got the lighter and he doesn't smoke." Tr. VII 1382.  Without a chance to have an expert examine the lighter, defense counsel nonetheless attempted to sow doubt about whether it was the ignition source, saying during closing argument, "[H]e didn't get the lighter. If this lighter is so close to the gasoline, where is any soot in that? Why wasn't that sent down there [to OSBI?]" Tr. VIII 1355.

As CFI Smith had been unavailable to testify at trial, appellate counsel retained him. After reviewing the trial transcripts and other materials, CFI Smith requested to inspect the fire evidence collected by the State. CFI Smith expressed a specific interest in examining the cigarette lighter, stating:

> I was particularly interested in the lighter because it would provide forensic evidence to validate or negate the state's claim of it being "the murder weapon". Specifically, if used to set the fire in a gasoline enriched atmosphere, sooting would be present on the surfaces of the lighter as a result of the immediate ignition of the gasoline vapor. As well, if not used to set the fire and within his pants pocket at the time of gasoline vapor ignition, the lighter would be void of sooting. This evidence of "sooting" would have been relatively easy to observe and establish with a magnifying glass or low power microscope and is a test that I would have conducted if allowed.

Att. 5, Ex. 2 at 16. CFI Smith's ability to examine the lighter and report his conclusions was critical to issues Mr. Harris planned to present on appeal. However, a photograph of the lighter rather than the actual lighter was submitted by the trial court to the appellate court. *See* Supp. O.R. II 47 (Order Regarding State's Exhibit 9). CFI Smith further clarified why this photograph was insufficient for his purposes:

> After reviewing the photograph, I did not observe any evidence indicating the presence of sooting. However, I am unable determine [sic] the presence or absence of sooting to any degree of scientific certainty without physical access to the evidence. Unlike the other missing evidence, the lighter was actually admitted during Mr. Harris's trial. Had I been permitted to testify, I would have been able to address

conclusively whether the physical characteristics of lighter [sic] collected from Mr. Harris supported the State's conclusion that the lighter had been used to start a gasoline fire.

Att. 5, Ex. 2 at 16-17. Mr. Harris's appellate counsel attempted to obtain the lighter, but it was now missing. Following a stipulation by appellate counsel and ADA Nicholson, Supp. O.R. II 45-46, the trial court ordered that "without expressing an opinion regarding who was the last person or office to possess State's Exhibit 9, efforts to locate this exhibit have been unsuccessful" and thus "the actual physical exhibit admitted at trial is unavailable for Mr. Harris's appeal."[59] Supp. O.R. II 47.

**B.**   **The New Evidence.**

Undersigned counsel procured the previously lost lighter from LeFlore County and provided it to CFI Smith. *See* Defendant Donnie L. Harris Jr.'s Motion for Withdrawal of State's Trial Exhibit 9, CF-2012-113 (LeFlore County May 28, 2021), appended hereto as Att. 10; Order Granting Defendant's Motion for Withdrawal of State's Trial Exhibit 9, CF-2012-113 (LeFlore County June 9, 2021), appended hereto as Att. 11; affidavit from Mark Jacobs, appended hereto as Att. 12; affidavit from Angela ("Angie") Beery, appended hereto as Att 13. CFI Smith was, for the first time,

---

[59]Despite the missing evidence, transcripts, and trial exhibits, Mr. Harris pressed forward with his direct appeal. Shortly after he filed his brief, the lighter was found by the court reporter; Mr. Harris then filed a notice seeking a remand, in which he detailed his previous efforts to locate and obtain the lighter, as well as its importance to his case. *See* Notice to Court Regarding Missing Evidence (Possibily [sic] State's Trial Exhibit 9) and Request to Remand to the LeFlore County District Court (Sept. 26, 2018), appended hereto as Att. 10, Ex. B. The notice also sought to verify that the lighter was in fact State's Exhibit 9, determine the circumstances of how and when the lighter was located and how it was packaged/maintained, and determine whether any other relevant evidence regarding Mr. Harris's case had been found. *Id.* In denying Mr. Harris's appeal, OCCA included a footnote summarily transforming the notice and remand request into a motion for new trial based on newly discovered evidence, which it then denied for lack of timeliness. *Harris*, 450 P.3d at 967 n.45. Mr. Harris was further left with no remedy in his state post-conviction proceedings, as his post-conviction application was fully briefed at the time of the denial of relief and Okla. Stat. tit. 22, § 1089(D)(2) bars supplementation.

able to examine this key piece of evidence, as he would have done at trial if not for his medical emergency and on direct appeal had the lighter not gone missing. Upon examination, CFI Smith concluded, to a reasonable degree of scientific certainty, that the lighter could not have been used to start an ignitable liquid fire as there is no sooting present and unburned lint is present. Att. 6 at 2-5. *See also* Ground 1; Ground 7 (discussing lighter examination as new evidence of innocence).

**C.   Section 2254(d) Does Not Preclude Relief Because the State Court Adjudication Was Legally and Factually Unreasonable.**[60]

  **1.   OCCA's Adjudication of the *Trombetta* Claim Was Legally and Factually Unreasonable.**[61]

   **a.   OCCA Unreasonably Applied *Trombetta*.**

On direct appeal, Mr. Harris argued his due process rights were violated through the State's loss of the lighter under the *Arizona v. Youngblood*, 488 U.S. 51 (1988) and *California v. Trombetta*, 467 U.S. 479 (1984) line of cases. Brief of Appellant at 31-34. In *Trombetta*, the Supreme Court first set forth the framework for assessing whether the loss of evidence deprived a defendant of due process. Noting the "the treacherous task of divining the import of materials whose contents are unknown," 467 U.S. at 486, the Court provided an avenue for relief under the Due Process Clause when a defendant can show the State destroyed or lost evidence with "an exculpatory value that was apparent before it was destroyed" and "of such a nature that the defendant would be unable to obtain

---

[60]This Court should consider CFI Smith's report (Att. 6) even though it has not been presented in state court. Mr. Harris was prevented from developing the facts in state court because OCCA failed to grant an evidentiary hearing and the State lost the evidence. *See Black*, 682 F.3d at 895-96 (citing *Pinholster*, 563 U.S. 213 n.5 (Sotomayor, J., dissenting)).

[61]If this Court finds Mr. Harris overcomes the limitations of § 2254(d) , "§ 2254(d) deference doesn't apply; review is de novo; and *Pinholster* doesn't preclude" the Court's consideration of CFI Smith's new report. *Eaton*, 931 F.3d at 1019 (citations omitted).

comparable evidence by other reasonably available means." *Id.* at 489. *Youngblood* instead applies,

and requires bad faith on the part of the State, where the lost evidence was only "potentially useful."

488 U.S. at 58.[62] Mr. Harris argued that in his case, given the apparent exculpatory value of the

purported ignition source, he satisfied the *Trombetta* standard. *See* Brief of Appellant at 33.

OCCA identified *Trombetta* as the correct legal standard, but misapplied it in concluding,

"Given the totality of the evidence presented, we can understand why [defense counsel never asked

to inspect the evidence]: there was nothing to be gained from it." *Harris*, 450 P.3d at 949. In

addition to using an incorrect and unreasonable determination of the facts to arrive at this

conclusion,[63] as detailed *infra*, Ground 2(C)(1), OCCA unreasonably supplied its own materiality

standard in place of that actually contained in *Trombetta*. In *Trombetta*, the Court found the "duty

[to preserve evidence] must be limited to evidence that might be expected to play a significant role

in the suspect's defense." 467 U.S. at 488. The Court then explained that its two-pronged test was

being promulgated "[t]o meet this standard of constitutional materiality." *Id.* at 489. The "totality

of the evidence" standard imposed by OCCA has no place in a *Trombetta* analysis and marks an

---

[62] While Mr. Harris currently possesses no evidence of bad faith, the *Youngblood* standard might be found to apply if he is granted his discovery or evidentiary hearing requests and, for the first time, is able to develop supporting evidence. *See Riggs v. Williams*, 87 F. App'x 103, 106 (10th Cir. 2004) (conducting independent review to determine whether *Youngblood* bad faith shown, as it is mixed question of fact and law and lower court did not hold evidentiary hearing). Mr. Harris on direct appeal did not concede there was an absence of bad faith, *see, e.g.,* Appellant's Reply Brief at 2, *Harris v. State*, No. D-2014-153 (Okla. Crim. App. Sept. 1, 2017), and he was prevented from developing such evidence in state court. It bears noting that, unlike with the routinely destroyed drunken driving breath samples at issue in *Trombetta*, the unpreserved crime scene evidence in Mr. Harris's case did not go missing "in accord with [the State's] normal practice." 467 U.S. at 488.

[63] Section 2245(d)(2) "provides relevant context for [] interpretation of (d)(1) . . . federal habeas courts must make as the starting points of their analysis the state courts' determinations of fact." *Williams*, 529 U.S. 362, 387 (2000).

unreasonable application of clearly established federal law.[64] This also prevented OCCA from reasonably applying the second prong of *Trombetta* to find that no other evidence could be comparable to the alleged ignition source, which has singular importance in this case.

      **b.**      **OCCA's Adjudication Was Factually Unreasonable.**[65]

In resolving Mr. Harris's *Trombetta* claim, OCCA stated:

> We first consider whether this evidence had any apparent exculpatory value. The simple answer is that, if the evidence had had any tendency to substantiate any part of the defense theory, or contradict the State's theory, then defense counsel would have at least asked to inspect it . . . [T]here was nothing particularly probative about the physical evidence for either party, as it only tended to corroborate what was never in dispute: that Appellant owned a cigarette lighter [].

Att. 1 at 32 (emphasis in original). This conclusion is factually unreasonable on multiple points, as the record before OCCA demonstrates. First, defense counsel did plan to have their expert, CFI Smith, inspect the physical evidence when he traveled to Oklahoma for the trial. In his pretrial report, CFI Smith had emphasized the importance of examining the lighter for soot in reporting, "The ignition device in this matter (competent ignition source) is opined to be a cigarette lighter present in the defendant's pocket at the time of his arrest. No data is present to indicate empirical testing of that theory, i.e., examination for soot particles, etc." Att. 3 at 6. On direct appeal, CFI Smith reiterated the central position of the lighter to the State's theory of guilt and the importance he therefore placed on examining and testing it. *See* Notice to Court and Request for Evidentiary

---

[64]Alternatively, OCCA's standard is contrary to *Trombetta*.

[65]OCCA's deficient fact-finding can support a finding that either § 2254(d)(2) is satisfied or that there was no adjudication on the merits. *See Gordon*, 780 F.3d at 202; *Milke v. Ryan*, 711 F.3d at 1007.

Hearing Regarding Missing Evidence, *Harris v. State*, No. D-2014-153 (Okla. Crim. App. Nov. 23,

2015) (appended hereto as Att. 14), Def. Ex. 2 at ¶ 8. CFI Smith

> was particularly interested in the lighter [State's Exhibit 9] because it would provide forensic evidence to validate or negate the state's claim of it being "the murder weapon". Specifically, if used to set the fire in a gasoline enriched atmosphere, sooting would be present on the surfaces of the lighter as a result of the immediate ignition of the gasoline vapor. As well, if not used to set the fire and within his pants pocket at the time of gasoline vapor ignition, the lighter would be void of sooting. This evidence of "sooting" would have been relatively easy to observe and establish with a magnifying glass or low power microscope and is a test that I would have conducted if allowed.[66]

Att. 5, Ex. 2 at 16. Only a physical examination of the lighter would have been sufficient, as CFI

Smith further explained:

> After reviewing the photograph [taken of the lighter for the appeal], I did not observe any evidence indicating the presence of sooting. However, I am unable [to] determine the presence or absence of sooting to any degree of scientific certainty without physical access to the evidence. Unlike the other missing evidence, the lighter was actually admitted during Mr. Harris's trial. Had I been permitted to testify, I would have been able to address conclusively whether the physical characteristics of [the] lighter collected from Mr. Harris supported the State's conclusion that the lighter had been used to start a gasoline fire.

*Id.* 16-17.

In numerous additional instances, the factual record belies OCCA's attempt to minimize the

lighter's role in the case. As the State's "murder weapon," the lighter was inarguably probative; in

---

[66] CFI Smith's statement also renders unreasonable another of OCCA's factual determinations, namely that "Appellant offers no theory of how any of this evidence might have been parlayed to his advantage with additional examination or testing." *Harris*, 450 P.3d at 949. To the contrary, Mr. Harris has repeatedly explained through his expert exactly how examination and testing could scientifically confirm the absence of sooting on the lighter and thus debunk the State's entire murder theory. *See* Brief of Appellant at 32.

recognition of such, the State admitted it as an exhibit.[67] It is unclear why OCCA believes the State would seek to introduce evidence of the alleged arson ignition source other than for its probative value. As recounted above, the State emphasized during its closing argument that the lighter was the ignition source; defense counsel sought to cast doubt on the same fact in closing. Both parties understood and reacted to the obvious exculpatory value of the lighter allegedly used in the arson underlying the capital felony-murder charge. In its own factual narrative, OCCA, too, saw fit to note that a "lighter was found in Mr. Harris's pocket, although he later told a detective that he did not smoke." *Harris*, 450 P.3d at 941.

OCCA's unsupported assertion that the lighter had been inexplicably introduced to prove ownership of an otherwise irrelevant item infected its assessment of Mr. Harris's *Trombetta* claim. OCCA went on to repeatedly and summarily contradict the record evidence in insisting the lighter lacked value. *See Harris*, 450 P.d at 949 ("We fail to see any exculpatory value in this evidence which would have been readily apparent before it went missing."); *id.* ("[T]here was nothing to be gained [from inspecting the lighter]."). Under a reasonable determination of the facts, the lighter would have been seen to satisfy both *Trombetta* prongs of possessing apparent exculpatory value and being of such a nature that Mr. Harris was unable to obtain comparable evidence. *See* 467 U.S. at 489. As the only alleged ignition source, the lighter is inherently incomparable to any other piece of evidence.

---

[67] This was an element that factored into the Supreme Court's analysis of whether a due process violation had occurred in *Youngblood*, where in contrast the "the State did not attempt to make use of the materials in its own case in chief." 488 U.S. at 56.

### 2. There Was No Reasonable Basis for the State Court to Deny Relief on Mr. Harris's *Cronic/Penson* Claim.

In addition to the *Trombetta* due process claim, Mr. Harris argued that the missing evidence had violated his constitutional right to meaningful assistance of counsel, as counsel was prevented from doing the testing she otherwise would have. *See* Brief of Appellant at 34-45. Mr. Harris argued for this claim to be analyzed under *Cronic*, 466 U.S. at 658-59 & n.24, which does not require a showing of prejudice where state interference prevents counsel from performing effectively, and *Penson v. Ohio*, 488 U.S. 75, 88 (1988), which applies *Cronic* to ineffective assistance of appellate counsel claims. Brief of Appellant at 35.

OCCA did not adjudicate Mr. Harris's appellate *Cronic/Penson* claim, resolving only the *Trombetta* claim. The *Cronic/Penson* adjudication thus falls into the category of an unreasoned denial. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). *See also id.* at 102 (§ 2254(d) requires federal habeas courts to "determine what arguments or theories [] could have supported [] the state court's decision"); *Johnson v. Williams*, 568 U.S. 289, 293 (2013) (federal court must apply rebuttable presumption that state court opinion addressing only some claims also meant to dispose of petitioner's other claims). Here, given the two claims' basis is the same missing evidence, OCCA's *Cronic/Penson* denial likely rested on the same unreasonable determinations of facts in light of the record as that underlying its *Trombetta* holding, discussed in the previous subsection. Here, too, OCCA's unreasonable and unsupported characterization of the alleged murder weapon as trivial would color its adjudication of the claim. As such, its *Cronic/Penson* adjudication would be unreasonable, and unentitled to deference, under § 2254(d)(2).

Using this unreasonable determination of facts as the necessary "relevant context" for interpreting OCCA's application of the governing law, *Williams*, 529 U.S. at 387, the adjudication would also not be entitled to deference under § 2254(d)(1). Under *Strickland*, the "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." 466 U.S. at 686 (collecting cases). Here, the State's interference, whether intentional or negligent, precluded appellate counsel from "subjecting [] to meaningful adversarial testing" a crucial aspect of the State's case. *Cronic*, 466 U.S. at 659. In light of the crucial role the supposed ignition source plays in an arson case, this amounts to "constitutional error of the first magnitude." *Id.* (internal citation and quotation marks omitted).

OCCA's miscasting of the lighter as a tangential piece of evidence that the defense team was uninterested in evaluating would have prevented it from correctly applying *Strickland, Cronic*, and *Penson*. Properly applied, this line of cases would accord the "murder weapon," and appellate counsel's representation unable to test it due to the State, its proper significance. The magnitude of this denial thus differentiates it from where appellate counsel simply "failed to argue an issue as effectively as [] she might," bringing it within the purview of *Penson* and allowing prejudice to be presumed. 488 U.S. at 88.

**D.**   **In the Alternative, If This Court Finds the New Evidence Transforms the Claim into One the State Court Has Not Adjudicated on the Merits, § 2254(d) Does Not Preclude Relief.**[68]

---

[68] Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust this claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

If this Court finds that the evidence not yet presented in state court does more than "'add[] color' to the claim presented in state court" and instead "so changes [the] legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim," this Court "must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild*, 579 F.3d at 1148-49 (citations omitted).

Here, the newly found and examined evidence puts Mr. Harris's *Trombetta* claim in a significantly stronger posture, providing the missing exculpatory link. While OCCA's *Trombetta* analysis was unreasonable legally and factually even without the new testing results, as explained *supra* in Ground 2(C), the new findings render the due process and right-to-counsel violations materially different in substance and not addressed by OCCA's analysis. Mr. Harris has now definitively confirmed the lighter's exculpatory value.

Further, the finding and testing of the lighter transforms Mr. Harris's *Trombetta* claim into a previously unraised *Brady* claim. *See Trombetta*, 467 U.S. at 486-87 ("In nondisclosure [vs. destruction] cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced."); *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994) (explaining how discovery of the missing evidence during appeals renders both the State's culpability in the evidence loss and "guessing as to its probative value" inapplicable, as *Brady* rather than *Trombetta*/*Youngblood* standards now governs analysis of the due process violation). *See also United States v. Femia*, 9 F.3d 990, 994 (1st Cir. 1993) ("We apply *Youngblood* to evidence which no longer exists and *Brady* to exculpatory evidence in the government's possession); *Abdul-Salaam v. Beard*, 2008 WL 2704605, at *15 (M.D. Pa. July 7, 2008) (with discovery results, "the *Youngblood* claim has manifestly evolved into a *Brady* claim").

73

While this evolution has occurred among standards that "might loosely be called the area of constitutionally guaranteed access to evidence," *Valenzuela-Bernal*, 458 U.S. at 867, the claim must nonetheless now receive analysis under a framework that could not be applied in Mr. Harris's initial state court proceedings. The lighter satisfies the newly applicable *Brady* standard as "favorable to [Mr. Harris], because it is exculpatory," "suppressed by the State, either willfully or inadvertently," and prejudicial to the trial's outcome, as the previously unavailable alleged ignition source. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

**<u>GROUND THREE</u>**

**THE STATE'S FAILURE TO DISCLOSE FAVORABLE IMPEACHMENT EVIDENCE REGARDING A KEY TRIAL WITNESS VIOLATED MR. HARRIS'S RIGHT TO DUE PROCESS.**[69]

Trial counsel's "strategy to defend Mr. Harris against the State's charges at trial centered around discrediting Agent Rust's conclusions and credibility . . . ."  Att. 4 at ¶ 5. At trial, counsel told Agent Rust during his testimony, "I'm trying to to [sic] show this jury that you did a poor investigation." Tr. IV 820. Counsel argued in closing, "I don't think you want to put your rubber

---

[69]Mr. Harris raised this claim as Proposition IV on pages 36-44 of his direct-appeal brief and pages 10-15 of his application for evidentiary hearing. On direct appeal, Mr. Harris claimed the State violated *Brady* with respect to the "Continuing Investigation and Possible Criminal Charges Regarding Rust's Investigation of the Harris Case." Brief of Appellant at 39. OCCA "easily dispense[d]" with that portion of the claim "because the factual basis simply did not exist at the time of trial. Appellant could not have impeached Rust's credibility with events that had not yet happened." *Harris*, 450 P.3d at 950. Mr. Harris does not raise this component of the claim in this petition.

With this petition, Mr. Harris presents additional *Brady* material to support the claim, which he has not yet presented in state court. Should this Court find this "new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, [it] must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild* 579 F.3d at 1149.

stamp on Tony Rust's work." Tr. VII 1363. However, defense counsel was unaware that the State

had failed to disclose favorable and material impeachment evidence.

A.    **Legal Argument.**

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression

by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution." The Court has

> since held that the duty to disclose such evidence is applicable even though there has
> been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 . . . (1976),
> and that the duty encompasses impeachment evidence as well as exculpatory
> evidence, *United States v. Bagley*, 473 U.S. 667, 676 . . . (1985). Such evidence is
> material "if there is a reasonable probability that, had the evidence been disclosed to
> the defense, the result of the proceeding would have been different." *Id.*[] at 682 . .
> .; *see also Kyles v. Whitley*, 514 U.S. 419, 433-434 . . . (1995). Moreover, the rule
> encompasses evidence "known only to police investigators and not to the
> prosecutor." *Id.*[] at 438. In order to comply with *Brady*, therefore, "the individual
> prosecutor has a duty to learn of any favorable evidence known to the others acting
> on the government's behalf in this case, including the police." *Kyles*, 514 U.S.[] at
> 437.

*Strickler*, 527 U.S. at 280-81. *See Giglio v. United States*, 405 U.S. 150, 153-55 (1972). Thus,

"[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to

the accused, either because it is exculpatory, or because it is impeaching; that evidence must have

been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

*Strickler*, 527 U.S. at 281-82. This duty to disclose does not end once the trial is over, but instead

"continues throughout the judicial process." *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir.

2009) (citing *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997)); *Smith*, 115 F.3d at 820 (citing

*Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)). The State's *Brady* obligation "turns on the

cumulative effect of all such evidence suppressed by the government," *Kyles*, 514 U.S. at 421;

75

"*Bagley* materiality" is defined "in terms of suppressed evidence considered collectively, not item by item," *id.* at 436.

**B.      The *Brady* Violations Presented in State Court.**

**1.      The State Failed to Disclose Information Regarding Agent Rust's History of Deceptive Investigative Practices.**

During the December 23, 2015 post-trial hearing regarding the location of missing evidence, *see* Ground 2, the State produced records from the OSFM office regarding Agent Tony Rust.[70] 12/23/15 State's Ex. 1, appended hereto as Att. 7. Although the bulk of the records produced concern the agency's discipline of Agent Rust for his investigation of the fire in Mr. Harris's case,[71] the records also document a previous reprimand for similar conduct and otherwise show longstanding problems with Agent Rust's investigations. The OSFM reprimanded Agent Rust in 2009 for "not doing on scene origin and cause investigations only taking pictures" [sic] and being "in a rush to arrest before a case was developed." *Id.* The records make clear that there were longstanding concerns about Agent Rust's investigations and that he had not been properly trained. When Agent Rust confronted his supervisor about being disciplined in 2015 (in relation to Mr. Harris's case) with the fact Agent Rust had investigated "over 900 fires for this Agency," the

---

[70]These records were related to an internal investigation by the OSFM relating to Agent Rust's investigation of Mr. Harris's case. 12/23/15 Tr. 7. In 2015, Agent Rust's pay was suspended pending an internal investigation of the violation of OSFM policy and procedures. Att. 7. "And they did a complete report, a complete investigation, for which . . . a number of . . . people were interviewed. And they took disciplinary action as a result of the investigation against Tony Rust." 12/23/15 Tr. 8.

[71]At the hearing, the State presented testimony from an OSFM Agent that Agent Rust violated the OSFM policies governing the "collection and handling" of evidence during his investigation of the Harris fire. 12/23/15 Tr. 97-98. As described *supra* at 62 n.57, Agent Rust faces possible perjury charges related to missing evidence in Mr. Harris's case.

76

supervisor replied, "900 investigations done incorrectly does not make it right."[72] *Id.* Agent Rust's supervisor ordered him to immediately cease investigating fires without on-scene supervision by his supervisor until completing extensive additional training.[73] *Id.*

In addition, the records showed that ADA Nicholson had knowledge of Agent Rust's shoddy investigative practices and untrustworthiness, based on past experiences with Agent Rust, including on Mr. Harris's case. ADA Nicholson testified that she supervised Agent Rust at the DA's office for about three months prior to his employment at the OSFM. 12/23/15 Tr. 8. ADA Nicholson described "issues" with Agent Rust's work. 12/23/15 Tr. 9. She explained Agent Rust "was spending an awful lot of time unsupervised in the state vehicle and it didn't seem to be productive." 12/23/15 Tr. 9. As a result, the first assistant "implemented a system to try to track his time better. . . . So there was a log system that the first assistant kind of implemented where Tony [Rust] was responsible for logging everywhere he went." 12/23/15 Tr. 9. ADA Nicholson "recall[ed] one specific instance of having to say, 'Hey, you know, you executed that warrant last week and you said you executed it again this week.'" 12/23/15 Tr. 9-10.

ADA Nicholson's knowledge of Agent Rust's deceptive investigative practices specifically included knowledge of his work on Mr. Harris's case. She disclosed during an interview with an OSFM agent that her office had to rewrite Agent Rust's probable cause affidavit in Mr. Harris's case after he had arrested Mr. Harris, because "Agent Rust's PC affidavit didn't contain the needed

---

[72]Agent Rust admitted at the remanded hearing that he did not know whether he was required to submit evidence to the evidence locker within a certain period of time. 12/23/15 Tr. 45. He admitted as an agent he should know that. 12/23/15 Tr. 45.

[73] When Agent Rust said he did not want to go to the training, his supervisor suggested Agent Rust "look for a new line of work." Att. 7.

elements to constitute probable cause." Att. 7. She "stated that after talking to Agent Rust about the fire she sent her investigator back to the scene with Agent Rust." *Id.* "Agent Rust stated that 'he didn't need a search warrant, he is the fire marshal'. At [ADA Nicholson's] insistence a search warrant was acquired before going back to the fire scene."[74] *Id.*

Trial counsel filed a detailed pretrial discovery motion that covered not only Agent Rust's OSFM employment records but also ADA Nicholson's personal knowledge regarding his competence and credibility. In the motion, trial counsel requested the State to "[i]dentify and produce all evidence tending to impeach the credibility of each potential witness" and "[i]dentify and produce each statement made by any person to the government concerning the credibility of any potential witness." O.R. I 34. Later in the motion, under the heading "Scientific and Technical Investigations," counsel specifically requested the State to "[i]dentify and produce all training manuals used as reference or training for each person conducting or participating in each such investigation, including peer review" and "[i]dentify and produce all proficiency tests and results for each person conducting or participating in each such investigation, including peer review." O.R.

---

[74]Investigator Thompson similarly explained in his interview that

> [he] and Assistant District Attorney Margaret Nicholson questioned Agent Rust about the fire and consequently had to rewrite his PC affidavit. Ms Nicholson advised Investigator Thompson to get a search warrant and return to the scene with Agent Rust to do an interior examination. Investigator Thompson indicated that Agent Rust replied "I don't need a search warrant, I'm the fire marshal". Ms. Nicholson reiterated to "get a search warrant" which Investigator Thompson did prior to returning to the fire scene.

Att. 7. Agent Rust's supervisor also faulted him in relation to Mr. Harris's case for failing to include "copies of a search warrant, scene sketches, Miranda Warning, Voluntary statements, Transfer of evidence documents or photo logs in the OSFM case File [sic]." Att. 7.

I 44. Even despite this formal discovery request, the State failed to provide Mr. Harris this impeachment material.

## C.     The *Brady* Violations Not Presented in State Court.[75]

### 1.     The State Failed to Disclose Information Regarding Agent Rust's Disputed Investigation of a 2009 Case and to Correct False Testimony.

Approximately four years prior to Mr. Harris's trial, Kristy Kay Kisselburg was charged with two felonies – second-degree arson and endangering emergency service personnel during arson – in the weeks following an August 30, 2009 fire in her Sequoyah County day care facility.[76] The charges carried potential penalties of fines in the tens of thousands of dollars, and decades of imprisonment. Att. 15, Ex. 1 (Information). Agent Rust investigated the fire on behalf of the OSFM, as he did in Mr. Harris's case. Agent Rust's September 14, 2009 origin and cause report[77] recounted Ms. Kisselburg's explanation that she had been cleaning the facility with gasoline and then accidentally left food cooking in the oven overnight, before concluding "the fire was humanly induced." Att. 15, Ex. 1 (OSFM Origin and Cause Report at 2). Agent Rust cited "multiple sets" of

---

[75]This Court should consider this evidence even though it has not been presented in state court. Mr. Harris was prevented from developing the facts in state court because OCCA failed to grant an evidentiary hearing. *See Black*, 682 F.3d at 895-96 (citing *Pinholster*, 563 U.S. 213 n.5 (Sotomayor, J., dissenting)). Further, although this claim is currently limited to Agent Rust's disputed investigation of a 2009 case, Mr. Harris may discover additional *Brady* material, which he will present in his amended petition as part of this same claim.

[76]The information regarding Ms. Kisselburg's case was discovered on post-conviction by defense investigator Kim A. Marks, but post-conviction counsel failed to present it. An affidavit from Kim A. Marks is attached hereto as Att. 15, and some of the information she discovered is attached to her affidavit as Ex. 1. Where Mr. Harris cites to a particular document she found, he will name the document (and, where necessary, provide a page number) in a parenthetical.

[77] The fire and investigation occurred in the same year that OSFM reprimanded Agent Rust for "not doing on scene origin and cause investigations only taking pictures" [sic] and being "in a rush to arrest before a case was developed." Att. 7. *See supra*, Ground 3(B).

fire origin areas and found "accidental causes were eliminated." *Id*. He also noted Ms. Kisselburg's "financial trouble with her business." *Id*. Citing his "training and experience" and "systematic scientific approach," Agent Rust concluded it was "an incendiary fire" in which "the building was set up to burn the evidence." *Id.* Agent Rust's affidavit supporting the arrest warrant, which issued ten days later, tread much of the same ground, with Agent Rust alleging "areas of high fuel load" and "multiple locations for this fire," which "eliminate[d] accidental causes," further citing "inaccurate statements . . . and [] the financial situation of Kristy Kisselburg."[78] Att. 15, Ex. 1 (Affidavit for Assurance of Arrest Warrant at 5).

However, a private investigator also conducted a fire scene examination, on behalf of Ms. Kisselburg's insurer. In a preliminary summary of his September 9, 2009 examination, investigator Matthew Cooper concluded the fire was caused by "unattended cooking activities" and "improper/unsafe storage and usage of gasoline." Att. 15, Ex. 1 (JJMA Investigations LLC Documentation of Origin and Cause Investigation). Unlike Agent Rust's vague references to his "systematic scientific approach," Mr. Cooper explicitly based his findings on the "2008 edition of NFPA 921; 'A Guide for Fire and Explosion Investigations'"[79] in both his preliminary summary and full origin and cause report, issued October 20, 2009. Att. 15, Ex. 1 (JJMA Investigations LLC Documentation of Origin and Cause Investigation; JJMA Investigations LLC Origin and Cause

---

[78] Agent Rust spent a good portion of the affidavit focused on factors external to fire science, such as employee statements speaking to issues with their paychecks or worker's compensation claims. Att. 15, Ex. 1 (Affidavit for Assurance of Arrest Warrant at 4-5).

[79] Ms. Kisselburg's judge approvingly deemed this manual "the Bible" of fire investigation. Att. 15, Ex. 1 (6/14/10 Prelim. Hrg. Tr. 10).

Report at 2). Mr. Cooper's full report matched the preliminary summary in concluding the fire had accidental causes. Att. 15, Ex. 1 (JJMA Investigations LLC Origin and Cause Report at 9).

Ms. Kisselburg's preliminary hearing occurred over multiple days in 2010. Att. 15, Ex. 1 (Docket at 2-3). Mr. Cooper testified to the many ways he disputed Agent Rust's findings. Att. 15, Ex. 1 (6/14/10 Prelim. Hrg. Tr. 63-71). Based on Mr. Cooper's own assessment of the scene, he answered defense counsel's question that "there's no way [Rust] could have seen a [gasoline] pour pattern with what you saw?" with an unequivocal, "No, sir." *Id.* at 65. On September 15, 2011 – nearly two years after Ms. Kisselburg's arrest – the charges were dismissed. Att. 15, Ex. 1 (Docket at 3). The cost of the wrongful criminal proceedings were borne by the State. *Id.* The prosecuting attorney told the press that District Judge Jeff Payton had dismissed the case based on Mr. Cooper's preliminary hearing testimony, which tracked his report in concluding "he did not think arson was involved." Att. 15, Ex. 1 (*Access World News* article (Sept. 16, 2011)). Further supporting the charges' dismissal, the insurance company for whom Mr. Cooper prepared his report had paid Ms. Kisselburg's insurance claim.[80] *Id.*

---

[80] Trial and appellate counsel's failure to obtain these court records also forms the basis of an ineffective assistance of counsel ("IAC") ground, *see* Ground 14(C). However, whether trial counsel should have been able to independently uncover undisclosed evidence is not the proper subject of a *Brady* claim analysis. Instead, "tradition and experience" counsel the assumption "that prosecutors have fully discharged their duties." *Strickler*, 527 U.S. at 286 (citations and internal quotation marks omitted). This circuit has rejected attempts to ground the *Brady* inquiry in the question of petitioner's diligence, s*ee Fontenot v. Crow*, No. 19-7045, 2021 WL 2933220, at *63-64 (10th Cir. July 13, 2021) (reaffirming rejection of defendant diligence requirement as aspect of *Brady* claim); *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995) (internal quotation marks omitted) ("The only relevant inquiry is whether the information was exculpatory."), as have certain other courts. *See, e.g., Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 293 (3d Cir. 2021) ("[A] defendant's lack of independent investigation does not equate to a lack of due diligence, at least not without facts giving him a reasonable basis to suspect a *Brady* violation."); *Com. v. Tucceri*, 589 N.E. 2d 1216, 1221 (Mass. 1992) (trial counsel failures "do not relieve the prosecution
(continued...)

Without these records, counsel could not adequately impeach Agent Rust at trial, leading to a further *Brady* violation when Agent Rust falsely testified regarding the disputed investigation. *See United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015) ("A defendant may have a *Brady* claim if . . . the prosecution did not correct testimony that it should have known was false."). During cross-examination, the following exchange between trial counsel and Agent Rust took place:

Q:     [D]o you have any investigations that were disputed[,] where anybody disputed your findings?
A:     I don't believe so.
Q:     Has there been any court that you've testified in or any cases where they had stated that your conclusions were wrong?
A.     No.

Tr. IV 805. Agent Rust neglected to mention Ms. Kisselburg's case, dismissed only two years before Mr. Harris's trial, where his findings were not only disputed, but were so debunked that the criminal charges were dismissed based on the private investigator's contrary report. Agent Rust was aware of the dispute, as he testified during Ms. Kisselburg's preliminary hearing. Att. 15, Ex. 1 (5/10/10 Prelim. Hrg. Tr. 76).

## D.     If This Court Finds the New Evidence Transforms the *Brady* Claim into One the State Court Has Not Adjudicated on the Merits, § 2254(d) Does Not Preclude Relief.[81]

If this Court finds that the *Brady* material not yet presented in state court – regarding Ms. Kisselburg's case and the State's failure to correct false testimony, described in the preceding

---

[80](...continued)
of its obligation to disclose exculpatory evidence"). *Fontenot* saw the Tenth Circuit hold steadfast as to this jurisdiction's approach, while recognizing the divergent law prioritizing diligence in some of its "sister circuits." *See Fontenot*, WL 2933220, at *64.

[81] Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust the *Brady* claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

82

subsection – does more than "'add[] color' to the claim presented in state court" and instead "so changes [the] legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim," this Court "must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild*, 579 F.3d at 1148-49 (citations omitted).

The *Brady* material, including the evidence not yet presented to OCCA, was favorable because it is impeaching, the evidence was suppressed by the State,[82] and prejudice ensued. *Strickler*, 527 U.S. at 281-82. The additional evidence strengthens the *Brady* claim, as the materiality of undisclosed evidence is assessed cumulatively, not item by item. *See Kyles*, 514 U.S. at 436. As set out *infra*, Ground 3(E), Agent Rust was central to the State's case against Mr. Harris. The undisclosed "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The prejudicial effect of the undisclosed evidence in Mr. Harris's case thus considers in totality Agent Rust's performance history, his prior disputed investigation, and his false testimony as to same.

**E.    In the Alternative, § 2254(d) Does Not Preclude Relief Because the State Court Adjudication Was Factually and Legally Unreasonable.[83]**

If this Court finds the *Brady* claim presented here is the same as that adjudicated on the merits by OCCA, it should still consider the claim de novo because it overcomes the limitations

---

[82] As Mr. Harris explains *infra*, this evidence within the possession of "agents of the prosecution" is imputed to the prosecution; actual knowledge is not required. *See infra* at 92 n.97 (citing *McCormick v. Parker*, 821 F.3d 1240, 1246-47 (10th Cir. 2016)).

[83] This Court should consider new *Brady* material (Att. 15, Ex. 1) even though it has not been presented in state court. Mr. Harris was prevented from developing the facts in state court because OCCA failed to grant an evidentiary hearing. *See Black*, 682 F.3d at 895-96 (citing *Pinholster*, 563 U.S. 213 n.5 (Sotomayor, J., dissenting)).

imposed by 28 U.S.C. § 2254(d)(1), (2).[84] OCCA's adjudication of the *Brady* claim was both factually and legally unreasonable.

Citing *Brady*, 373 U.S. at 87, *Bagley*, 473 U.S. at 677, 682, and *Cone v. Bell*, 556 U.S. 449, 470 (2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)), OCCA found there was no *Brady* violation. *Harris*, 450 P.3d at 949-52. Specifically, OCCA found that "Appellant has not demonstrated a reasonable probability that any of the proffered information concerning Agent Rust would have affected the outcome of the trial." *Id.* at 952. OCCA's decision was contrary to and involved unreasonable applications of *Brady* and its progeny, including *Bagley*, *Kyles*, and *Strickler*. § 2254(d)(1). It was also based on unreasonable determinations of fact. § 2254(d)(2).

## 1.    OCCA's Adjudication Was Based on Unreasonable Determinations of Fact.[85]

First, OCCA made factually unreasonable determinations in mischaracterizing the withheld impeachment material. OCCA found:

> Appellant concedes that the "bulk" of his concerns with Agent Rust's credibility relate to his investigation of *this* case, and he does not claim that the prosecutor has withheld any information on that subject. Since those allegations arose, the prosecutor has been completely cooperative and forthcoming in transmitting information to Appellant's defense team.

*Harris*, 450 P.3d at 950. Although some of the evidence regarding Agent Rust's investigation of this case did not arise until after trial, it is not the case that the State had no information on the subject of Agent Rust's credibility with his respect to his investigation of Mr. Harris's case. Contrary to

---

[84]If this Court finds Mr. Harris overcomes these limitations, "§ 2254(d) deference doesn't apply; review is de novo; and *Pinholster* doesn't preclude" the Court's consideration of the new *Brady* material. *Eaton*, 931 F.3d at 1019.

[85]OCCA's deficient fact-finding can support a finding that either § 2254(d)(2) is satisfied or that there was no adjudication on the merits. *See Gordon*, 780 F.3d at 202; *Milke*, 711 F.3d at 1007.

OCCA's finding, Mr. Harris did, in fact, claim on direct appeal that the prosecutor withheld information on Agent Rust's investigation of this case prior to trial. *See* Brief of Appellant at 38-39. As described above, ADA Nicholson disclosed during an interview with an OSFM agent that her office had to rewrite Agent Rust's probable cause affidavit in Mr. Harris's case after he had arrested Mr. Harris, because "Agent Rust's PC affidavit didn't contain the needed elements to constitute probable cause." Att. 7. She "stated that after talking to Agent Rust about the fire she sent her investigator back to the scene with Agent Rust." *Id.* "Agent Rust stated that 'he didn't need a search warrant, he is the fire marshal'. At her insistence a search warrant was acquired before going back to the fire scene."[86] *Id.* OCCA correctly stated this information was disclosed to counsel after the trial in the course of the investigation of Agent Rust, but it was in the State's possession prior to the trial.

OCCA again unreasonably mischaracterized the withheld impeachment material in finding:

The . . . allegations concern Rust's training and other alleged personnel issues which occurred before this prosecution. We stress that these allegations *do not* involve claims that Rust ever destroyed, hid, or tampered with any evidence, in this investigation or in any other.[87] In essence, the evidence that developed after trial[88] suggested that Rust had not always followed office policy in his investigations, and that the prosecutor herself had unspecified "issues" with Rust while she briefly supervised him years before. We believe any impeachment value in Agent Rust's general work habits bears little relevance to this case.

---

[86]Investigator Thompson corroborated this account in his interview. Att. 7. Agent Rust's supervisor also described Agent Rust's failures to include required documentation in the file. *Id.*

[87]OCCA later similarly claimed, "Appellant does not claim any of the evidence Rust collected was tampered with or planted. He does not claim that his statements to Rust were coerced or fabricated." *Harris*, 450 P.3d at 951. For the reasons described *infra*, this was unreasonable.

[88]To clarify, this evidence itself did not "develop[] after trial" even though it was disclosed in the course of an investigation that occurred after trial. *Harris*, 450 P.3d at 951.

*Harris*, 450 P.3d at 951. First, Mr. Harris did not only complain about evidence withheld regarding "Rust's training and other alleged personnel issues which occurred before this prosecution." *Id.* As just described, the prosecution withheld evidence related to Agent Rust's investigation of Mr. Harris's case, which OCCA unreasonably ignored in its entirety. Further, while Mr. Harris has not explicitly alleged Agent Rust "destroyed, hid, or tampered with evidence," those concerns are encompassed in his complaint about Agent Rust's "deceptive investigation practices."[89] Brief of Appellant at 38. The impeachment evidence the jury did not hear would have called into question all aspects of Agent Rust's investigation. Contrary to OCCA's finding, the evidence was not limited to the "suggest[ion] that Rust had not always followed office policy in his investigations" and "unspecified 'issues'" the prosecutor had with Agent Rust or "Agent Rust's general work habits." *Harris*, 450 P.3d at 951. In addition to showing specific problems the prosecutor had with Agent Rust's investigation of Mr. Harris's case, the evidence showed specific issues on other cases prior to Mr. Harris's prosecution that were directly relevant to Agent Rust's investigation of Mr. Harris's case. The OSFM reprimanded Agent Rust in 2009 for "not doing on scene origin and cause investigations only taking pictures" [sic] and being "in a rush to arrest before a case was developed." Att. 7. In 2015, his supervisor suggested he had completed all 900 of his prior investigations incorrectly and ordered him to immediately cease investigating fires without supervision until completing extensive additional training. Att. 7. Similarly, ADA Nicholson's "issues" with Agent

---

[89]These concerns are not far-fetched, given that while Mr. Harris's case was on direct appeal, evidence arose suggesting Agent Rust tampered with evidence (by forging a day planner entry) and lied, resulting in ADA Nicholson's referring his case to the AG's office for possible perjury charges. Further, Agent Rust was reprimanded in relation to Mr. Harris's case for failing to include "copies of a search warrant, scene sketches, Miranda Warning, Voluntary statements, Transfer of evidence documents or photo logs in the OSFM case File [sic]." Att. 7.

Rust were far from "unspecified." *Harris*, 450 P.3d at 951. She explained Agent Rust's conduct required her office to implement a special process to force Agent Rust to document everywhere he went because he "was spending an awful lot of time unsupervised in the state vehicle and it didn't seem to be productive." 12/23/15 Tr. 9. For example, Agent Rust had logged executing a warrant one week and then logged executing the same warrant the following week. 12/23/15 Tr. 9-10. These "issues" directly reflect on Agent Rust's competence and trustworthiness in his role as fire marshal.

In addition to unreasonably minimizing the value of the impeachment testimony, OCCA also made unreasonable factual determinations in minimizing Agent Rust's role in the case and the importance of his testimony. Throughout its analysis, OCCA unreasonably sought to cast Agent Rust as a tangential figure in the investigation of Mr. Harris's case. OCCA found:

> Appellant claims Rust's credibility was essential – that the State could not have made its case without him. We disagree. The State's case was built upon the statements of the victim immediately after the fire, and Appellant's own suspicious conduct and statements. Rust's credibility *per se* was not central to the State's case, because Rust's participation was limited to collecting evidence from Appellant and the fire scene, and – as we observed in Proposition III – the probative value of *that* evidence was marginal as well.[90]

*Harris*, 450 P.3d at 951. These findings are factually unreasonable. Agent Rust and his testimony were key to the case, as indicated by his lengthy trial testimony. Tr. IV 756-90 (direct examination); Tr. IV 791-835 (cross-examination). One of only four officers who worked on the case, Agent Rust was the fire marshal tasked with investigating the fire. Tr. V 1116. As Investigator Saulsberry testified at a post-trial remand hearing, Agent Rust "was case agent, started the investigation."[91]

---

[90]OCCA similarly concluded, "The State's case did not rest on Agent Rust's credibility. It did not even rest, to any material degree, on the evidence he collected." *Harris*, 450 P.3d at 952.

[91]ADA Nicholson testified at this hearing that Agent Rust was "certainly" "a key part in the

(continued...)

12/23/15 Tr. 108. Agent Rust interviewed Mr. Harris, obtained a statement from him, decided to

arrest him, and did so. O.R. I 3; Tr. III 665; Tr. IV 762-63, 765. He executed the search warrant,

collected evidence, and submitted it for testing. O.R. I 3; Tr. IV 785. He testified that Mr. Harris

smelled like gasoline. Tr. IV 800. He wrote the Origin and Cause Report and determined "[t]his was

an incendiary fire caused by the application of a flammable substance (gasoline) to a human being

and the surrounding area of the bedroom. The flammable substance (gasoline) was ignited by a

humanly introduced heat source (cigarette lighter)." Att. 7. He testified repeatedly about his

conclusion that Mr. Harris intentionally set Ms. Ferguson on fire. *See infra* at 91-92. His testimony

included what appeared to be a scientific basis for his conclusions, based on his alleged expertise

as a fire investigator: He testified:

> [I]f something else caused this, if you're talking about vapors from gasoline, Donnie
> would've been burned, too. . . . Because those vapors spread out. It's not the gasoline
> that burns; it's the vapors off the gasoline. . . . And they stay low, and Donnie
> would've been burned too if . . . [t]here was something else that set the fire.

Tr. IV 809. He testified that if Mr. Harris had taken Ms. Ferguson's clothes off to help her like he

said, Agent Rust "would've expected to see burns on his fingers and the palms of his hands." Tr. IV

767.

---

[91](...continued)
case against Mr. Harris," as "[h]e was the arresting agent." 12/23/15 Tr. 10. As defense counsel
Astor explained:

> He – as Ms. Nicholson said, he was the arresting officer. He interrogated Donnie. I
> mean, he was – he was the key role. He was needed to show the origin and cause of
> the fire. He was the one who collected the evidence of this. I mean, his role was to
> show that this was not an accidental fire because if it were an accidental fire then he
> wouldn't be here for murder.

12/23/15 Tr. 66. Mr. Astor did not "think the State could have made its case without Agent Rust."
12/23/15 Tr. 66.

To the extent "[t]he State's case was built upon the statements of the victim immediately after the fire,[92] and Appellant's own suspicious conduct and statements," *Harris*, 450 P.3d at 951, Agent Rust's testimony was a source of evidence regarding this "suspicious conduct," and Agent Rust is the officer who obtained Mr. Harris's written statement.[93] *See* Tr. IV 762-63, 765-66, 788, 791-92, 797, 800, 806-08. Regarding Mr. Harris's "suspicious conduct and statements," *Harris*, 430 P.3d at 951, Agent Rust testified, "He just wouldn't give me full answers." Tr IV 762-63. He testified that after he told Mr. Harris, "You're not telling me the truth," Mr. Harris replied, "I didn't splash gasoline on her and set her on fire," and that before he made that statement, Agent Rust had not "mentioned the word 'gasoline' at all."[94] Tr. IV 765, 806-07. Had defense counsel been able to impeach Agent Rust's credibility, they could have more effectively called into question his testimony regarding the "suspicious conduct and statements." *Harris*, 450 P.3d at 951.

In downplaying the significance of Agent Rust's role in the case and his testimony, OCCA found:

> As we have noted, the fact that Appellant kept a liquor bottle full of gasoline in his bedroom, and that gasoline played a part in the fire that killed Ferguson, was never in dispute. Contrary to Appellant's claim, Rust did not "rush to judgment" by focusing on and retrieving pieces of the liquor bottle from the scene; his focus was guided by Appellant's own account of what happened. The only question at trial was whether Appellant intentionally set Ferguson ablaze. Rust never claimed any ability to "prove" that contention.

---

[92]In moving for a directed verdict, defense counsel argued in detail that "[t]he State has not proven that Mr. Harris intentionally set a fire." Tr. VI 1141. After detailing the problems with Agent Rust's investigation, counsel argued, "There's no proof [Mr. Harris intentionally set Ms. Ferguson on fire] other than the statements made by Kristi after she was burned, after she was in shock, and are, I think, unreliable." Tr. VI 1142-43.

[93]Agent Rust's interview with Mr. Harris was not recorded. Tr. III 661-62.

[94]On cross-examination, Agent Rust acknowledged Mr. Harris was present when Ms. Ferguson purportedly stated Mr. Harris put gasoline on her. Tr. IV 797, 806.

*Id.* at 952. These findings were factually unreasonable. Contrary to OCCA's finding, Agent Rust did

rush to judgment by failing to conduct a fire investigation, as was his role in the case, before making

an arrest. He completed his origin and cause report four days before he purportedly investigated the

fire. Tr. IV 799-800, 815. Agent Rust testified that after he got the witness statements from the

Talihina Police Department and District Attorney's Office, he did not "take any other steps to

eliminate all other possible sources of the fire." Tr. IV 787, 818. Defense counsel asked Agent Rust

on cross-examination, "So you had 48 hours to scramble to justify your arrest; fair to say?" Tr. IV

801. Agent Rust admitted, "That's true." Tr. IV 801. He admitted he "arrested and then did an

investigation." Tr. IV 808-09. When asked why he did not investigate before arresting Mr. Harris,

he said, "Because. It was my opinion that he did this . . . ."[95] Tr. IV 809. He testified he was not

aware until his trial testimony that there was a "burnt up power strip that was found in the southeast

bedroom." Tr. IV 821. He did not see it. Tr. IV 833. He "had no idea" "whether people had

knowledge of whether Donnie Harris overloaded his power strips." Tr. IV 835. He "had no idea

because [he] didn't ask anything." Tr. IV 835. Agent Rust could not remember if he "dug down to

the floor." Tr. IV 830. Contrary to OCCA's finding, Agent Rust's focus was not "guided by

Appellant's own account of what happened." *Harris*, 450 P.3d at 952. Although Mr. Harris admitted

to having a bottle of gasoline in the room,[96] he also explained, "I started to pick up the room . . . and

---

[95]Before trial, CFI Smith wrote in his report that "[a]n arrest was affected based on the lack
of evidence, with a Search Warrant days later being issued to find evidence that fit with the original
'theory'." Att. 3 at 6.

[96]If Agent Rust disbelieved Mr. Harris's explanation that he had taken the bottle of gasoline
inside after burning trash, which was supported by Officer Klitzke's testimony, Tr. IV 735-36, an
investigation would have provided other reasons Mr. Harris might have a bottle of gasoline.
Investigator Thompson took photographs at the home, which included a gas can outside that
(continued...)

in an instant there was a fire I noticed a small fire and then jumped to a blaze it was on her clothes

happend so fast [sic]. . . ." State's Ex. 7 at 2-3. Had Agent Rust been "guided by Appellant's own

account of what happened," *Harris*, 450 P.3d at 952, he would have conducted a proper fire

investigation to determine the cause.

OCCA's finding that "Rust never claimed any ability to 'prove'" "[t]he only question at

trial" – "whether Appellant intentionally set Ferguson ablaze" – was also factually unreasonable.

*Harris*, 450 P.3d at 952. As the sole fire investigator to testify on either side of this case, Agent Rust

repeatedly testified about Mr. Harris's intent to set Ms. Ferguson on fire. He testified he did not

believe Mr. Harris's story was the truth. Tr. IV 765. When asked if he was able to determine the

cause of the fire, Agent Rust testified, "The determination for me was that . . . what he told me that

morning that he didn't do, all those [witness] statements told me that he did do." Tr. IV 788. Agent

Rust testified that he did not "see anything that led [him] to believe that the fire was accidental." Tr.

IV 790.  He testified, "The things that I saw, all the pieces fit together, . . . led me to believe that he

did splash gas on her and set her on fire, and after I got all those [witness] statements, it kind of

confirmed it – well, it did confirm it. . . ." Tr. IV 800. He agreed "the only viable cause of the burns

that Kristi Ferguson sustained was as a result of having . . . gas poured upon her and then ignited by

open flame." Tr. IV 805. He testified that "when Mr. Harris said he didn't splash gas on her and set

---

96(...continued)
appeared to be "aged from the sun." Tr. V 947, 958-59; State's Ex. 33. Kevin testified that State's
Exhibits 5 and 6 showed a "family gas jug." Tr. VI 1202-03. Kevin Harris testified that he and Mr.
Harris "liked to tinker with cars" and "other small engines, like lawnmowers." Tr. VI 1199. He
testified they would not always keep gas in a jug. Tr. VI 1199-1200. They would usually use "two-
liter pop bottles" if they forgot their jugs. Tr. VI 1200. Ms. McKosky testified it was not unusual for
Mr. Harris and Kevin to put gasoline in a container that was not made specifically for gasoline. Tr.
VI 1264-65. In the trial's second stage, Dr. Janice Garner testified Mr. Harris "huff[ed] gas." Tr. VII
1533.

her on fire, I believe that he did." Tr. IV 806. He testified, "When he came out with, 'I didn't splash

gas on her and set her on fire,' that pretty well told me what happened." Tr. IV 807. When asked if

he could "foreclose the possibility that there were other causes of this fire," Agent Rust testified, "At

that point, I just didn't think that that true [sic]." Tr. IV 808. Agent Rust testified, "It's not the

gasoline that burns; it's the vapors off the gasoline. . . . And they stay low, and Donnie would've

been burned too if . . . [t]here was something else that set the fire." Tr. IV 809. Defense counsel and

Agent Rust had the following exchange:

> Q.      . . . [H]ow did she catch fire?
> A.      I think you know how I think she got set on fire.
> Q.      I'm asking you how did she catch fire?
> A.      I think she got splashed with gasoline and there was a humanly induced
>           flame put close to her and caught her on fire.
> Q.      And so there's no possibility in your mind that something else, such as carpet
>           or any type of flotsam and jetsam on the ground – any debris – any other fuel
>           package that may have caught fire first and then caught her on fire?
> A.      No.

Tr. IV 823-24. Finally, Agent Rust bluntly testified, "He set a human body on fire." Tr. IV 825.

Contrary to OCCA's finding, Agent Rust – the fire marshal tasked with investigating the cause of

this fire and the only fire investigator to testify – repeatedly testified it was an intentional fire set by

Mr. Harris.

### 2.   OCCA's Adjudication Was Contrary to and Involved an Unreasonable Application of Clearly Established Federal Law.

Citing *Bagley* and *Cone*, 556 U.S. at 470 (quoting *Kyles*, 514 U.S. at 435), OCCA found

"Appellant has not demonstrated a reasonable probability that any of the proffered information

concerning Agent Rust would have affected the outcome of the trial."[97] *Harris*, 450 P.3d at 952.

---

[97]OCCA appears to have rested its decision solely on its finding that the withheld evidence
(continued...)

---

[97](...continued)

was not material. However, it also noted:

> [W]e question whether *Brady* extends to a prosecutor's personal opinion about a particular officer's work habits, punctuality, or similar issues. We also question whether *Brady* requires prosecutors to trawl for impeachment ammunition (including confidential personnel information) about every agent, from any arm of law enforcement, who had any involvement in a particular investigation. Given the posture of the case, we need not explore those questions here.

*Harris*, 450 P.3d at 950-51. To the extent OCCA relied on these "question[s]" to find no *Brady* violation, such a finding is factually and legally unreasonable. As explained above, *supra* at 85-87, ADA Nicholson did not merely have a "personal opinion" about Agent Rust's "work habits, punctuality, or similar issues." *Harris*, 450 P.3d at 950. Further, OCCA's questioning of "whether *Brady* requires prosecutors to trawl for impeachment ammunition . . about every agent, from any arm of law enforcement, who had any involvement in a particular investigation" was an unreasonable application of *Brady* and *Bagley* and contrary to their progeny. As the Tenth Circuit explained:

> Under *Brady*, the prosecution has a duty to disclose material impeachment evidence that is favorable to the defense. [*Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 825 (10th Cir.1995)]. But that duty arises even if the prosecutor has no "actual knowledge of the existence of the evidence at issue" because – for *Brady* purposes – the "prosecution" includes "not only the individual prosecutor handling the case, but also . . . the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture." *Id.* at 824 (internal citation and footnote omitted). Accordingly, we impute knowledge of material impeachment evidence to the prosecutor for *Brady* purposes when that knowledge is in the possession of other "agents of the prosecution." *See id.* at 824-25 (quoting *Fero v. Kerby*, 39 F.3d 1462, 1472 n.12 (10th Cir.1994)); *see also Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) ("It is well settled that if a member of the prosecution team has knowledge of *Brady* material, such knowledge is imputed to the prosecutors.").

*McCormick,* 821 F.3d at 1246-47. In *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992), the D.C. Circuit held, "The cases finding a duty to search have involved files maintained by branches of government 'closely aligned with the prosecution', *United States ex. rel. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985), and in each case the court has found the bureaucratic boundary too weak to limit the duty." At a minimum, Agent Rust – "a member of [Mr. Harris's] prosecution team" – had knowledge of his own 2009 reprimand. *McCormick*, 821 F.3d at 1247 (citation omitted). Further, an obligation to "trawl" files is consistent with *Brady* and its progeny. *Harris*, 450 P.3d at

(continued...)

93

OCCA's finding that the withheld impeachment evidence was not material under *Brady* was contrary to or an unreasonable application of *Brady*, *Bagley*, and *Kyles*. *See Brady*, 373 U.S. at 87; *Bagley*, 473 U.S. at 676; *Kyles*, 514 U.S. at 433-34.

Throughout its decision, OCCA unreasonably minimized the value of the withheld impeachment evidence. For example, neither *Brady* nor its progeny demands that the impeachment material show Agent Rust "destroyed, hid, or tampered with" evidence in order to be favorable and material. *Harris*, 450 at 951. In *Kyles*, the Supreme Court found the *Brady* material – an informant's "various statements" – "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation" and its "disclosure would have revealed a remarkably uncritical attitude on the part of the police." 514 U.S. at 445. *See also Fontenot*, WL 2933220, at *78 (quoting *Kyles*, 514 U.S. at 445). The Court held:

> [T]he defense could have examined the police to good effect on their knowledge of [the informant's] statements and so have attacked the reliability of the investigation . . . . *See, e.g., Bowen v. Maynard*, 799 F.2d 593, 613 ([10th Cir.] 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation"); *Lindsey v. King*, 769 F.2d 1034, 1042 ([5th Cir.] 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case"). . . . [T]he defense could have laid the foundation for a vigorous argument that the police had been guilty of negligence.

---

[97](...continued)
950. In *Agurs*, 427 U.S. at 100-01, the undisclosed evidence was a victim's criminal record, which was not drawn from that case. In *Kyles*, information about an informant's criminal conduct was among the evidence deemed to be *Brady* material, even though it was unrelated to the case. 514 U.S. at 428-29. ADA Nicholson was also personally aware, from her own experience, of Agent Rust's potential credibility issues. *See United States v. Padilla*, 2011 WL 1103876, at *7 (D.N.M. Feb. 8, 2017) (quoting *Brooks*, 966 F.2d at 1503) ("A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'").

*Kyles*, 514 U.S. at 446-47. The Court concluded that "confidence that the verdict would have been unaffected cannot survive when suppressed evidence would have entitled a jury to find . . . [among other things] that the investigation . . . was insufficiently probing, and that the principal police witness was insufficiently informed or candid." *Id.* at 454.

Several courts have found *Brady* violations for failures to disclose law enforcement personnel records. *See Milke*, 711 F.3d at 1006-07 (finding the State violated *Brady* in failing to provide defense impeachment evidence from personnel records of its key law enforcement witness detailing problems with the agent's past investigations and other misconduct involving dishonesty)[98]; *Vaughn v. United States*, 93 A.3d 1237, 1255 (D.C. 2014) (finding *Brady* violation where the State's failure, in a prison assault case, to provide the defense with personnel records documenting that its key correctional officer witness had been demoted for misrepresenting facts in an earlier inmate incident report).[99] *See also United States v. Deutsch*, 475 F.2d 55, 58 (5th Cir. 1973), *overruled on*

---

[98]OCCA attempted to distinguish *Milke*. *Harris*, 450 P.3d at 951 n.15. OCCA explained "[t]he detective's credibility was clearly key to the state's case – yet neither the defense nor the jury knew about the detective's 'long history of lying under oath and other misconduct.'" *Id.* (citing *Milke*, 711 F.3d at 1000-01). As argued *infra* at 87-92, Agent Rust's credibility was similarly key to Mr. Harris's case.

[99]OCCA pointed out:

In *Vaughn*, . . . the court found that undisclosed information affecting a prison guard's credibility was not material as to one defendant, because the only relevant information that the guard provided (identification of the defendant as being present during the assault) was admitted by [the defendant] in a post-trial affidavit. *Vaughn*, 93 A.3d at 1266. Here, Appellant stipulated that the physical evidence collected by Agent Rust need not be introduced at trial, and he had no challenge to the OSBI's test results.

*Harris*, 450 P.3d at 951 n.15. Agent Rust played a key role in Mr. Harris's case, even aside from evidence collection. For example, he testified, as the sole fire investigator on the case, that Mr.

(continued...)

95

*other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984) (finding defense entitled to personnel records of postal employee in case involving bribery of postal employee if the defense could prove the information could have been used to impeach the witness during cross-examination); *State v. Laurie*, 653 A.2d 549, 552, 554 (N.H. 1995) (finding that where the State withheld a "pre-employment investigation file" that "disclose[d] numerous instances of conduct that reflect negatively on [an officer's] character and credibility" and "a major element of the defense strategy at trial was to discredit the behavior of the police," "[t]he withheld evidence . . . would have played a role in that strategy").

Contrary to OCCA's finding, the State's case *did* "rest on Agent Rust's credibility." *Harris*, 450 P.3d at 952. Had defense counsel been able to impeach Agent Rust utilizing the undisclosed evidence, there is a reasonable probability Mr. Harris would have been acquitted or received a lesser sentence than the death penalty. *See Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682). *See also Giglio*, 405 U.S. at 154-55 ("Here the Government's case depended almost entirely on [witness] Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."); *Bagley*, 473 U.S. at 676 (quoting *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)) ("'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . .'"). "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might

---

[99](...continued)
Harris intentionally started the fire. *See infra* at 91-92. Mr. Harris has maintained he did not.

be sufficient to create a reasonable doubt." *Agurs*, 427 U.S. at 113. Here, the verdict was of "questionable validity," and Agent Rust's testimony was of more than "minor importance." *Id.* In a case where the defense theory was that the alleged victim's death was caused by an accidental fire, it was imperative that the jury hear evidence undermining the arresting fire marshal's opinion as to the cause of the fire.

OCCA's finding that Agent Rust's "perceived lapses in this case were made apparent to the jury" was also unreasonable. *Harris*, 450 P.3d at 951. In making this finding, OCCA explained, "Defense counsel chastised Rust on cross-examination for not considering alternative theories of how the fire started. The OSBI criminalist who tested the materials Rust submitted to him testified that Rust's preservation of Appellant's clothing was 'probably one of the worst' evidence-collection jobs he had seen." *Id.* However, Agent Rust could have been specifically cross-examined regarding a prior reprimand for his investigations, the need for training, and failures in the investigation of Mr. Harris's case. This evidence would have been substantially different from defense counsel's "chastising" Agent Rust or a single criticism regarding evidence packaging,[100] and would have been favorable and material. *Harris*, 450 P.3d at 951. "[E]vidence significantly enhancing the quality of the impeachment evidence usually will [meet the *Kyles* materiality standard]." *Douglas*, 560 F.3d at 1174.

In minimizing the value of the undisclosed impeachment evidence and the importance of Agent Rust's testimony, OCCA unreasonably emphasized the other evidence upon which Mr. Harris's conviction was "built." *Harris*, 450 P.3d at 951. The Supreme Court has emphasized:

---

[100]For this reason, OCCA's finding that Agent Rust's "perceived lapses . . . were made apparent to the jury" is also factually unreasonable. *Harris*, 450 P.3d at 951.

Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [Citations omitted.] . . . *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence . . . .

*Kyles*, 514 U.S. at 434. The Court also emphasized, "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." *Id.* at 434-35. *See Douglas,* 560 F.3d at 1173.

The Eighth Amendment mandates a heightened standard of reliability in capital cases. *Lockett v. Ohio*, 438 U.S. 586 (1978). This Court should "apply a heightened concern for fairness in this case, where the state is prepared to take a man's life." *Douglas* 560 F.3d at 1194. *See also Lindsey*, 769 F.2d at 1043 ("Whether it is reasonably probable that a different result might have obtained had the evidence been disclosed is a question of agonizing closeness. This is a capital case, however, and one moreover in which our reading of the evidence shows there is a real possibility that the wrong man is to be executed. In such a case, if ever, petitioner should receive the benefit of the doubt.").

## GROUND FOUR

**THE STATE VIOLATED MR. HARRIS'S RIGHT TO DUE PROCESS BY FAILING TO CORRECT THE FALSE TESTIMONY OF A KEY WITNESS.**[101]

Under the Fourteenth Amendment, a prosecutor may not knowingly allow false testimony

---

[101] Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust the *Napue* claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

"to go uncorrected when it appears." *Napue*, 360 U.S. at 269. *Napue* violations include where a witness testifies falsely regarding their own credibility, as "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]" *Id*. A *Napue* violation has three elements: (1) false testimony from a State witness; (2) that the State knows to be false; (3) where the testimony is material. *See Garcia*, 793 F.3d at 1207 (citing *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002)).

**A.      The State Committed a *Napue* Violation When It Knowingly Allowed False, Material Testimony from Agent Rust Regarding His Credibility.**

Mr. Harris incorporates by reference the facts giving rise to the testimonial *Brady* violation described in Ground 3(C). This false testimony also violated Mr. Harris's due process rights under *Napue*.

**1.      The State Knowingly Failed to Correct Agent Rust's False Testimony.**[102]

Unlike the *Brady* standard, *Napue* claims require that the prosecutor had actual knowledge of the testimony's falsity. *See Smith*, 50 F.3d at 830-31. Mr. Harris has reason to believe, based on the prosecutor's knowledge of Agent Rust's past as described in Ground 3(B), that the prosecutor also had actual knowledge of the prior disputed investigation, and therefore of the falsity of Agent

---

[102] That Agent Rust falsely testified during cross-examination by defense counsel does not figure in the analysis. The limited elements comprising a *Napue* claim in this circuit do not restrict where in the trial the false testimony must have occurred. *See Garcia*, 793 F.3d at 1207. The affirmative duty described in *Napue* broadly concerns whether a prosecutor "allows [false testimony] to go uncorrected when it appears." 360 U.S. at 269. Indeed, *Napue* contemplated testimony elicited in part on cross-examination, *see id*. at 267 n.2, as did the Tenth Circuit in *Caballero*, 277 F.3d at 1244 (examining whether evidence established falsity of testimony "either on direct or cross-examination"). The Tenth Circuit has indicated no limiting principle regarding which party elicited the false testimony, and where other jurisdictions diverge, this Court looks to "the law in this circuit." *Fontenot*, WL 2933220, at *64.

Rust's contrary testimony. Mr. Harris will be seeking discovery to confirm same, but nonetheless is pleading his *Napue* claim presently to preserve it.

### 2.      The False Testimony Was Material.

The *Napue* materiality standard also differs from that governing *Brady*: A claim under *Napue* is material so long as the false testimony was not harmless beyond a reasonable doubt. *See Garcia*, 793 F.3d at 1207. Here, the undisclosed evidence damaging Agent Rust's credibility satisfies the *Brady* standard, *see supra* Section 3(D), and thus easily satisfies *Napue*'s more lenient materiality threshold. This false testimony, obscuring from the jury's view important impeachment evidence as to the key State witness, cannot be said to have been harmless beyond a reasonable doubt.

### GROUND FIVE
### MR. HARRIS WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.

The Sixth Amendment guarantees a criminal defendant the reasonably effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court made clear when counsel provide deficient performance, resulting in prejudice to their client, judicial relief is necessary. "The first prong [of *Strickland*] – constitutional deficiency – is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688). "[T]he standards for capital defense work articulated by the American Bar Association (ABA) [are] standards to which [the Supreme Court has] long referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). Guideline 10.7 of the American Bar Association Guidelines for the Appointment and Performance

of Defense Counsel in Death Penalty Cases ("ABA Guidelines") requires defense counsel "to conduct thorough and independent investigations relating to the issues of both guilt and penalty." 31 Hofstra L. Rev. 913, 1015 (rev. ed. Feb. 2003). In assessing performance, the Supreme Court emphasizes a case-by-case approach that considers "all the circumstances." *Strickland*, 466 U.S. at 688. "[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices" made *after* investigation of options. *Id.* at 680. *See also Wiggins*, 539 U.S. at 527-28 (finding counsel's performance deficient because counsel chose to abandon their investigation).

**A.     Trial Counsel's Failure to Present Testimony from a Qualified Fire Expert and/or Preserve the Record on This Issue.**[103]

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton*, 571 U.S. at 273 (quoting *Richter*, 562 U.S. at 106) (internal quotation marks omitted). *See, e.g., Soffar v. Dretke*, 368 F.3d 441, 477-78, 480 (5th Cir. 2004); *Loyd v. Whitley*, 977 F.2d 149, 156-61 (5th Cir. 1992); *Gersten v. Senkowski*, 426 F.3d 588, 611, 615 (2d Cir. 2005) (all cases granting relief based on IAC for failure to call experts). "Fire science, a field largely developed by lay 'arson investigators,' police officers, or similar first responders untrained in chemistry and physics, has been historically dominated by unreliable methodology, demonstrably false conclusions, and concomitant

---

[103]Mr. Harris raised this claim as Proposition XIV(A) on pages 78-81 of his direct-appeal brief and pages 6-7 of his application for evidentiary hearing. However, with this petition, he presents a new report from CFI Smith, which he has not yet presented in state court (Att. 6). Should this Court find "new evidence so changes the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim, [it] must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild*, 579 F.3d at 1149.

miscarriages of justice." Valena E. Beety, Jennifer D. Oliva, *Evidence on Fire*, 97 N.C. L. Rev. 483 (2019). In Mr. Harris's case, it should have been obvious that the assistance of a skilled fire expert was crucial. Despite that, defense counsel failed to hire a substitute expert when CFI Smith became unavailable, or to preserve the record for appeal on this critical issue. *See Evitts v. Lucey*, 469 U.S. 387, 397-98 (1985) (criminal defendants have right to the effective assistance of counsel on appeal); *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001) (appellate counsel ineffective for not raising claims with reasonable probability of success).

In Ground 1, Mr. Harris alleged the trial court erred in not granting a mistrial or continuance after his fire expert suffered a medical condition rendering him unable to testify. Trial counsel's "strategy to defend Mr. Harris against the State's charges at trial centered around discrediting Agent Rust's conclusions and credibility through the testimony of C.F.I. Smith. C.F.I. Smith's testimony was, in essence, Mr. Harris's entire defense." Att. 4 at ¶ 5. On direct appeal, Mr. Harris maintained his trial counsel acted reasonably under the circumstances. However, he raised this IAC claim in the event "this Court finds that counsel should have arranged for C.F.I. Smith to testify remotely, obtained another expert from OIDS [the Oklahoma Indigent Defense System] or the court fund, or that counsel failed to properly preserve the record for appeal." Brief of Appellant at 78.

Two possible solutions besides a mistrial were referenced in Mr. Harris's written motion and in discussions on the record; these solutions were remote testimony and the substitution of another fire expert for CFI Smith. Regarding the first possible solution, the trial transcript and original record contain trial counsel's objections to CFI Smith's appearing remotely. O.R. II 260-61; Tr. III 663-64; Tr. V 925-27. However, it is unclear from the record if remote testimony was a viable option because there was no discussion regarding whether there were available facilities to accommodate

remote testimony or whether, aside from CFI Smith's being on a narcotic pain reliever, O.R. II 259;

Tr. VI 1279, his medical condition would otherwise prohibit him from testifying remotely. The

record is also unclear as to the State's position and whether the trial court factored this into its

decision to deny the requests for mistrial. Tr. V 921-35. On direct appeal, lead trial counsel, Peter

Astor, provided an affidavit addressing these questions. *See* Att. 4 at ¶ 8. He explained:

> During this time period, there were several off-the-record conversations between
> myself, Mr. Bowen, ADA Nicholson, and Judge Sullivan regarding the impact of
> C.F.I. Smith's medical condition on his ability to travel to Oklahoma to testify. At
> some point, not long after we found out about C.F.I. Smith's condition, someone
> raised the possibility of C.F.I. Smith testifying remotely. However, there was never
> any serious discussion regarding this topic. The conversation did not even progress
> to the point where we talked about whether LeFlore County had the facilities to make
> this type of testimony possible. I never addressed this possibility with C.F.I. Smith,
> so I do not know whether there would have been a facility near C.F.I.'s [sic] Smith's
> home or if his medical condition would have precluded him from testifying, even
> remotely. I do know C.F.I. Smith was not in good shape when I spoke to him on the
> phone and that he was taking several medication, including a strong narcotic pain
> reliever. It is my recollection that ADA Nicholson ultimately stated that she was not
> in favor of any type of remote testimony. Because remote testimony was never really
> a viable option, we did not discuss the issue on the record, and it did not factor into
> Judge Sullivan's rulings on the subject.

*Id.* It is clear from the record that trial counsel recognized CFI Smith's absence would be a critical

issue in Mr. Harris's appeal. As a result, they had a duty to place this obviously relevant information

on the record. *See Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5. The failure to do so

constituted IAC.

　　The second possibility posited by trial counsel was to obtain a substitute fire science expert.

In their mistrial motion, counsel explained:

> Since it is unknown when or even if Mr. Smith will ever be able to testify, counsel
> has no other alternative but to seek out another expert on arson and fire causation.
> This requires finding another expert and submitting a request for expert funds from
> the agency's [Oklahoma Indigent Defense System's ("OIDS")] directors.

O.R. II 260. Counsel explained it was "unknown" how long hiring another expert and obtaining a report might take. O.R. II 260. Counsel announced "if we could contract with another expert and get him here Monday, I'd do it, but we can't do it." Tr. V 930-31. The record does not indicate whether trial counsel had actually requested another expert from OIDS. Furthermore, nothing in the record indicates trial counsel requested funding from the court to obtain an alternative expert. Trial counsel Astor stated in his direct-appeal affidavit:

> Mr. Bowen and I never attempted to locate a substitute expert or requested funds to obtain another expert. By the time Judge Sullivan denied the motion, there was not enough time to locate an expert and complete the necessary paperwork for my office to approve funds for another expert. Had Judge Sullivan granted a mistrial or a continuance, I would have asked my agency for a substitute expert. I have no reason to believe that any such request would not have been approved.

Att. 4 at ¶ 9. Counsel's failure to attempt to secure another expert to testify on Mr. Harris's behalf constituted IAC, as did their failure to make a complete record on this issue. *See Hinton*, 571 U.S. at 273; *Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5.

Finally, trial counsel were ineffective in failing to file a formal, written motion for continuance to preserve the issue for appeal. In his direct-appeal affidavit, Mr. Astor stated:

> During an off-the-record conversation between myself, Mr. Bowen, ADA Nicholson, and Judge Sullivan, I suggested the possibility of continuing Mr. Harris's case until January and having the jurors we had already death qualified to return as an alternative to having to begin jury selection over again from scratch. I thought this was a good compromise that would either allow C.F.I. Smith to recover or permit me the time necessary to obtain another expert. During this conversation, ADA Nicholson stated that she did not object or see any legal impediment to this option. However, ultimately Judge Sullivan did not accept this as a possible solution to the problem.

Att. 4 at ¶ 10. Counsel's failure to preserve this issue for appeal constituted ineffective assistance of counsel. *See Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5.

1. **If This Court Finds This Claim Was Not Adjudicated on the Merits, It Should Be Reviewed De Novo. If This Court Finds the Additional Evidence Transforms the Claim into One the State Court Has Not Adjudicated on the Merits, § 2254(d) Does Not Preclude Relief.**[104]

Regarding Mr. Harris's "four ineffective-counsel claims [that] rely on evidence outside the record," including the claim at issue here, OCCA found, "we do not reach the merits of these complaints, but only determine whether additional fact-finding regarding them is necessary." *Harris*, 450 P.3d at 960-61 (citing Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2019)). If this Court determines OCCA did not reach the merits of this claim, it should review it de novo.

Alternatively, if this Court finds that OCCA did adjudicate the claim on the merits, it might find that the new information from CFI Smith,[105] *see* Att. 6, "so changes [the] legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim" and this Court "must necessarily say that the new evidence effectively makes a new claim – one that the state court has not adjudicated on the merits." *Fairchild*, 579 F.3d at 1148-49 (citations omitted). Among other compelling findings, CFI Smith's report shows that had he evaluated the lighter alleged to be the ignition source, he could have ruled it out. Att. 6 at 2-5. Had counsel retained another expert, they could have examined the lighter and provided this testimony. There is a reasonable probability that such testimony would have impacted the outcome of the trial. *Strickland*, 466 U.S. at 687.

---

[104] Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust this claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

[105] This Court should consider this evidence even though it has not been presented in state court. Mr. Harris was prevented from developing the facts in state court because OCCA failed to grant an evidentiary hearing and the State lost relevant evidence. *See Black*, 682 F.3d at 895-96 (citing *Pinholster*, 563 U.S. 213 n.5 (Sotomayor, J., dissenting)).

2.      **In the Alternative, § 2254(d) Does Not Preclude Relief Because the State Court Adjudication Was Legally and Factually Unreasonable.**

Alternatively, if the Court determines the IAC claim presented here is the same as that adjudicated on the merits by OCCA, and that OCCA did, in fact, "reach the merits of these complaints," *Harris*, 450 P.3d at 960, it should still consider the claim de novo because it overcomes the limitations imposed by 28 U.S.C. § 2254(d)(1), (2).[106]

a.      **OCCA's Adjudication Was Legally and Factually Unreasonable.**[107]

In "determin[ing] whether additional fact-finding . . . is necessary," *id.* at 960, OCCA explained that in its resolution of Proposition II, *see* Ground 1, "[w]e found no reasonable probability of prejudice from Smith's absence, because his proposed opinions reflected in his pretrial report would not have materially added to defense counsel's cross-examination of Agent Rust's methods and conclusions." *Id.* at 961. OCCA additionally found that "as we observed in Proposition II, such alternatives [remote testimony or expert substitution] were considered and rejected by the defense team. Counsel's decision appears to have been a tactical choice made after due consideration and research. As such, it is 'virtually unchallengeable' on appeal.'" *Id.* OCCA cited *Strickland*. *Id.* (citing 466 U.S. at 690-91, 697).

OCCA's finding that counsel's refusal to present the remote testimony of CFI Smith or the in-person testimony of another expert was a "tactical choice" and was "virtually unchallengeable"

---

[106]If this Court finds Mr. Harris overcomes these limitations, "§ 2254(d) deference doesn't apply; review is de novo; and *Pinholster* doesn't preclude" the Court's consideration of CFI Smith's new report. *Eaton*, 931 F.3d at 1019.

[107]OCCA's deficient fact-finding can support a finding that either § 2254(d)(2) is satisfied or that there was no adjudication on the merits. *See Gordon*, 780 F.3d at 202; *Milke*, 711 F.3d at 1007.

was an unreasonable application of *Strickland* and contrary to its progeny. *Harris*, 450 P.3d at 951. In *Hinton*, a unanimous Supreme Court found counsel's performance deficient for failing to obtain an adequate expert. 571 U.S. at 273-75. In doing so, the Court recognized the risk of wrongful convictions based on faulty forensic science and that "[t]his threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses." *Id.* at 276. In *Hinton*, counsel's deficient performance – his choice of an unqualified expert – stemmed from his mistake of law. *Id.* at 275. But counsel can also be ineffective based on an incomplete or nonexistent investigation of the facts: "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made '*after thorough investigation of [the] law and facts*', is 'virtually unchallengeable.'"*Id.* (quoting *Strickland*, 466 U.S. at 690) (emphasis added). Thus, *Hinton* counsels that an attorney must conduct a thorough investigation of both law and facts before making choices about what experts to call or whether to call an expert at all. OCCA's finding that counsel made a tactical choice was also factually unreasonable.

"[C]ourts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Richter*, 562 U.S. at 109 (citation omitted). Here, the record shows defense counsel had a week during which he could have hired another expert; however, he did not attempt to locate a substitute expert or request funds from OIDS or the court. Att. 4 at ¶ 9. According to Mr. Astor, this is because he did not believe there was time to complete the necessary paperwork, *id.*, although he admitted on the record it was "unknown" how long hiring another expert might take. O.R. II 260. Even if counsel chose not to pursue testimony from another expert, this was not a "'strategic choic[e] . . . made 'after thorough investigation of [the] law and facts.'" *Hinton*, 571 U.S. at 275 (quoting *Strickland*, 466 U.S. at 690).

For the reasons explained in Ground 1, OCCA's determination that there was "no reasonable probability of prejudice from Smith's absence" was legally unreasonable. *See supra* at 42-45; *Strickland*, 466 U.S. at 694 (finding *Strickland* prejudice standard "finds its roots in the test for materiality" provided by *Valenzuela-Bernal*, 458 U.S. at 872-74). OCCA's finding of no prejudice was an unreasonable application of *Strickland* and contrary to its progeny. *See, e.g., Gersten*, 426 F.3d at 613-14 (finding state court's determination of no prejudice unreasonable where "counsel's failures go to something as important as the medical evidence . . . – the only objective evidence that a crime occurred" and finding where the record evidence is thin and "not challenged by defense experts or an informed cross-examination," there is more likely to be prejudice); *Soffar*, 368 F.3d at 478-49 (finding petitioner was prejudiced by trial counsel's failure to consult with and call ballistics expert where petitioner confessed, but there was no eyewitness to the alleged crime, there was no forensic evidence linking petitioner to crime, and there was no murder weapon recovered). Had trial counsel obtained a substitute expert, there exists a reasonable probability Mr. Harris would have been acquitted of first degree murder.[108]

OCCA's no-prejudice finding was also based on unreasonable determinations of fact. Contrary to OCCA's determination, as explained *supra* at 57-59, CFI Smith's opinions *would* "have materially added to defense counsel's cross-examination of Agent Rust's methods and conclusions." *Harris*, 450 P.3d at 961. OCCA unreasonably ignored CFI Smith's report obtained on direct appeal. Instead, OCCA only considered CFI Smith's "proposed opinions reflected in his pretrial report."

---

[108]The prejudice resulting from counsel's failures bled into the sentencing stage. Had counsel presented an expert like CFI Smith, there is a reasonable probability such a witness would have created residual doubt. *See Lockhart*, 476 U.S. at 181. This evidence would have also undermined the aggravators.

*Harris*, 450 P.3d at 961. OCCA explained that "[b]ecause Smith's revised report includes opinions based on post-trial information, we cannot consider it here, as it has no logical bearing on what trial counsel knew or did at the time of the trial."[109] *Harris*, 450 P.3d at 961 n.37. However, the report obtained on direct appeal does have bearing on prejudice, as counsel could have elicited this information from an expert had one testified. Critically, CFI Smith's direct-appeal affidavit explained he would have examined the lighter at trial and testified as to whether it could have been used to start the fire. Att. 5, Ex. 2 at 16-17.

> **b.    There Was No Reasonable Basis for the State Court to Deny Relief on Mr. Harris's Claim that Trial Counsel's Failure to Preserve the Issue for Record on Appeal Was Ineffective.**

In its decision, OCCA noted in a footnote, regarding Mr. Harris's claim that counsel failed to "fil[e] a proper motion for continuance, . . . the trial court considered a continuance as a possible option, so we find no prejudice in failing to file a separate request." *Harris*, 450 P.3d at 961 n.36. Aside from this footnote, OCCA did not address trial counsel's failure to preserve the issue of CFI Smith's absence for the record on appeal. That adjudication thus falls into the category of an unreasoned denial, and Mr. Harris must show "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98 (2011). *See also id.* at 102; *Johnson*, 568 U.S. at 293. There was no reasonable basis for OCCA's denial.

One basis upon which OCCA denied relief may have been a supposed lack of prejudice. However, OCCA's opinion demonstrates the prejudice to Mr. Harris. OCCA found, regarding the claim raised as Proposition II in the direct appeal and raised here in Ground 1, "Nor did defense

---

[109]OCCA explained, "We will revisit Smith's revised report in our discussion of Appellant's Motion for New Trial." *Harris*, 450 P.3d at 961 n.37. OCCA failed to do so. *See id.* at 966-67.

counsel make a record of any alternative remedies that were considered, such as having Smith testify remotely, and why no alternative to Smith's physical presence was feasible." *Harris*, 450 P.3d at 945. Had counsel preserved the record on this issue, OCCA could not have made this finding. Trial counsel's failure to preserve the record for appeal was prejudicial, as there is a reasonable likelihood it impacted the outcome of Mr. Harris's direct appeal.

**B.    Trial and Appellate Counsel's Failure to Investigate and Present Testimony from a Burn Expert.**[110]

Trial and appellate counsel were ineffective in failing to investigate and present the testimony of a burn expert. *Hinton*, 571 U.S. at 273; *Soffar*, 368 F.3d at 477-78, 480; *Loyd* 977 F.2d at 156-61; *Gersten*, 426 F.3d at 611, 615. ABA Guideline Guideline 10.7 requires defense counsel "*at every stage* . . . to conduct thorough and independent investigations relating to the issues of *both guilt and penalty*." 31 Hofstra L. Rev. at 1015. Capital defense counsel's duty to investigate guilt and penalty phase issues includes consultation with forensic science experts. *See* ABA Guideline 10.7, Commentary at 1020, 1026 ("With the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence.";"The circumstances of a particular case will often require specialized research and expert consultation."). Direct-appeal counsel was charged with raising trial counsel's ineffectiveness. *Evitts*, 469 U.S. at 397-98. Counsel's failure to fully develop and present each claim of trial counsel's ineffectiveness rendered her ineffective. *Neill*, 278 F.3d at 1057 n.5

---

[110] Mr. Harris has retained a burn expert, Dr. Anjay Khandelwal, who has reviewed all relevant materials and made his findings but has not yet finalized his report, which counsel will file as an attachment to his amended petition in support of this claim. Counsel for Mr. Harris will also be seeking a return to state court so that he may exhaust this claim and present the new evidence. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below.

(appellate counsel ineffective for not raising claims with reasonable probability of success). Under *Strickland*, "ineffective appellate assistance can be established on the basis of the demonstrable merit of the issue omitted by counsel on the petitioner's direct appeal." *Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003). "If the underlying issue was not valid, . . . counsel was not ineffective for failing to raise it on direct appeal." *English v. Cody*, 241 F.3d 1279, 1283 (10th Cir. 2001). Here, "the underlying issue was . . . valid." *Id.*

In closing argument, the State emphatically argued Ms. Ferguson's burns could have *only* been caused by being doused in gasoline. Had defense counsel hired an expert, they could have presented testimony to rebut this argument; in fact, they could have presented expert testimony that Ms. Ferguson's injuries were not consistent with being doused in gasoline and lit on fire, and that Mr. Harris's injuries were consistent with his statements that he tried to help smother the fire with a blanket and remove Ms. Ferguson's clothing.

### 1.    Trial Testimony and Argument About Ms. Ferguson's Burns.

According to the State's witnesses, Ms. Ferguson had burns on approximately 42 percent of her body. Tr. V 1037, 1051.The medical examiner, Dr. Eric Pfeifer, testified that Ms. Ferguson's burns "were consistent with being doused with a flammable liquid that was then lit on fire[.]" Tr. V 1066-67. On cross-examination, he testified that Ms. Ferguson's burns would also be consistent with "falling into an accelerant that suddenly catches fire." Tr. V 1068. He agreed the burns were consistent with "lots of other circumstances that a person could find themselves with accelerant on them, and a spark or fire and they go up."[111] Tr. V 1068.

---

[111]Defense counsel did not ask if the burns were consistent with a scenario in which the accelerant was on the floor but was not on Ms. Ferguson.

During defense counsel's cross-examination, DA Investigator Saulsberry testified, "I mean, when you look at the pictures of Kristi, you don't have to have a lot of experience to see that there was an accelerant used." Tr. V 1131. Defense counsel then asked Investigator Saulsberry if he had any fire training. Investigator Saulsberry responded, "Only when I blew myself up with gasoline." Tr. V 1131. He then testified about a time when he burned brush using gasoline; only his arms, which were in close proximity to the gasoline, were burned. Tr. V 1131-33. Defense counsel asked, "As far as the physical evidence we were talking about of Kristi's injuries, and I think what you're saying is you're using your common sense and maybe personal experience to conclude that she had gas poured on her?" Tr. V 1133. Investigator Saulsberry answered, "Some type of accelerant; yes, sir." Tr. V 1133. Investigator Saulsberry confirmed he was not testifying as "the fire expert." Tr. V 1134.

In its closing argument, the State used Investigator Saulsberry's testimony to illustrate that "[y]ou don't catch on fire here and it spreads all over everywhere. It's the accelerant. . . . The parts that are burned are the parts that are covered with gas." Tr. VI 1323. The State argued:

> [Y]ou can see the delineation of the burns. You can see the parts that are burned and the parts that aren't burned. And on the leg, look at the locati[o]n of the [in]jury. It's all the way around the leg. It's not like you're standing in front of something and it just explodes by itself and catches you on fire. It's back here. It's back there. How does that get back there? It's poured on you. It's thrown on you. How does that get back there naturally? It doesn't. Somebody has to put it there. Somebody has to put it on the arms and the legs and the back, and the front of the hand and the back of the hand, and the belly.

Tr. VI 1325. The State reiterated, "Where her injuries are, the location of them indicates to you and indicates to the doctor caused by an accelerant."[112] Tr. VI 1333.

---

[112] No doctor testified to this.

112

In closing, defense counsel argued:

> [T]he State said something in their first closing that essentially was a person couldn't be burned as bad as Kristi Ferguson was burned unless someone had thrown gas on them. Wonder how many arson investigators would agree with that?. . . I mean, that pretty much removes any accidental fire that's ever taken place where someone has lost their life . . . .

Tr. VII 1371-72. Counsel argued, "[W]e didn't . . . see any evidence or hear any testimony that her injuries beyond a reasonable doubt were caused by having gasoline on her skin." Tr. VII 1349-50. Had counsel presented expert testimony, counsel would not have resorted to asking Investigator Saulsberry about his personal experiences with burns, and could have refuted the State's argument that Ms. Ferguson's burns could only have been caused by being doused in accelerant – an argument that was not supported by expert testimony.[113]

### 2.     Trial Testimony and Argument About Mr. Harris's Burns.

Mr. Harris explained in his written statement and in his interview with Investigator Saulsberry that he had tried to smother the fire on Ms. Ferguson with a blanket and then he helped get her clothes off during the fire. State's Ex. 7 at 3; Tr. V 1097-98. According to law enforcement,

---

[113]OCCA apparently credited this argument despite its lack of support. In its resolution of a claim on direct appeal, OCCA found:

> The possibility of an accidental ignition source is one thing, but how Ferguson ended up with gasoline all over her body is different matter entirely. . . . [O]ne must still account for . . . the kinds of burns Ferguson exhibited . . . . Smith never offered any of his own [alternative scenarios], including how Ferguson came to be covered in gasoline.

*Harris*, 450 P.3d at 947 n.7.

Mr. Harris's only burn was on top of his left hand, and his hair, beard, and the hair on the left side of his arm were singed. Tr. V 955, 1102. Agent Rust testified:

> [I]f something else caused this, if you're talking about vapors from gasoline, Donnie would've been burned, too. . . . Because those vapors spread out. It's not the gasoline that burns; it's the vapors off the gasoline. . . . And they stay low, and Donnie would've been burned too if . . . [t]here was something else that set the fire.

Tr. IV 809. Again inexplicably relying on Investigator Saulsberry as a source of testimony about burns, defense counsel asked him on cross-examination if it was possible for someone to grasp the pants of another person who was on fire and not get severely burned; Investigator Thompson testified it was not possible. Tr. V 953. Upon further questioning along these lines, he testified, "It's hard for me to answer . . . . I don't know how burns work." Tr. V 954. He then agreed it was possible the inside of a hand might not get burned if someone was grasping something with a closed fist. Tr. V 954.

In closing, the State argued, "If I'm in a room with you and there's some terrible accident, why do you get burned like that and I get burned like that? Because I don't have gas in my face and I don't have gas on my body. That's why. Why don't my clothes catch on fire? Because they're not covered in gasoline." Tr. VI 1323-24.  The State argued, "If it's just some horrible accident, why isn't he burned? . . . How come that horrible accident struck her and not him who's standing right there? Same reason, the brush fire that Travis Saulsberry didn't burn to a crisp." Tr. VI 1326. Had counsel presented expert testimony, counsel would not have again resorted to asking Investigator Saulsberry about his personal experiences with burns and could have refuted Agent Rust's testimony and the State's argument that Mr. Harris's burns were only consistent with its theory.

### 3.      Available Expert Testimony.

Undersigned counsel has retained Anjay Khandelwal, MD, FACS, FICS, Chief of the Division of Burn Surgery and the Director of the Paul and Carol David Foundation Burn Institute at Akron Children's Hospital. Had trial counsel conducted a reasonable investigation, they could have hired Dr. Khandelwal or another expert to undermine the State's arguments regarding Ms. Ferguson's and Mr. Harris's burns. Dr. Khandelwal would have testified that the pattern of burns on Kristi Ferguson and Mr. Harris was not consistent with the State's theory. Both trial and appellate counsel[114] failed entirely to investigate and present this evidence. Counsel's performance was constitutionally deficient and Mr. Harris was prejudiced as a result. *Strickland,* 466 U.S. at 687; *Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5. *See also* Ground 7 (discussing expert report as new evidence of innocence).

### C.      Trial Counsel's Failure to Properly Utilize Available Evidence During Trial to Cross-Examine Witnesses on Critical Issues and Appellate Counsel's Failure to Raise This Issue.[115]

Trial counsel unreasonably failed to use available information to adequately cross-examine State's witnesses, Martha and Barry Johnson and Agent Rust. *See Strickland*, 466 U.S. at 687; *Raether v. Meisner*, 608 F. App'x 409, 415 (7th Cir. 2015) (defendant was prejudiced when defense

---

[114]Given appellate counsel's complaint that "the State either lost or destroyed the bulk of the evidence it collected during the investigation of its case against [Mr. Harris]," Brief of Appellant at 25, it was imperative that counsel adequately investigate the available evidence that remained, which included the evidence Dr. Khandelwal reviewed for his report.

[115]Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below. Additionally, although this claim is currently limited to the cross-examination of three witnesses, Mr. Harris may discover additional evidence counsel should have used in cross-examination of these or other witnesses, which he will present in his amended petition as part of this same claim.

counsel did not cross-examine witnesses with prior inconsistent statements; "[h]ad counsel cross-examined the witnesses adequately, he could have cast significant doubt on [state witnesses'] testimon[ies], which w[ere] ripe for impeaching"). Appellate counsel unreasonably failed to raise this issue. *Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5. These failures prejudiced Mr. Harris at trial and on appeal.

### 1. Failure to Impeach Martha Johnson and Barry Johnson with Prior Inconsistent Statements.

In defense counsel's motion for directed verdict, counsel explained the many problems with Agent Rust's investigation. Tr. VI 1141-42. He then argued:

> So I think we have a real problem with . . . the element of intentionally setting this fire. And the State alleges that he – that Mr. Harris – not just set the house on fire; he set Kristi Ferguson on fire. There's no proof of that other than the statements made by Kristi after she was burned, after she was in shock, and are, I think, unreliable. There's nothing else to corroborate those statements; not another thing. Nothing from Agent Rust. Nothing from anyone else.

Tr. VI 1142-43. Despite counsel's belief that Ms. Ferguson's alleged statements were the only evidence that Mr. Harris intentionally set her on fire, they did not use everything available them to undermine that evidence.

At trial, Martha Johnson[116] testified that after her son Barry opened the door and said, "What in the hell," "Kristi talked and Little Donnie stood there." Tr. IV 842. She testified, "And Kristi talked again and she said, 'Look what he done to me. He put gas on me and he started me on

---

[116]Ms. Johnson testified that she had just gotten out of alcohol rehabilitation at the time of trial in December 2013, but that she did not have an alcohol problem in February 2012. Tr. IV 861-62.

fire.'"[117] Tr. IV 842. Defense counsel failed to impeach Ms. Johnson with the statement she initially

gave to police "a couple hours" after the fire. Tr. IV 893. This statement was, in its entirety:

> About 11:50 I was awaken by a noise at my front door. My 2 sons & I were asleep. When my older son & me went to the door, Christi was sittin on the chair close to the door. Little Donnie kept tellin her to be quiet. She looked at him and told him *You shouldn't have started that fire.*
> We had them to come in. She was naked but had a bra on & was burned head to toe.[118] [sic]

Att. 16, Ex. 1 (emphasis added).

At trial, Ms. Johnson's son Barry Johnson testified that after he opened the door, "Kristi had

stood up and looked me in the eyes and told me that, 'he had lit me on fire.'"[119] Tr. IV 881. Barry

also testified that after he got off the phone with 911, Ms. Ferguson "looked at Donnie and told him,

'I told you not to light it.' And he said, 'I know,' . . . and, 'I'm sorry.'" Tr. IV 883. Defense counsel

failed to impeach Barry with the statement he initially gave to police the morning after the fire. This

statement was, in its entirety:

> I heard the girl say *he started the fire* and the guy said I started the fire I'm sorry I shouldn't have litt the fire. The girl was burned on her face, arm's, leg's, They smelled like gas.
> The girl was Kristy. The guy was donnie. Jr [sic]

Att. 16, Ex. 2 (emphasis added).

Thus, the statements Ms. Johnson and Barry gave to police shortly after the fire did not

include any statements by Ms. Ferguson accusing Mr. Harris of having put gasoline on her or set

---

[117]At the preliminary hearing, Ms. Johnson testified, "I heard her say, 'He poured gas on me and burned me.'" Prelim. Hrg. Tr. at 9.

[118]Although not the subject of the claim here, contrary to Ms. Johnson's testimony, this statement does not say Ms. Johnson smelled gasoline. Tr. IV 843.

[119]At the preliminary hearing, Barry testified, "She had looked at me and told me that he had caught her on fire, and that the house was burning." Prelim. Hrg. Tr. at 33.

her on fire; instead, they alleged statements by Ms. Ferguson that "[y]ou shouldn't have started that fire," Att. 16, Ex. 1, and that "he started the fire," Att. 16, Ex. 2. In a case where a fire indisputably occurred, what mattered was whether Mr. Harris intentionally set Ms. Ferguson on fire. Ms. Ferguson's statements, as alleged by the Johnsons the morning after the fire, do not indicate whether Mr. Harris intentionally set Ms. Ferguson on fire.

In closing arguments, the State seized on these alleged statements. The State argued:

> Peter Astor told you who came in here and said that she was burned up by having gas on her and put on fire? I'll tell you who said it. Kristi Ferguson said it. Kristi Ferguson, through Keith Lickly[120] and Martha Johnson came in here and said, "He threw gasoline and set me on fire."

Tr. VII 1382. The State emphasized, "[S]he told you what happened to her. Not just, 'he did this to me,' but 'He poured gasoline on me and set me on fire.'" Tr. VI 1335. Counsel's failure to impeach the Johnsons with these prior inconsistent statements was unreasonable and prejudiced Mr. Harris. *Strickland*, 466 U.S. at 687. Appellate counsel's failure to raise this issue was similarly unreasonable and prejudicial.[121] *Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5.

---

[120]Paramedic Keith Lickly testified Ms. Ferguson told him Mr. Harris had thrown "kerosene" on her and set her on fire. Tr. IV 899, 909-10. *See Lindsey*, 769 F.2d at 1038 ("[P]ositive identification by two unshaken witnesses possesses many times the power of such an identification by one only, and . . . the destruction by cross-examination of the credibility of one of two crucial witnesses – even if the other remains untouched – may have consequences for the case extending far beyond the discrediting of his own testimony.").

[121]On direct appeal, OCCA emphasized Ms. Ferguson's alleged statements were "important primary evidence." *Harris*, 450 P.3d at 947. It found, "The State's case was built upon the statements of the victim immediately after the fire, and Appellant's own suspicious conduct and statements." *Id.* at 951. *See also id.* at 947 n.7.

### 2.      Failure to Impeach Agent Rust with Prior Case Dismissal.

During Agent Rust's cross-examination by defense counsel, the following exchange occurred:

> Q:    [D]o you have any investigations that were disputed[,] where anybody disputed your findings?
> A:    I don't believe so.
> Q:    Has there been any court that you've testified in or any cases where they had stated that your conclusions were wrong?
> A.    No.

Tr. IV 805. As described in Grounds 3(C) and 4, this was false. Counsel's strategy was to undermine Agent Rust's credibility and investigation. Had defense counsel conducted an adequate investigation, they could have impeached Agent Rust by asking about his disputed investigation of Ms. Kisselburg's case. Counsel could have shown Agent Rust had conducted a shoddy investigation and rushed to make an arrest in a prior case, and that he provided false testimony at Mr. Harris's trial. The information about Ms. Kisselburg's case was easily accessible on public websites. Att. 15. Counsel's failure to investigate and utilize this evidence constituted deficient performance and prejudiced Mr. Harris. *Strickland*, 466 U.S. at 687. Appellate counsel's failure to raise this issue was also deficient and prejudiced Mr. Harris. *Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5.

### D.      Trial and Appellate Counsel's Failures to Investigate and Present Additional Mitigation Evidence.[122]

Trial counsel failed to investigate and present compelling mitigating evidence. A reasonable investigation into Mr. Harris's background would have uncovered evidence that he has brain damage

---

[122]Although this claim is currently limited to evidence of a Fetal Alcohol Spectrum Disorder, Mr. Harris may discover additional mitigating evidence, which he will present in his amended petition as part of this same claim.

caused by a Fetal Alcohol Spectrum Disorder ("FASD").[123] Trial counsel presented testimony from family members, a social worker, and a psychologist. However, this presentation, which was based on an inadequate investigation including a failure to obtain neuropsychological testing, left the jury unaware of the deficits Mr. Harris suffered as a result of his mother's alcohol use during pregnancy. Appellate counsel then failed to investigate and present additional critical evidence regarding Mr. Harris's FASD, including a specific diagnosis.

When deciding which witnesses to prepare for the penalty phase of a capital case, ABA Guideline 10.11(F) at 1055-56 obliges defense lawyers to consider the following:

> 1. Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;

> 2. Expert and lay witnesses along with supporting documentation . . . to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); . . . and/or to rebut or explain evidence presented by the prosecutor.

The Supreme Court has emphasized counsel's failure to conduct a reasonable investigation of mitigation is deficient performance. *See Sears v. Upton*, 561 U.S. 945, 951-52 (2010); *Porter v. McCollum*, 558 U.S. 30, 39-40 (2009); *Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005); *Wiggins*, 539 U.S. at 527-28; *Williams*, 529 U.S. at 395-96. "To perform adequately in a capital case, trial counsel must undertake 'to discover *all reasonably available* mitigating evidence . . . .'" *Anderson*

---

[123]FASD encompasses various diagnoses, which each have their own criteria, and includes, among others: Fetal Alcohol Syndrome (FAS), Alcohol-Related Neurodevelopmental Disorder (ARND), and Neurobehavioral Disorder Associated with Prenatal Alcohol Exposure (ND-PAE). Centers for Disease Control and Prevention (CDC), *Fetal Alchol Spectrum Disorders (FASDs)*, https://www.cdc.gov/ncbddd/fasd/facts.html (last visited July 18, 2021).

*v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007) (quoting *Wiggins*, 539 U.S. at 524). This Court

is "compelled to insure the sentencing jury makes an individualized decision while equipped with

the 'fullest information possible concerning the defendant's life and characteristics,' and must

scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation

evidence." *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (quoting *Lockett*, 438 U.S. at

603). Here, counsel had no reasonable basis for failing to thoroughly investigate and present key

areas of Mr. Harris's mitigation case.

    1.    **Trial Counsel's Failure to Investigate and Present Additional Mitigation Evidence.**[124]

        a.    **The Mitigation Evidence Trial Counsel Presented.**

In the sentencing stage, trial counsel presented the testimony of five family members (Mr.

Harris's father, two brothers, and two aunts); Krystal Green, his former girlfriend of eight years and

the mother of his child; Ms. McKosky, his brother's girlfriend; a former employer; and two jail

ministry leaders. Through these witnesses, the jury heard Mr. Harris's mother, Linda Harris, died

of an aneurysm in 2011, and that her sudden death was hard on the family emotionally and

---

[124]Mr. Harris raised this ineffective-assistance-of-trial-counsel claim as Proposition XIV(D) on pages 84-87 of his direct-appeal brief and pages 15-23 of his application for evidentiary hearing. Mr. Harris also raises, *infra*, Ground 5(D)(2), an IAC claim (not yet exhausted in state court) regarding trial and appellate counsel's failure to obtain additional evidence regarding FASD. In support of that claim, he presents a report from Dr. Kenneth Lyons Jones, appended as Att. 17. He also plans to amend his petition to provide additional evidence in support of that claim. This Court should find the evidence presented in support of that claim is relevant to this already-exhausted ineffective-assistance-of-trial-counsel claim as well. This Court should consider the evidence even though it has not been presented in state court. Mr. Harris was prevented from developing the facts in state court because OCCA failed to grant an evidentiary hearing. *See Black*, 682 F.3d at 895-96 (citing *Pinholster*, 563 U.S. 213 n.5 (Sotomayor, J., dissenting)). Further, if this Court finds Mr. Harris overcomes the limitations of § 2254(d) with respect to this claim, "§ 2254(d) deference doesn't apply; review is de novo; and *Pinholster* doesn't preclude" the Court's consideration of Dr. Jones's report and the other new evidence. *Eaton*, 931 F.3d at 1019.

financially. Tr. VII 1432-33, 1439, 1441, 1445-46, 1478-79. These witnesses (including those in the house during the fire) testified that Mr. Harris's life has value for various reasons – including that he had found God, had a young daughter, and was a good, helpful, and kind person – and that they did not want him to receive a death sentence. Tr. VII 1434-37, 1442-43, 1447-49, 1453-54, 1469-70, 1473, 1475, 1479-81, 1483, 1485-87.

Trial counsel also presented the testimony of two experts: social worker Janice Garner, LCSW, Ph.D.,[125] and psychologist Jeanne Russell, Ed.D. Dr. Garner explained she did a biopsychosocial assessment of Mr. Harris. Tr. VII 1497. She testified her role on the case was essentially that of a mitigation specialist. Tr. VII 1497. Based on interviews and records, she testified that Mr. Harris's father, Harris, Sr. is African American and is the youngest of twelve children, that Harris, Sr.'s mother died in childbirth, that there was "a lot of poverty," and that he "had difficulty reading and writing," so most of his jobs were "labor kinds of jobs that did not require a person to read or write." Tr. VII 1502, 1504-06. She testified Donnie Harris, Jr.'s mother, Linda Harris, had three sisters and "[t]hey have a different biological father than the father that raised them." Tr. VII 1504-05. Ms. Harris "ha[d] Indian blood as well as Caucasian." Tr. VII 1505. Ms. Harris graduated from high school, got a licensed practical nurse degree, and was the "primary breadwinner." Tr. VII 1506. Harris, Sr. and Ms. Harris "had their ups and downs" and "separated maybe a time or two," and there was "some conflict in the family." Tr. VII 1506.

Dr. Garner testified Ms. Harris did not think she could have children and she did not have them for ten years with Harris, Sr. Tr. VII 1506. She did not "realize initially that she was pregnant"

---

[125]Dr. Garner is a licensed clinical social worker and has a Ph.D. in social work. Tr. VII 1490. She testified she is able to diagnose mental illness. Tr. VII 1493.

with Mr. Harris, "so there were some issues early on with some alcohol abuse and that kind of thing. However, when Donnie was born, there were no real indicators of what you might look at as fetal alcohol syndrome or something like that." Tr. VII 1506. She noted Mr. Harris "did have a heart problem" when he was born "that was treated in Ft. Smith and that was monitored for maybe a year." Tr. VII 1506. She testified Harris, Sr. "could not give me specifics" about Mr. Harris's development. Tr. VII 1507.

Dr. Garner testified Mr. Harris had two younger brothers: Shaun (about five years younger than Mr. Harris), and then Kevin (about four or five years younger than Shaun). Tr. VII 1508. "[A]s they were growing up, [Ms. Harris] worked the night shift and usually Donnie, Sr. worked during the day, so there was not a lot of supervision of these boys. They grew up pretty much on their own." Tr. VII 1508. They "never had any real community support; they never had a babysitter; they never stayed with family members." Tr. VII 1508. Mr. Harris "did not do really well in school and he eventually dropped out." Tr. VII 1507. He began drinking alcohol around the age of fourteen when a neighbor bought alcohol for him. Tr. VII 1508. According to Mr. Harris, "that was very helpful to him because he was a very shy person and it helped him to communicate better." Tr. VII 1508. Mr. Harris started using drugs by the age of sixteen, which is "a developmental phase."[126] Tr. VII 1509. His emotional maturity was "pretty much arrested around fourteen, fifteen, or sixteen. He did not continue to mature emotionally." Tr. VII 1509.  "Intellectually, he continued, but emotionally, it was pretty much arrested at that point." Tr. VII 1509.

---

[126]Mr. Harris was "huffing gas and some other things." Tr. VII 1533.

Around this time, Mr. Harris began a relationship with Krystal Green. Tr. VII 1509. They lived with friends and he became more involved with drugs.[127] Tr. VII 1509. He began supporting the relationship by selling drugs. Tr. VII 1509. Ms. Green "was the primary person like Linda had been." Tr. VII 1509. "She became the more stable person, more dominant in their relationship in terms of decision making and that kind of thing." Tr. VII 1509. After seven or eight years of a "nomadic existence" going back and forth between living with the Harrises, on their own, and with friends, Mr. Harris and Ms. Green had a child. Tr. VII 1510. Ms. Green began to mature despite "her own drug and alcohol problem." Tr. VII 1510. Mr. Harris "was still very much partying all the time and acting like a teenager and she had a child to raise." Tr. VII 1510. Ms. Green "needed a more dependable partner." Tr. VII 1510.

Mr. Harris met Ms. Ferguson and began a relationship with her. Tr. VII 1510. They were both "immature, using drugs." Tr. VII 1510. They were "together off and on" for seven years. Tr. VII 1514. "[T]here was a pattern established . . . of staying together for awhile, and Kristi getting restless and leaving and coming back . . . . She wanted to be independent but she was never able to achieve that, and she would come back." Tr. VII 1515. Mr. Harris and his family loved and cared about her, and she lived with them. Tr. VII 1515. Mr. Harris's aunt, Ms. Brown, told Dr. Garner that the Christmas before the fire in February, Mr. Harris and Ms. Ferguson told her they planned to marry, and Mr. Harris had given Ms. Ferguson a ring. Tr. VII 1515. They had "talked a lot about what they needed to do to get healthier, to be more stable to be married, and . . . they discussed the

---

[127]Dr. Garner testified "there was quite a bit of [substance] abuse, consistently." Tr. VII 1533.

counseling they might need." Tr. VII 1515. Sometime between then and the time of the fire, they separated. Tr. VII 1515-16.

Dr. Garner testified that in addition to "the maturity level of the people involved here," Mr. Harris and Ms. Ferguson were impaired by drugs and alcohol. Tr. VII 1516. Neither was "equipped to deal with conflict very well" so they would "split." Tr. VII 1516. She testified Mr. Harris "very much loved [Ms. Ferguson] and always did whatever he could . . . to get together again." Tr. VII 1516.

Dr. Garner testified there was "no major traumatic event – major abuse issues or whatever in Donnie's life." Tr. VII 1517. The most traumatic event before the fire was the death of his mother; it had "a very strong impact on everybody in that family, because after her death there was nothing to keep them together. . . . The boys were pretty much on their own." Tr. VII 1517-18. Dr. Garner also testified that Harris, Sr. had a stroke. Tr. VII 1518. She explained Mr. Harris and his brothers were not adults "in their way of being and thinking and their ability to resolve conflict; their ability to think through a problem and come up with a reasonable resolution. A lot of it's impulsive." Tr. VII 1518. Ms. Harris "did not teach them to handle things on their own; she bailed them out of any trouble they got in." Tr. VII 1519. They "did not have a lot of experience with consequences, so they didn't think ahead; there was a lot of impulsivity." Tr. VII 1534. They did not have the skills required to "deal with life," and "if you're under the influence of something, you're impaired even further." Tr. VII 1519. Dr. Garner testified that if Mr. Harris did what he was convicted of, she thought it happened during a "volatile situation, some argument." Tr. VII 1520. She testified, "I do not think such a thing could ever have been planned out by Donnie." Tr. VII 1520.

Dr. Garner testified:

Donnie is chronologically thirty years old, but emotionally, in his . . . ability to think through and look at consequences, his level of maturity is not that of adolscence. [sic] So you have to think of him in that way, that in a lot of ways Donnie has not grown up to be an adult in the way that adults function in terms of responsibility.

Tr. VII 1516. She explained, "[W]ith maturity come[] the ability to tolerate frustration," "the ability to resolve conflict in a reasonable way," and "responsibility and thinking through consequences before actions are taken, before you behave on an impulse." Tr. VII 1520-21. She testified he was impaired on "two different levels": He was "under the influence," and "[w]ith Donnie and this level of maturity that is . . . more in an adolescent range, . . .his judgment is going to be impaired even at times when he might not be under the influence." Tr. VII 1521. Mr. Harris "had difficulty – in really communicating well his thoughts, so his ability to tolerate frustration was not good." Tr. VII 1521.

She described Mr. Harris's "flat affect, which means that he could report information but there was no emotion attached to it," which is "a symptom of depression." Tr. VII 1522. She testified he became "tearful quite a bit during the interview, particularly when we talked about his mother and when we talked about Kristi." Tr. VII 1522. He "was having a lot of flashbacks to the fire" and "a number of symptoms of trauma." Tr. VII 1523. He had symptoms of PTSD. Tr. VII 1523. She testified Mr. Harris was "[a]bsolutely" grieving over Ms. Ferguson. Tr. VII 1525. "He still talks about her in some ways almost in terms of what the future could have been. I mean, he can't get past this loss." Tr. VII 1525.

On cross-examination, Dr. Garner testified that she did not find evidence of "brain trauma" or an "inherent brain problem," and that Mr. Harris was never seen in any mental health setting, treated, or given a diagnosis. Tr. VII 1528-29. She did not perform any standardized tests on Mr. Harris, and social workers are not trained to do so. Tr. VII 1531. She testified that usually if tests

126

are needed, a psychologist will conduct them. Tr. VII 1531. She testified there are tests for maturity level, "but these are done by psychologists" and reiterated "[i]t's not part of social work training." Tr. VII 1531-32. She could not say what they are "because I'm not familiar with them." Tr. VII 1532. She testified there was no indication in Dr. Russell's report of "mental retardation." Tr. VII 1536.

Dr. Jeanne Russell, a psychologist, testified she performed an IQ test on Mr. Harris because family members expressed concerns about him being "slow" and not being able to understand his lawyer "unless they were slower and used more simple language," concerns his mother did not know she was pregnant and was drinking, and "concerns to what kind of impact that may have had on his IQ." Tr. VII 1540-41. Dr. Russell administered the fourth edition of the Wechsler Adult Intelligence Scale ("WAIS-4"). Tr. VII 1541. Mr. Harris's IQ was 87, which was in the 19th percentile, or the low average range. Tr. VII 1541-42. Dr. Russell testified that his score for verbal comprehension was in the 13th percentile, "[s]o he's going to have trouble on tasks where information is presented verbally"; "it lent some validity to his aunt's concern that the attorneys need to go slow and explain things to him, because he's just not going to understand it as well as most people." Tr. VII 1543-44. His processing speed was his lowest score. Tr. VII 1543. She explained, "So the information coming in – I have to take that information and process it and then respond back to it, or make plans for it, and he's not going to be able to do that very quickly . . . ." Tr. VII 1545. His working memory and perceptual reasoning (i.e., "in areas such as puzzles" or working on cars) were average. Tr. VII 1546-47.  She testified there was no indication of a developmental disability. Tr. VII 1549-50.

### b.     The Evidence Trial Defense Counsel Failed to Investigate and Present: Evidence of a Fetal Alcohol Spectrum Disorder.

At trial, several of Donnie's proposed mitigating circumstances related to brain deficits or fetal alcohol exposure, including:

- "the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired";

- "the defendant was under the influence of mental/emotional disturbance";

- "the defendant's intellectual functioning falls in the low average range";

- "the defendant's mother drank heavily during pregnancy"; and

- "the defendant's low emotional maturity level."

O.R. II 374. Next to each of these proposed mitigators, the jury wrote "no."[128] O.R. II 374.

Despite proposing these mitigating circumstances, trial counsel conducted an inadequate investigation into Donnie's prenatal alcohol exposure and its effects. Direct-appeal counsel presented an affidavit from trial counsel's investigator, Steve Leedy. Mr. Leedy explained:

> During my office's representation of Mr. Harris, I had numerous conversations with Donnie. Right from the beginning I believed something was not right about Donnie. I found my interactions with him frustrating because he seemed detached and unable to stay focused or follow the direction of our conversations. At times it seemed like Donnie had trouble processing information to the point that I was not always sure he fully understood the things I tried to explain to him or my requests for him to provide me information to help in his defense.

---

[128]On direct appeal, Mr. Harris argued that the omission of the mandatory instruction defining mitigating circumstances from the packet provided to the jury violated Mr. Harris's rights to due process, a fair trial, and a reliable sentencing proceeding. Brief of Appellant at 64. Mr. Harris argued "[t]he jury's hand-written notes on instruction number 60, OUJI-CR 4-79, clearly indicate that it believed it was required to make unanimous findings beyond a reasonable doubt on each alleged mitigating circumstance, as it had for the State's alleged aggravating circumstances." Brief of Appellant at 65 (citing O.R. I 74). Mr. Harris does not raise this claim here.

128

App. for Evid. Hrg., Att. 6 (appended hereto as Att. 18) at ¶ 3. He explained that he "learned through family members that Donnie's mother Linda Harris was unaware she was pregnant with Donnie until shortly before he was born. Donnie's father . . . and . . . paternal uncle Floyd Harris both told me that Linda Harris drank to the point of intoxication most weekends while she was pregnant with Donnie." *Id.* at ¶ 4. Mr. Leedy's interviews with family members led him to "obtain[] Linda and Donnie's hospital records from the time frame surrounding Donnie's birth," which "contained what I believed to be red flags indicating possible markers for Fetal Alcohol Syndrome." *Id.* Mr. Leedy reported:

> I shared this information with Dr. Kathy LaFortune, who at the time was the Chief of Forensic/Psychological Services at the Oklahoma Indigent Defense System. Dr. LaFortune agreed that the information I obtained combined with Donnie's inability to focus and/or process information supported a possibility that Donnie suffered from brain damage caused by Fetal Alcohol Syndrome. Dr. LaFortune expressed an opinion that this line of mitigation defense should be explored in greater detail by a qualified expert. However, shortly after my conversation with Dr. LaFortune, she left the employ of OIDS.

> I shared this information with Mr. Harris's trial counsel Peter Astor and Jim Bowen. Despite my urging, counsel did not pursue this line of mitigation defense or retain an expert to conduct neuropsychological testing in Donnie's case. I shared my disappointment at the decision not to pursue this avenue with Mr. Astor and Mr. Bowen at the time.

*Id.* at ¶¶ 5-6.

Direct-appeal counsel also presented an affidavit from former OIDS Chief of Forensic/Psychological Services Kathy LaFortune, J.D., Ph.D., whose "job duties included consulting with OIDS capital trial attorneys regarding mental health based defenses and mitigation and locating and obtaining expert witnesses to assist the attorneys defending capital clients." App. for Evid. Hrg., Att. 7 (appended hereto as Att. 19) at ¶ 1. Dr. LaFortune explained that shortly before she left OIDS, she "recall[ed] discussing and recommending Fetal Alcohol Syndrome as a possible avenue to pursue" in Mr. Harris's case. *Id.* at ¶ 2. She explained, "It was my opinion at the time, that

this avenue warranted further exploration. However, not long after this conversation, I left OIDS to pursue another employment opportunity and had no further discussions with Mr. Harris's trial team regarding the case." *Id.* at ¶ 2.

Despite Mr. Leedy's concerns and Dr. LaFortune's advice, counsel retained two experts who were not qualified to test for deficits related to prenatal alcohol exposure, or to explain to the jury how these deficits impacted Mr. Harris's ability to function and communicate with others. Trial counsel retained Dr. Russell for the limited purpose of conducting intelligence testing. Although Dr. Russell is a psychologist, she is not a neuropsychologist, so she is unable to conduct neuropsychological testing. App. for Evid. Hrg., Att. 14 (appended hereto as Att. 20) at ¶ 4. On direct appeal, Dr. Russell provided an affidavit explaining that the "significant 15 point disparity" between Mr. Harris's verbal and non-verbal intelligence testing scores and statements from his family members "that his mother was unaware she was pregnant and drank alcohol throughout her pregnancy" were "marker[s]/indicators[s] of possible organic bran damage." *Id.* Dr. Russell explained, "I am not a neuropsychologist and am not qualified to administer neuropsychological testing. However, it is my opinion that neuropsychological testing was warranted in Mr. Harris's case to fully assess and explain his true level of functioning." *Id.*

Direct-appeal counsel retained a neuropsychologist, John Fabian, Psy.D., J.D., ABPP, to evaluate Mr. Harris.[129] Dr. Fabian's report states "[t]here are concerns that the mother was using four

---

[129]In addition to reporting on the neuropsychological testing he conducted, Dr. Fabian reported on many details of Mr. Harris's life. These included that Mr. Harris had a 2.4 grade point average through eleventh grade, that he had tutors to assist with his deficits in speech and language, that he was placed in alternative school and failed to complete it, and that he "did not really ever live alone or display appropriate independent living skills." App. for Evid. Hrg., Att. 15 (appended hereto as Att. 21), Ex. 2 at 3, 5, 19.

to ten drinks per day per weekend and was drinking most if not every weekend and had been drinking consistently from conception to eight months' gestation." App. for Evid. Hrg., Att. 15 (appended hereto as Att. 21), Ex. 2 at 21. Dr. Fabian conducted neuropsychological testing and found Mr. Harris met the criteria for Other Specified Neurodevelopmental Disorder (Associated with Prenatal Alcohol Exposure).[130] *Id.* at 18. He reported that his neuropsychological testing of Mr. Harris "has significant findings related in some areas known to be impaired in individuals with fetal alcohol effect or syndrome." *Id.* at 20. Dr. Fabian reported, "Whether Mr. Harris qualifies for fetal alcohol effect or full alcohol spectrum disorder, both conditions have similar effects on one's neurodevelopment." *Id.* at 21. He reported that alcohol-related neurodevelopomental disorder (ARND) "requires evidence of both prenatal alcohol exposure and CNS abnormalities," and that he "believe[s] in this case" there was evidence of both. *Id.* at 21. He explained, "Mr. Harris has demonstrated a functional abnormality as related to a complex pattern of cognitive and behavioral problems that are not consistent with developmental level and cannot be explained by other factors other than prenatal alcohol exposure." *Id.* at 22. Dr. Fabian explained that "[n]eurodevelopmental disorders beginning in childhood are developmental in nature and are permanent with a relatively steady course, and are associated with factors affecting brain development." *Id.* at 18.

> Symptoms typically manifest early in development and often before the child enters grade school and are characterized by developmental deficits that produce impairments in personal, social, academic, or occupational functioning. Brain developmental deficits vary from very specific limitations of learning to more complex executive functions to global impairments of social skills and/or intelligence. . . . Impairments associated with fetal alcohol spectrum disorders are often a reflection of underlying structural changes in the brain with potential

---

[130]Dr. Fabian also diagnosed Mr. Harris with Language Disorder, Attention-Deficit Hyperactivity Disorder, Posttraumatic Stress Disorder, Amphetamine Use Disorder, and Other Specified Depressive Disorder. Att. 21, Ex. 2 at 17-18.

decrease in brain size and potential effects of structural and functional impairment in different areas of the brain.

*Id.* at 18.

Affidavits obtained from Harris family members and friends obtained on direct appeal describe Mr. Harris's mother's alcohol use while pregnant, Mr. Harris's delay in reaching developmental milestones during his childhood, and the limitations in his functioning as an adult. Family and friends also explained Mr. Harris's complicated on-again, off-again relationship with Ms. Ferguson and the strain her drug abuse, suspected mental illness, and history of self-harm placed on his limited mental abilities. App. for Evid. Hrg., Atts. 8-13.

In his affidavit, Mr. Harris's father, Donnie Harris, Sr., provided a detailed account of his wife's alcohol abuse during her pregnancy with Mr. Harris, and Mr. Harris's difficulties in achieving developmental milestones:

> My wife and I did not think we could have children for the first several years of our marriage. Linda was very far along in her pregnancy when we were told we were having our first baby (Little Donnie). She went to the doctor because her stomach would move in odd ways while laying down. It seemed like we were told of the pregnancy and a week later the baby came. At the time, we lived in a trailer and had nothing prepared for bringing a baby home.
>
> Linda smoked cigarettes and drank alcohol until she learned of the pregnancy. My brother, Leroy Harris and his wife, Thelma Harris owned a bar in Tuskahoma. We spent most weekend nights there drinking alcohol until we learned of the pregnancy.
>
> At first, we thought Little Donnie was a healthy baby. Once we brought him home from the hospital he started having trouble breathing and his lower body started turning blue. We rushed him to the hospital and learned he had a heart problem. The doctors said they thought he would grow out of it. My wife and I had no experience around babies or small children. We arranged our schedules so that one of us would always be with Little Donnie. He was rarely around other children until his brothers were born.
>
> It wasn't until we had more children that we noticed Little Donnie was different. My wife and I talked about the noticeable differences between Little Donnie and his baby

brother, Shaun. Although we recognized the developmental differences between the boys, we did not know what to do. Linda felt we should just give Little Donnie time to catch up. We noticed that Little Donnie did not develop or hit milestones as quickly as his brothers. For example, he wanted to be carried around as a toddler whereas both the younger boys wanted to walk, run and play. Little Donnie was trying to talk before he learned to walk. In general, I felt Little Donnie was just slower than Shaun or Kevin. I believe we did not notice how different Little Donnie was because we were young inexperienced parents with no other children to compare him to at the time. Little Donnie was much slower to potty train than the other two children. The younger boys would let us know if their diaper or clothes were wet or dirty. They wanted to be changed immediately. Little Donnie did not seem to care nor did he cry to let us know he needed to be changed.

App. for Evid. Hrg. (appended hereto as Att. 22), Att. 8 at ¶¶ 2-5. Krystal Green Thompson, who has known Mr. Harris since he was fifteen, was in a relationship with him from approximately 1998 to 2007, and is the mother of his only child, stated:

During our relationship, I felt there was something off or slow about Little Donnie. I chalked it up to immaturity, because I have always heard that boys mature slower than girls. As we got older, I realized that was something wrong with his mind or the way he thought.

Little Donnie and I were still in a relationship when he first met Kristi Ferguson. However, after the birth of our daughter, I had become unhappy in the relationship and welcomed the break-up. I felt like I was ready to grow-up and raise our daughter but I felt Little Donnie was still like a kid.

App. for Evid. Hrg., Att. 9 (appended hereto as Att. 23) at ¶¶ 4-5. Ms. McKosky, who lived in the Harris home from 2010 until the fire in 2012, explained, "I would describe Little Donnie as someone who is not good at problem solving. He does not have good thinking or planning skills. He always seems to take the hard way of doing things. I do not think he catches on to things very well." App. for Evid. Hrg., Att. 10 (appended hereto as Att. 24) at ¶ 3. Kenny Ray Smith, a friend who knew Mr. Harris since approximately 1998, explained:

I would describe Donnie's mental abilities as slow. For example, he came to me once and asked if I wanted to buy a "cow/steer/bull"? I asked him if it was a cow or a steer or a bull because I wanted to know which I was buying. He said again its [sic] a

133

"cow/steer/bull". I said, yeah I would buy it because I had never seen one. At the time, it was humorous but I do not think Donnie knew it was funny or why.

App. for Evid. Hrg., Att. 11 (appended hereto as Att. 25) at 2.

It is clear from the jury's handwritten findings on Instruction 60 that it did not find trial counsel's efforts to prove the alleged mitigating circumstances persuasive. The jury expressly indicated it did not believe evidence had been presented to support Mr. Harris's claim that his mother drank heavily during her pregnancy with him or any of the four mitigators related to psychological impairments. O.R. II 374. Testimony from a qualified expert like Dr. Fabian is critical in a case like Mr. Harris's to tip the scales against aggravation toward mitigation. Had Mr. Harris's jury been provided a more complete and accurate picture of his deficits and their cause, there is a reasonable probability one juror "would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### c.     If This Court Finds This Claim Was Not Adjudicated on the Merits, It Should Be Reviewed De Novo.

Regarding Mr. Harris's "four ineffective-counsel claims [that] rely on evidence outside the record," including the claim at issue here, OCCA found, "we do not reach the merits of these complaints, but only determine whether additional fact-finding regarding them is necessary." *Harris*, 450 P.3d at 960-61 (citing Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2019)). If this Court determines OCCA did not reach the merits of this claim, it should review it de novo.

### d.     In the Alternative, § 2254(d) Does Not Preclude Relief Because the State Court Adjudication Was Legally and Factually Unreasonable.[131]

---

[131]OCCA's deficient fact-finding can support a finding that either § 2254(d)(2) is satisfied or that there was no adjudication on the merits. *See Gordon*, 780 F.3d at 202; *Milke*, 711 F.3d at 1007.

Alternatively, if the Court determines the IAC claim presented here is the same as that adjudicated on the merits by OCCA, and that OCCA did, in fact, "reach the merits of these complaints," *Harris*, 450 P.3d at 960, it should still consider the claim de novo because it overcomes the limitations imposed by 28 U.S.C. § 2254(d)(1), (2).

### i. Deficient-Performance Prong.

In its direct-appeal opinion, OCCA addressed the merits of Mr. Harris's IAC claim based on counsel's failure to investigate and present this mitigating evidence. *See Harris*, 450 P.3d at 962-65. Citing *Strickland*, OCCA found counsel's performance was not deficient. *Id.* OCCA found:

> This is not a case involving lack of capital trial experience on the part of counsel, lack of funds or professional resources, or lack of focus. Appellant had two experienced capital trial attorneys defending him. . . . Counsel consulted with and presented considerable testimony (exceeding sixty pages of transcript) from two professionals, both of whom considered Fetal Alcohol Syndrome within the context of their respective fields. We believe trial counsel conducted reasonable investigation into this subject. The fact that counsel might have been able to locate some other expert with an arguably different opinion does not render their efforts deficient. Ultimately, neither Dr. Russell nor Dr. Garner found evidence of mental impairment substantial enough to warrant further inquiry. Trial counsel made a reasonable strategic choice not to continue shopping for other opinions.

*Id.* at 964. OCCA's finding that counsel did not perform deficiently was an unreasonable application of *Strickland*. It was also contrary to *Strickland*'s progeny, including *Wiggins*, *Porter*, *Williams*, *Rompilla*, and *Sears*, which OCCA did not cite in its analysis. § 2254(d)(1). OCCA's finding of no deficient performance was also based on several unreasonable determinations of fact. § 2254(d)(2).

### a. OCCA's Adjudication Was Legally and Factually Unreasonable.

First, OCCA unreasonably determined trial counsel's performance was not deficient because "trial counsel conducted reasonable investigation into this subject." *Harris*, 450 P.3d at 964. In *Strickland*, the Court held:

135

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

466 U.S. at 690-91. OCCA correctly explained, "Counsel has a duty to make reasonable investigations, or to 'make a reasonable decision that makes particular investigations unnecessary.'" *Harris*, 450 P.3d at 964 (quoting *Strickland*, 466 U.S. at 691). However, OCCA unreasonably determined counsel "conducted reasonable investigation into this subject." *Id.* Counsel did no such "thorough investigation"; instead, they failed to investigate the "facts relevant to plausible options." *Strickland*, 466 U.S. at 690. This Court should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Mr. Harris's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523. Here, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28.

"The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made '*after thorough investigation of [the] law and facts*', is 'virtually unchallengeable.'" *Hinton*, 571 U.S. at 276 (emphasis added). *See, e.g., Soffar*, 368 F.3d at 477-78, 480; *Loyd*, 977 F.2d at 156-61; *Gersten*, 426 F.3d at 611, 615. Counsel were aware Mr. Harris's mother drank alcohol during pregnancy and that he was "slow." Tr. VII 1540-41, 1543-44. However, after investigator Leedy and Dr. LaFortune alerted counsel to the possibility of FASD, counsel failed to investigate this possibility by hiring an expert qualified to conduct neuropsychological testing. Instead, they hired two experts who found additional red flags – yet counsel still did not hire an expert to do neuropsychological testing. Trial counsel's failure to investigate and present a

competent expert to adequately explore the possibility of FASD fell below what the Constitution requires.

OCCA's legally unreasonable finding of no deficient performance was based on unreasonable determinations of fact[132] regarding the extent to which the defense experts explored FASD. OCCA found:

> The record shows that the possibility of Fetal Alcohol Syndrome was, in fact, explored by the experts defense counsel consulted. Both Drs. Russell and Garner investigated Appellant's mental health and cognitive ability as mitigating factors. . . . Both said they had received information . . . that Appellant's mother, who died in 2011, drank alcohol to some extent while pregnant with Appellant. Both had access to Appellant and others who could describe his apparent intellectual abilities. Yet, neither Dr. Russell nor Dr. Garner found evidence that Appellant suffered any developmental deficiencies that might convincingly be attributed to Fetal Alcohol Syndrome. (There was also no evidence that Appellant suffered from any mental illness.) . . . Russell . . . found no evidence of developmental disability.

*Harris*, 450 P.3d at 963. OCCA's finding that "the possibility of Fetal Alcohol Syndrome was, in fact, explored" by Drs. Garner and Russell is an unreasonable determination of fact. *Id.* OCCA was correct in finding that both doctors "said they had received information . . . that Appellant's mother . . . drank alcohol to some extent while pregnant with Appellant." *Id.* However, while they had information about Mr. Harris's prenatal alcohol exposure, the doctors did not "explore[]" the possibility of Fetal Alcohol Syndrome. *Id.* Despite recognizing that "there were some issues early on with some alcohol abuse and that kind of thing," and that Mr. Harris "did have a heart problem" when he was born, Dr. Garner testified that "when Donnie was born, there were no real indicators of what you might look at as fetal alcohol syndrome or something like that." Tr. VII 1506-07.

---

[132] "Ineffectiveness . . . is a mixed question of law and fact." *Strickland*, 466 U.S. at 699 (citation omitted). Section 2245(d)(2) "provides relevant context for [] interpretation of (d)(1) . . . federal habeas courts must make as the starting points of their analysis the state courts' determinations of fact." *Williams*, 529 U.S. at 387.

Notably, Dr. Garner only testified about a lack of "real indicators" of FASD "when Donnie was born."[133] Tr. VII at 1506. Donnie's alleged lack of "indicators" at birth did not eliminate a possible FASD diagnosis. Tr. VII at 1506. As Dr. Fabian explained in his report:

> According to the National Institute of Alcohol Abuse and Alcoholism, Fetal Alcohol Spectrum Disorders (FASD) may relate to a number of neuropsychological and emotional and behavioral deficits including learning[,] remembering, controlling emotions and impulsivity, communicating, and socializing. . . . FASD cases are also related to psychiatric conditions including ADHD and depression, as well as hyperactivity, conduct and impulse control disorders, and increased incidence of alcohol and other substance use disorders, which are all present in this case.

Att. 21, Ex. 2 at 21. These indicators of FASD could not have been determined at the time of Mr. Harris's birth. *See Trevino v. Davis*, 829 F.3d 328, 354 (5th Cir. 2016) (quoting expert report that "*the deficits found in FAS/FAE children tend to become more debilitating as these individuals get older*"). Further, according to Dr. Fabian, Mr. Harris *did* have "a real indicator[] of what you might look at as fetal alcohol syndrome" when he was born. Tr. VII 1506-07. "Regarding the "heart problem" Dr. Garner reported Mr. Harris had at birth, Tr. VII 1506, Dr. Fabian reported:

> Mr. Harris had another medical condition at birth including coarctation of the aorta, a condition often associated with FASD. This condition indicates a narrowing of the aorta, which is the major blood vessel carrying blood from the heart to the rest of the body. His risk of having this condition is elevated if he is exposed to fetal alcohol effects.

Att. 21, Ex. 2 at 22.

Additionally, contrary to Dr. Garner's conclusory testimony that she did not find evidence of an "inherent brain problem," Tr. VII 1528, she testified about various deficits Mr. Harris displayed, which were remarkably consistent with Dr. Fabian's explanation of FASD, Att. 21, Ex.

---

[133]She acknowledged she did not have "specifics" about Mr. Harris's development as a child. Tr. VII 1507. She testified that "[i]n this particular case, there were many more people it would've been good to talk to." Tr. VII 1502.

2 at 21. Consistent with Dr. Fabian's explanation that "Fetal Alcohol Spectrum Disorders (FASD) may relate to a number of neuropsychological and emotional and behavioral deficits including learning[,] remembering, controlling emotions and impulsivity, communicating, and socializing," *id.*, Dr. Garner testified that Mr. Harris's emotional maturity was "pretty much arrested around fourteen, fifteen, or sixteen. He did not continue to mature emotionally," Tr. VII 1509, that "he was a very shy person," Tr. VII 1508, and that he was impulsive and had impaired judgment, difficulty communicating his thoughts, and a poor ability to tolerate frustration, Tr. VII 1516, 1520-21. Consistent with Dr. Fabian's explanation that "FASD cases are also related to psychiatric conditions including ADHD and depression, as well as hyperactivity, conduct and impulse control disorders, and increased incidence of alcohol and other substance use disorders," Att. 21, Ex. 2 at 21, Dr. Garner testified Mr. Harris showed symptoms of depression and PTSD[134] and that "there was quite a bit of [substance] abuse, consistently." Tr. VII 1522-23, 1533. Given the deficits Dr. Garner described, it is unclear why she believed there was no evidence of an "inherent brain problem." Tr. VII 1528.

Apparently failing to recognize these indicators of FASD herself, Dr. Garner did not conduct or recommend necessary testing to determine whether Mr. Harris had FASD. As OCCA pointed out, Dr. Garner testified she is able to diagnose mental illness. *Harris*, 450 P.3d at 964 n.39. *See* Tr. VII 1493. However, FASD is not a mental illness. An FASD diagnosis requires neuropsychological testing. *See Trevino*, 829 F.3d at 328 (emphasis added) (noting an "expert states that although his *[neuropsychological] assessment 'is a critical component in the FASD diagnostic process*,' the

---

[134]Given Dr. Garner's testimony about various deficiencies and symptoms of depression and PTSD, OCCA's determination that "[t]here was also no evidence that Appellant suffered from any mental illness" was factually unreasonable. *Harris*, 450 P.3d at 963.

diagnosis of FASD must be made by a medical doctor"). Dr. Garner testified  Mr. Harris had never

been seen in any mental health setting, Tr. VII 1529, and that she did not perform any standardized

tests on Mr. Harris, as social workers are not trained to do so, Tr. VII 1531. She testified there are

tests for maturity level, "but these are done by psychologists" and reiterated "[i]t's not part of social

work training." Tr. VII 1531-32. She could not say what they are "because I'm not familiar with

them." Tr. VII 1532. Contrary to OCCA's determination, Dr. Garner's conclusions were not based

on an exploration of the possibility Mr. Harris had FASD.[135]

Likewise, contrary to OCCA's factual finding, Dr. Jeanne Russell, the psychologist, did not

explore "the possibility of Fetal Alcohol Syndrome."[136] *Harris*, 450 P.3d at 963. Dr. Russell testified

she performed an IQ test on Mr. Harris because family members expressed concerns about his being

"slow" and not being able to understand his lawyer,[137] concerns his mother did not know she was

pregnant and was drinking, and "concerns to what kind of impact that may have had on his IQ." Tr.

VII 1540-41. Her testing showed an IQ in the 19th percentile and difficulties with verbal

comprehension and processing speed. Tr. VII 1541-43, 1545. There is no indication that she

explored the possibility of FASD. She testified there was no indication of a "developmental

disability." Tr. VII 1549-50. However, IQ testing was not sufficient to rule out an FASD diagnosis.

---

[135]For the reasons just described, OCCA's determination that "neither Dr. Russell nor Dr. Garner found evidence that Appellant suffered any developmental deficiencies that might convincingly be attributed to Fetal Alcohol Syndrome" was factually unreasonable; they both found evidence that he suffered developmental deficiencies that, as Dr. Fabian's report makes clear, could be attributed to FASD. *Harris*, 450 P.3d at 963.

[136]OCCA similarly determined,"Dr. Russell . . . reached the same conclusion [about the lack of FASD] as Dr. Garner." *Harris*, 450 P.3d at 964 n.39. This was factually unreasonable. As explained *infra*, Dr. Russell did not consider FASD or reach any conclusions about it.

[137]OCCA found Dr. "Russell confirmed family members' opinions that Appellant had difficulty understanding complicated concepts." *Harris*, 450 P.3d 963.

"FASD increases the risk for intellectual disability by 23 times. However, the most typical presentation of FASD is not intellectual disability. . . . People with FASD . . . frequently have higher IQs but much lower adaptive skills." Larry Burd & William Edwards, Fetal Alcohol Spectrum Disorders Implications for Attorneys and the Courts, Crim. Just., Fall 2019, at 21, 27. *See also* N.N. Brown et al. *A Proposed Model Standard for Forensic Assessment of Fetal Alcohol Spectrum Disorders*, 38 J. Psychiatry & L. 383, 386-87 (2010) ("Other misconceptions [of FASD] . . . include: . . . persons with IQs in or near the average range couldn't have FASD and/or couldn't have neurocognitive deficits that cause them to function at levels similar to those with intellectual disabilities[.]"). An exploration of FASD required neuropsychological testing, which neither Dr. Garner, Dr. Russell, nor any other expert performed on Mr. Harris before the trial. On direct appeal, Dr. Russell provided an affidavit explaining she saw markers of "possible organic brain damage" and that although she is "not a neuropsychologist and . . . not qualified to administer neuropsychological testing . . . , it is [her] opinion that neuropsychological testing was warranted in Mr. Harris's case to fully assess and explain his true level of functioning." Att. 20, Att. 14 at ¶ 4. *See Trevino*, 829 F.3d at 328.

OCCA unreasonably determined that Mr. Harris's "cognitive difficulties . . . were apparently not so great as to cause concern to the experts whom trial counsel consulted." *Harris*, 450 P.3d at 933. This was an unreasonable determination of fact, as Dr. Garner testified at length about Mr. Harris's difficulties, and Dr. Russell found a "15 point disparity" in his intelligence testing and believed neuropsychological testing was warranted. Att. 20 at ¶ 4.

OCCA's finding of no deficient performance was an unreasonable application of *Strickland* and contrary to its progeny. Appellate counsel's failure to follow up on Dr. Garner's and Dr.

Russell's concerns was constitutionally deficient. *Wiggins*, 539 U.S. at 527-28. Despite the advice of Mr. Leedy and Dr. Fortune to obtain an expert regarding FASD, and despite the many indicators of FASD recognized by Dr. Garner and the markers of organic brain damage recognized by Dr. Russell, defense counsel failed to investigate a possible FASD diagnosis with neuropsychological testing.[138] Counsel did not make a "reasonable strategic choice not to" consult a neuropsychologist. *Harris*, 450 P.3d at 964. Instead, he failed to conduct a reasonable investigation that would have allowed him to make such a strategic decision. *See Richter*, 562 U.S. at 109 (citation omitted) ("[C]ourts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions."). Counsel "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.

"It is unquestioned that under the prevailing professional norms at the time of [Mr. Harris's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter*, 558 U.S. at 39 (quoting *Williams*, 529 U.S. at 396). However, Mr. Harris's counsel "ignored pertinent avenues for investigation of which [t]he[y] should have been aware." *Porter*, 558 U.S. at 40. In *Porter*, the Supreme Court found deficient performance where, due to inadequate investigation, "[c]ounsel . . . failed to uncover and present any evidence of Porter's mental health or mental impairment," among other evidence. *Id.* "[A reviewing] court must consider

---

[138]OCCA found, "The fact that counsel might have been able to locate some other expert with an arguably different opinion does not render their efforts deficient. . . . Trial counsel made a reasonable strategic choice not to continue shopping for other opinions." *Harris*, 450 P.3d at 964. Contrary to OCCA's factual finding, Dr. Fabian was not merely "some other expert with an arguably different opinion." *Id.* Unlike the experts trial counsel hired, he was qualified to conduct neuropsychological testing.

not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527 As in *Wiggins*, OCCA's "deference to counsel's strategic decision," "despite the fact that counsel based this alleged choice on . . . an unreasonable investigation, was . . . objectively unreasonable." *Id.* at 528. Like counsel in *Williams*, counsel here performed deficiently in failing to investigate and present that their client "might have mental impairments organic in origin." 529 U.S. at 370. *See also Sears*, 561 U.S. at 949-51 (mitigation investigation inadequate where counsel failed to discover evidence including "significant frontal lobe abnormalities").

The Tenth Circuit has emphasized that "because of the crucial mitigating role that evidence of . . . mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence." *Wilson v. Sirmons*, 536 F.3d 1064, 1085 (10th Cir. 2008). *See also Smith v. Mullin* (*Smith I*), 379 F.3d 919, 942 (10th Cir. 2004). The Tenth Circuit has held:

> Our analysis . . . is guided by the Supreme Court's . . . jurisprudence emphasizing the importance of thorough investigation – in particular, of mental health evidence – in preparation for the sentencing phase of a capital trial. While initially, the Supreme Court applied *Strickland* rather narrowly, [citation omitted], this is no longer the case. In *Williams v. Taylor* [citation omitted], *Wiggins v. Smith* [citation omitted], and *Rompilla v. Beard* [citation omitted], counsel conducted some inquiries, but the Court required a more robust, complete investigation, tethered at a minimum to the norms of adequate investigation articulated by the American Bar Association Standards for Criminal Justice.[139] Because of counsel's deficient investigations, the Supreme Court overturned the petitioners' death sentences in each case.

*Wilson*, 536 F.3d at 1083.

---

[139]Capital defense counsel's duty to investigate guilt and penalty phase issues specifically includes consultation with mental health experts. *See* ABA Guideline 10.7, Commentary at 956 ("[B]rain scans . . . and consultation with additional mental health specialists may also be necessary.").

143

In *Littlejohn v. Trammell* (*Littlejohn I*), 704 F.3d 817, 862 (10th Cir. 2013) (quoting *Wiggins*, 539 U.S. at 527), the Tenth Circuit remanded for an evidentiary hearing due to trial counsel's failure to adequately investigate evidence of organic brain damage caused by prenatal drug exposure. Trial counsel had hired Dr. Wanda Draper, who "held 'a PhD in development,' 'a masters of science in child development,' and had done post-doctoral work in genetic epistomology." 704 F.3d at 861. Her testimony was strikingly similar to Dr. Garner's in Mr. Harris's case:

> She presented a socio-psychological report on Mr. Littlejohn, concluding essentially that his development "stifled around age ten," . . . and that, while he understood the difference between wrong and right, he lacked "sensitivity" to it . . . . Further, evidence was offered detailing various aspects of Mr. Littlejohn's "troubled" childhood, including testimony indicating that he had difficulty making friends and knowing appropriate boundaries . . . , and that he had a rough home life . . . .
>
> Furthermore, the jury heard testimony suggesting that Mr. Littlejohn's mother used narcotics during the duration of her pregnancy with him.

*Id.* (internal citations omitted). On post-conviction, "Mr. Littlejohn secured the services of Dr. Saint Martin, a psychiatrist, who conducted a thorough examination of him. Dr. Saint Martin is 'licensed to perform psychological and neuropsychological evaluations' . . . ." *Id.* at 861. On habeas, Dr. Saint Martin suggested that 'Mr. Littlejohn . . . suffer[s from] a behavioral disorder . . . *that is caused by* neuro-developmental deficits experienced in his peri-natal development,' specifically his mother's drug abuse." *Id.* In remanding for an evidentiary hearing,[140] the Tenth Circuit explained that "it is well-settled that" evidence of "physical brain damage" "is of considerable importance to a capital sentencing jury." *Id.* at 863. The Court found:

---

[140]Following the remanded hearing, the court found no IAC because the brain damage "ultimately consisted of only two commonly diagnosed conditions: attention deficit disorder and an impulse-control disorder, neither of which was powerful enough *on these facts* to support a claim of prejudice." *Littlejohn v. Royal* (*Littlejohn II*), 875 F.3d 548, 564 (10th Cir. 2017) (emphasis added).

144

> The Supreme Court has squarely rejected the notion that, when counsel has "*some* information with respect to petitioner's background," counsel has necessarily fulfilled his constitutional duty to investigate and present a case in mitigation. (quoting *Wiggins*, 539 U.S. at 527 . . . .)). In this case, there was readily available evidence that should have alerted a reasonable defense counsel to the realistic possibility that Mr. Littlejohn suffered from organic brain damage. . . . [T]here is a very real likelihood that the decision of Mr. Littlejohn's counsel to focus *solely* on mitigating evidence relating to the socioeconomic conditions of Mr. Littlejohn's upbringing and to his psychological makeup – without even investigating whether there was some physical, brain-related condition that would account for Mr. Littlejohn's beahvior – amounted to constitutionally deficient performance.

*Id.* at 862-63. Here, as in *Littlejohn*, there were "patent 'red flags' . . . pointing to a possible physiological explanation" for Mr. Harris's behavior. *Id.* at 863. Counsel failed to investigate such an explanation.

In *Williams v. Stirling*, 914 F.3d 302, 312-19 (4th Cir. 2019), the Fourth Circuit affirmed the District Court's decision granting habeas relief based on ineffective assistance of counsel for failure to investigate FASD. As the Fourth Circuit explained:

> "[P]revailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable[.]" *Strickland*, 466 U.S. at 688 []. With respect to investigating mitigating evidence in preparation for the penalty phase of capital proceedings, the ABA Guidelines at the time of trial noted that a defendant's psychological history and mental status could "explain or lessen the client's culpability for the underlying offense [ ]," and therefore should be considered as part of the mitigation investigation. ABA Guidelines § 10.11(F)(2), *reprinted in* 31 Hofstra L. Rev. at 1056. Commentary to § 10.11 explained that expert testimony concerning "the permanent neurological damage caused by fetal alcohol syndrome" could "lessen the defendant's moral culpability for the offense or otherwise support[ ] a sentence less than death." *Id.* at 1060-61; *see also id.* at 956-57 (noting, with respect to § 4.1, that because "the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase," the defense team should include at least one person qualified to screen for mental or psychological defects so as to "detect the array of conditions (e.g., post-traumatic stress disorder, *fetal alcohol syndrome*, pesticide poisoning, schizophrenia, mental retardation) that could be of critical importance" (emphasis added)).

*Id.* at 313.

145

OCCA's opinion in Mr. Harris's case bears a striking resemblance to the *Williams* state post-conviction opinion, which the federal courts deemed legally and factually unreasonable under § 2254(d). In *Williams*, the state court found on post-conviction that trial counsel had presented "evidence that [Williams'] mother drank during pregnancy" and "the resulting complications, including brain damage" to a team of defense experts before trial. *Id.* at 309-10. The state court determined, "Considering all the of the information it had available and in consultation with its experts, trial counsel . . . *made a strategic decision* not to present to the jury evidence of brain damage or a diagnosis of Fetal Alcohol Syndrome . . . ." *Id.* The Fourth Circuit found that the state court's "determination that the investigation was not deficient involved both an unreasonable application of the law and an unreasonable determination of the facts." *Id.* at 316. The court concluded

> even under the highly deferential standard afforded to the [state] court, that court's conclusion was unreasonable: "In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the [state court] unreasonably applied *Strickland*." [*Wiggins*, 539 U.S.] at 534 . . . . In short, the [state] court could not reasonably find trial counsel made a strategic decision in accord with *Strickland* where counsel was unaware of the decision.

*Williams*, 914 F.3d at 316. The court also found:

> The [state] court's determination of the facts was also objectively unreasonable. . . . Specifically, the [state] court relied on the factual assumption that trial counsel made a strategic choice not to present the FAS evidence. But . . . it was impossible for trial counsel to have made a strategic choice because there was no investigation into FAS.

*Id.* at 316-17.

In Mr. Harris's case, too, there was "no investigation into FAS." *Id. Williams* made clear that counsel can perform ineffectively if they fail to adequately investigate evidence of FASD even when – as in Mr. Harris's case – counsel investigate and present the testimony of multiple experts,

146

including a social worker and mental health experts.[141] The Fourth Circuit explained, "In preparation for the penalty phase, [trial counsel] assembled a defense team that included, among others," a social worker, a clinical neuropsychologist, a clinical psychiatrist, a neurologist, and a forensic psychiatrist. The social worker learned through interviews with family members that the petitioner's mother drank while pregnant. *Id.* The court explained that before trial,

> [t]he defense team experts assessed Williams for neurological and psychological issues. Following an evaluation, [the clinical neuropsychologist] concluded that Williams suffered neurological impairments as the result of frontal lobe damage and, consequently, had learning difficulties. [The clinical psychiatrist] examined Williams and diagnosed him with bipolar and obsessive-compulsive disorder. Finally, following an MRI and neurological exam the week prior to the trial, [the neurologist] reported that, though there were some cognitive issues, Williams' MRI showed a normal brain.

*Id.* In *Williams*, trial counsel consulted with far more experts than Mr. Harris's counsel did; the Fourth Circuit nevertheless found counsel had not conducted an investigation into FAS.

Affirming the District Court's decision granting habeas relief, the Fourth Circuit explained:

> [B]ecause there was no recognition of a potential FAS diagnosis by trial counsel, there was no further exploration of FAS as a potential mitigating factor. And because there was no further exploration, there was *necessarily* no opportunity for counsel to make a strategic decision about whether or not to further develop the FAS

---

[141]*Williams* also made clear that counsel can perform ineffectively when they fail to investigate FASD, even where they present a seemingly robust mitigation case that includes evidence of mental illness and other issues:

> During the penalty phase, defense counsel presented mitigating evidence of Williams' troubled childhood – including his mother's alcoholism – as well as his mental illness and difficulties in school. . . . Moreover, through his cross-examination of the state psychiatrist, [trial counsel] elicited additional mitigation testimony, including information about Williams' trouble with his parents' divorce, [his mother]'s alcoholism, Williams' difficulty in school, and his untreated attention deficit disorder.

914 F.3d at 307-08.

147

evidence or present it in mitigation. Rather, the investigation here was deficient for the same reasons that *Wiggins* found counsel's investigation to be deficient: the lack of an informed decision regarding mitigating evidence.

*Id.* at 314. The court found that

there was sufficient evidence of alcohol abuse that [the social worker] flagged it for general concern. Second, there was evidence of Williams' brain damage, including impairment of the frontal lobe. . . . Consequently, evidence of FAS *was* reasonably available, but counsel failed to connect the indicators suggesting further investigation. And given that FAS evidence was widely acknowledged to be a significant mitigating factor that reasonable counsel should have at least explored – as outlined in the ABA Guidelines and caselaw at the time . . . – counsel's actions were deficient.

*Id.* at 315. In Mr. Harris's case, there was similarly "no opportunity for counsel to make a strategic decision about whether or not to further develop the FAS evidence or present it." *Id.* There was also "sufficient evidence of alcohol abuse that [the experts] flagged it for general concern" as well as "evidence of [Mr. Harris's] brain damage," including his arrested maturity and his "significant 15 point disparity" between verbal and non-verbal intelligence testing scores. Att. 20 at ¶ 4. "Consequently, evidence of FAS *was* reasonably available, but counsel failed to connect the indicators suggesting further investigation." *Williams*, 914 F.3d at 315. "FAS evidence was widely acknowledged to be a significant mitigating factor . . . as outlined in the ABA Guidelines and caselaw at the time" of Mr. Williams's trial in 2005, *id.*; this was even more the case at the time of Mr. Harris's trial in 2013.

OCCA unreasonably discounted the importance of the cause of Mr. Harris's deficits. OCCA found that "counsel made a sound strategic choice . . . not to expend any more time trying to identify a possible neurological cause for an effect (mild cognitive impairment) that was never seriously disputed." *Harris*, 450 P.3d at 965. The Supreme Court and Tenth Circuit have repeatedly reiterated

148

the importance of investigating "neurological cause[s]." *Id. See, e.g., Williams*, 529 U.S. at 370;

*Sears*, 561 U.S. at 949-51. As the Fourth Circuit explained in *Williams*:

> An investigation into FAS evidence would also have been substantively different from the defense team's investigation into other mental illnesses and behavioral issues because FAS could have established both *cause and effect* for Williams' criminal acts whereas the other mitigation evidence went more to effects on behavior. That is, FAS evidence could have provided to the jury evidence of an overarching neurological defect that *caused* Williams' criminal behavior. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1061-61 . . . Without the information on FAS, the jury could have assumed that Williams was an individual who – despite a challenging childhood, learning disabilities, and other mental health issues – was generally responsible for his actions, and therefore would have assigned greater moral culpability to him for his criminal behavior.

*Williams*, 914 F.3d at 315-16. *See also Littlejohn I*, 704 F.3d at 863 (emphasizing importance of

"investigating whether there was some physical, brain-related condition that would account for Mr.

Littlejohn's behavior"). Here, the jury believed the State's theory and convicted Mr. Harris of first

degree murder. "FAS evidence could have provided to the jury evidence of an overarching

neurological defect that caused [Mr. Harris's] criminal behavior. . . . Without the information on

FAS, the jury could have assumed that [Mr. Harris] was an individual who . . . was generally

responsible for his actions." *Williams*, 914 F.3d at 315-16. According to Dr. Garner, Mr. Harris's

impairments were attributable to substance use from an early age, in combination with his mother's

failure to teach him consequences. Tr. VII 1509, 1534. Dr. Fabian could have explained to the jury

that Mr. Harris's substance use was not the cause of his difficulties, but instead was – like much of

his behavior – an effect of "an overarching neurological defect": FASD. *Williams*, 914 F.3d at 315;

Att. 21, Ex. 2 at 21.

OCCA's reliance on its claim that "[t]his is not a case involving lack of capital trial

experience on the part of counsel, lack of funds or professional resources, or lack of focus" to find

no deficient performance was an unreasonable application of *Strickland* and contrary to its progeny.

*Harris*, 450 P.3d at 964. "[A] single, serious error may support a claim of ineffective assistance of

counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986) (citing *Cronic*, 466 U.S. at 657 n.20).

"[T]he objective reasonableness of counsel's performance is not assessed by the attorney's general

legal skill, experience, and knowledge." *Stouffer v. Reynolds*, 168 F.3d 1155, 1168 (10th Cir. 1999).

"'When the choice is between life and death,' [*Lockett*, 438 U.S. at 605], . . . '[t]hat a person who

happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the

constitutional command.'" *Id.* (quoting *Strickland*, 466 U.S. at 685). In *Williams*, the Fourth Circuit

explained:

> We note at the outset that most of trial counsels' decisions and actions on issues
> unrelated to FAS *did* bear the hallmarks of effective assistance: trial counsel had
> experience in capital cases; counsel consulted with numerous experts in developing
> a mitigation case; and counsel spent a significant amount of time developing
> mitigation arguments. . . . But as *Wiggins* makes abundantly clear, an inadequate
> investigation into potentially mitigating evidence can be, by itself, sufficient to
> establish deficient performance.

914 F.3d at 313-14 (citing *Wiggins*, 539 U.S. at 534). Such was the case here.

### ii.   Prejudice Prong.

#### a.   OCCA's Adjudication Was Legally and Factually Unreasonable.

In addition to finding counsel did not perform deficiently in failing to investigate and present

evidence of FASD, OCCA found there was no prejudice:

> Almost anything *might* be offered as mitigation evidence; but that does not mean that
> everything possible can or should be offered as mitigation evidence. It also does not
> mean that anything not presented was outcome-determinative. While Dr. Fabian
> concluded that a particular cause contributed to Appellant's cognitive state, we do
> not find that cognitive state was markedly unusual or debilitating; if it had been, it
> seems likely that Dr. Garner would have noticed it.

*Harris*, 450 P.3d at 964.

OCCA's finding of no prejudice was an unreasonable application of *Strickland* and contrary to its progeny, including *Rompilla*. *Strickland*, 466 U.S. at 687; *Rompilla*, 545 U.S. at 393. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. The Supreme Court has emphasized the critical mitigating value of evidence of brain damage. In *Rompilla*, post-conviction experts "found that Rompilla 'suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions,'" and "said that 'Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome'" 545 U.S. at 392 (citations omitted). The Supreme Court held, "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . . [T]he likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing . . . ." *Id.* at 393 (quoting *Strickland*, 466 U.S. at 694).

The Tenth Circuit has repeatedly emphasized the importance of presenting mitigating evidence regarding brain deficits. *See Littlejohn I*, 704 F.3d at 864; *Wilson v. Sirmons*, 536 F.3d at 1093-94; *Anderson*, 476 F.3d at 1146-47; *Smith I*, 379 F.3d at 942. "And for good reason – the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action." *Hooks*, 689 F.3d at 1205. In *Anderson*, the Tenth Circuit explained why this type of evidence is so critical: "Anderson's brain deficits affect his reasoning, problem solving, and judgment. These deficits can be perceived by lay persons as 'meanness' or antisocial behavior, but with expert evaluation and

explanation are properly explained as deriving from disruption and impairments to the nervous system." 476 F.3d at 1144. Evidence of this type "serves to humanize a defendant." *Id.* at 1147.

Although defense counsel presented some mitigation evidence on Mr. Harris's behalf, "there is a reasonable probability that at least one juror would have struck a different balance" if the jury had heard the FASD evidence. *Wiggins*, 539 U.S. at 537. *See Sears*, 561 U.S. at 954 ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented."). In *Grant (Donald) v. Royal*, 886 F.3d 874, 925 (10th Cir. 2018), the Tenth Circuit found:

> [I]n *Sears v. Upton*, 561 U.S. 945, 947, 949, 130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010), the Supreme Court found prejudice where trial counsel's mitigation case "portray[ed] the adverse impact of [the defendant's possible] execution on his family and loved ones," and omitted evidence of the defendant's "frontal lobe abnormalities" and dysfunctional childhood, which impaired the defendant's planning, sequencing, and impulse control. Similarly, in *Rompilla*, 545 U.S. at 378, 392, 125 S. Ct. 2456, the Court found prejudice where trial counsel presented testimony from family members that the defendant "was innocent and a good man," and omitted evidence that the defendant suffered from organic brain damage and fetal alcohol syndrome.
>
> And, in *Wiggins*, the Court found prejudice where counsel argued only that the defendant had a "clean record," with no prior convictions, despite the fact that "[t]he mitigating evidence that counsel failed to discover and present in this case [was] powerful," including evidence of petitioner's "diminished mental capacities." 539 U.S. at 515, 534-35, 123 S. Ct. 2527. . . .
>
> In each of these cases, the good-guy and beloved-family-member mitigating evidence presented by counsel was significantly different from the omitted-and potentially more powerful-evidence of organic brain damage, which could have served to explain and lessen the defendants' moral culpability for their offense conduct.

In *Wilson* , 536 F.3d at 1093-94, the Tenth Circuit found:

> Courts have repeatedly found this type of evidence to be powerful mitigation. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that

are attributable to . . . emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987) (O'Connor, J., concurring)); *see also Rompilla*, 545 U.S. at 391, 125 S. Ct.  2456 (highlighting schizophrenia as one mental health problem with a potentially mitigating effect); *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) ("Evidence of . . . emotional disturbance is typically introduced by defendants in mitigation."); *Smith*, 379 F.3d at 942 (juries respond to evidence of mental illness); *Silva v. Woodford*, 279 F.3d 825, 847 (9th Cir.2002) (holding that failure to present evidence of childhood abuse, mental illness, organic brain disorder, and substance abuse, which included PTSD, fetal alcohol syndrome, and attention deficit disorder, was extremely prejudicial); *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir.1988) ( "[P]sychiatric evidence. . . has the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior.").

In attempting to minimize the significance of the testimony Dr. Fabian could have provided,

OCCA unreasonably conflated IQ testing and neuropsychological testing:

While [Dr. Fabian's] tests often placed Appellant in categories such as "low average," "mild impairment," or "mild to moderate impairment" when compared to the general population, these results were not inconsistent with Dr. Russell's own test-based opinion; Dr. Fabian simply confirmed Appellant's mild impairment in more discrete and subtle ways.

*Harris*, 450 P.3d at 963. This finding was factually unreasonable. First, neuropsychological testing

does not merely "confirm" impairment shown in IQ testing; instead, intelligence testing "is *one area*

of neuropsychological functioning." John Matthew Fabian, PSY. D., J.D, ABPP et. al., *Life, Death,*

*and IQ: It's Much More Than Just A Score: Understanding and Utilizing Forensic Psychological*

*and Neuropsychological Evaluations in Atkins Intellectual Disability/Mental Retardation Cases*, 59

Clev. St. L. Rev. 399, 406 (2011) (emphasis added). *See also* Att. 20 at ¶ 4. The "Wechsler Adult

Intelligence Scale - (4th Edition)," which is the IQ test Dr. Russell gave Mr Harris, "assesses verbal

comprehension, perceptual reasoning, working memory, and processing speed." *Life, Death, and*

*IQ* at 406. "[T]raditional neuropsychological assessment instruments and batteries assess executive

153

neurocognitive functioning, including problem solving, planning, abstract thinking; language and oral comprehension skills; visuospatial perception; auditory and visual attention; auditory and visual immediate and delayed memory; motor and sensory perception skills; and emotional/social intelligence." *Id.*

OCCA unreasonably dismissed the importance of the cause of Mr. Harris's deficits in finding Dr. Fabian's test "results were not inconsistent with Dr. Russell's own test-based opinion; Dr. Fabian simply confirmed Appellant's mild impairment in more discrete and subtle ways," 450 P.3d at 963, and "the fact that Appellant suffers from mild intellectual deficits, *whatever the cause*, was never disputed." *Id.* (emphasis added). To the extent OCCA based a finding of no prejudice on these determinations, this was an unreasonable application of *Strickland* and contrary to its progeny, including *Rompilla.* 545 U.S. at 391. The cause of Mr. Harris's deficits was not irrelevant, as OCCA tried to paint it; on the contrary, the cause was critical. In *Williams*, the Fourth Circuit found, "As previously discussed, the FAS evidence was different from the other evidence of mental illness and behavioral issues because it could have established *cause and effect* for the jury – specifically, a FAS diagnosis could have provided to the jury evidence of a neurological defect that *caused* Williams' behavior." *Williams*, 914 F.3d at 318. Again, Dr. Fabian could have explained to the jury that (contrary to Dr. Garner's testimony) Mr. Harris's substance use was not the cause of his difficulties, but instead was an effect of "an overarching neurological defect": FASD. *Williams*, 914 F.3d at 315.

OCCA "d[id] not find [Mr. Harris's] cognitive state was markedly unusual or debilitating; if it had been, it seems likely that Dr. Garner would have noticed it." *Harris*, 450 P.3d at 964. Similarly, OCCA found Mr. Harris's "mild cognitive impairment . . . cannot reasonably be said to

154

have had a discernible impact on Appellant's ability to manage his affairs, control his emotions, or appreciate the consequences of his acts." *Id.* at 965. These were unreasonable factual determinations. As explained at length in Dr. Fabian's report, Mr. Harris's cognitive state was "markedly unusual or debilitating" and his impairment had "a discernible impact" on his abilities. *Id.* For example, Dr. Fabian explained "Mr. Harris's neurocognitive deficits, especially in the areas of attention, memory, processing of information, reasoning, and receptive and expressive language would cause him to have significant difficulties in communicating with others and comprehending information." Att. 21, Ex. 2 at 20. In addition, Dr. Garner did "notice[] it." *Harris*, 450 P.3d at 964. *See supra* at 138-39. However, she failed to grasp the full range of Mr. Harris's deficits or identify their cause.

OCCA additionally found, "Also, with regard to the probable effect of such evidence, there are portions of Dr. Fabian's investigation and report that might have done more harm than good at trial. Most notably, Appellant had a considerable history of drug use." *Harris*, 450 P.3d at 965. This determination was based on an unreasonable determination of fact and an unreasonable application of *Strickland* and contrary to its progeny. OCCA ignored the fact that the jury was already aware of Mr. Harris's "history of drug use." *Id.* Dr. Garner testified about his history with drugs, including selling them and huffing gasoline. Tr. VII 1509, 1533. She testified "there was quite a bit of [substance] abuse, consistently."[142] Tr. VII 1533. In fact, according to Dr. Garner, Mr. Harris's substance use caused his deficits and exacerbated them. Tr. VII 1509, 1516. Contrary to OCCA's finding that Dr. Fabian's testimony about drugs would have been harmful, it would have helped; Dr. Fabian could have put Mr. Harris's substance use into context for the jury by explaining that "FASD

---

[142] During Dr. Garner's testimony, the trial court acknowledged "there's been evidence of that [Mr. Harris's and Ms. Ferguson's drug use] already. . . . Early – in the first stage that there was drug use, so I mean, it's not anything new." Tr. VII 1513.

cases are related to psychiatric conditions including . . . increased incidence of alcohol and other substance use disorders, which are all present in this case." Att. 21, Ex. 2 at 21. "Without the information on FAS, the jury could have assumed that [Mr. Harris] was an individual who . . . was generally responsible for his actions, and therefore would have assigned greater moral culpability to him for his criminal behavior." *Williams*, 914 F.3d at 315-16.

> OCCA noted that in an affidavit, Dr. Russell
>
> states that she now believes "neuropsychological testing was warranted" in this case to "fully assess and explain [Appellant's] true level of functioning." It is not clear if Dr. Russell felt that way at the time of trial, or felt that any findings in that regard would "move the ball" as far as Appellant's moral blame, but her testimony at least suggests she did not.

*Harris*, 450 P.3d at 964 n.40. OCCA's finding that it is not clear if Dr. Russell "felt that any findings [regarding Mr. Harris's true level of functioning] would 'move the ball' as far as Appellant's moral blame, but her testimony at least suggests she did not" is both legally and factually unreasonable. *Id.* First, Dr. Russell's opinion as to whether neuropsychological test results "would 'move the ball' as far as Appellant's moral blame" is irrelevant; OCCA's finding to the contrary is an unreasonable application of *Strickland* and contrary to its progeny. The Supreme Court has made clear that counsel – not experts or anyone else – have a duty to make decisions regarding the investigation and presentation of mitigation evidence. *See Rompilla*, 545 U.S. at 381; *Porter*, 558 U.S. at 40. Further, OCCA's finding that Dr. Russell's "testimony at least suggests she did not" feel that "any findings in that regard would 'move the ball' as far as Appellant's moral blame" is an unreasonable factual determination. *Harris*, 450 P.3d at 964 n.40. Dr. Russell's testimony provides no indication of how she felt about neuropsychological testing or Mr. Harris's "moral blame." *Id.*

156

Moreover, OCCA's finding of no prejudice was factually unreasonable and an unreasonable application of *Strickland* and contrary to its progeny because it failed to take into account Dr. Fabian's explanations of Mr. Harris's behavior "during the investigation and trial." Att. 21, Ex. 2 at 23:

> While he may have presented as aloof or having no remorse, he likely had difficulties processing the dysfunctional relationship he shared with Ms. Ferguson and especially the traumatic nature of the instant offense. Mr. Harris's neurocognitive deficits in a number of areas . . . would also have a detrimental impact in providing written and verbal accounts of event to the police. Furthermore, these cognitive deficits coupled with his emotional deficits related to depression and trauma would also have profoundly impacted his abilities to adequately process, comprehend, retain, and appreciate legal information and adequately assist his defense counsel in trial. His ability to cognitively make legal decisions would be impacted by his emotional dysregulation . . . .

*Id.* Dr. Fabian could have cast residual doubt on Mr. Harris's guilt.[143] *See Lockhart*, 476 U.S. at 181.

Finally, OCCA unreasonably found, "We must also keep in mind that the jurors (assuming none were neuropsychologists)[144] were able to consider Appellant's cognitive abilities, from a layperson's point of view, through his extensive video interview with Detective Saulsberry and by observing his demeanor and interactions with counsel throughout the trial." *Harris*, 450 P.3d at 965 n.41. First, this determination was factually unreasonable, as the jury did not view Mr. Harris's "extensive video interview with Detective Saulsberry," and instead Detective Saulsberry testified about Mr. Harris's statements during the interview.[145] A finding of no prejudice based on this

---

[143]The State argued in first-stage closing, "A rational human being doesn't keep gasoline in their room for two or three or four weeks in an enclosed bottle." Tr. VII 1380. Mr. Harris's FASD could have provided an explanation for this and other behavior.

[144]The record shows no jurors were neuropsychologists, so OCCA needed not "assume[]." *Harris*, 450 P.3d at 965 n.41.

[145]The State's choice to present the contents of the video through the lengthy testimony of
(continued...)

determination was also an unreasonable application of *Strickland* and contrary to its progeny. It is not the jury's role to make inferences about a capital defendant based on courtroom observations, particularly given "the crucial mitigating role that evidence of . . . mental health problems can have in the sentencing phase." *Wilson*, 536 F.3d at 1085. In a capital case, an attorney has an obligation to present his client's background to the jury sentencing him. *See, e.g., Porter*, 558 U.S. at 39; *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (citation and internal quotation marks omitted) ("The responsibility of the lawyer is to walk a mile in the shoes of the clients . . . and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.").

Contrary to *Strickland*, OCCA utilized the wrong standard in its determination of no prejudice in concluding, "Having considered Dr. Fabian's report, we do not find a strong possibility that such evidence would have cast Appellant's culpability in a materially different light."[146] *Harris*, 450 P.3d at 965. The clearly established standard to determine prejudice is that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). In *Rompilla*, the Supreme Court found:

---

[145](...continued)
Detective Saulsberry instead of playing the video suggests an attempt to keep the jury from seeing Mr. Harris's "cognitive abilities" on display in the interview. *Harris*, 450 P.3d at 965 n.41.

[146]OCCA explained that "[t]o obtain relief under Rule 3.11(B), a defendant need only show a 'strong possibility' that trial counsel was ineffective." *Harris*, 450 P.3d at 964. "This standard is intended to be less demanding than the test imposed by *Strickland*." *Simpson v. State*, 230 P.3d 888, 906 (Okla. Crim. App. 2010). Instead of utilizing this relaxed standard to require that Mr. Harris show only *a strong possibility of a reasonable probability* that the result of the proceeding would have been different, OCCA heightened the standard, requiring that Mr. Harris show a strong possibility that the result of the proceeding would have been different.

> This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and *although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test*. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability." *Wiggins* [], 539 U.S.[] at 538 . . . (quoting *Williams*[], 529 U.S.[] at 398 . . .), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S.[] at 694 . . . .

545 U.S. at 393 (emphasis added).

Applying the correct standard to Mr. Harris's case renders unreasonable OCCA's finding of no prejudice. "In assessing whether counsel's deficient performance was prejudicial, [the reviewing court] must bear in mind the mitigating evidence introduced during the penalty phase, the aggravating circumstances actually found by the jury, and the strength of the State's case." *Clayton v. Gibson*, 199 F.3d 1162, 1178-79 (10th Cir. 1999). Here, the State's case against Mr. Harris "cannot fairly be described as overwhelming*." Mayes*, 210 F.3d at 1290. The State alleged, and the jury found, only two aggravators: 1) the murder was especially heinous, atrocious, or cruel and 2) the defendant knowingly created a great risk of death to more than one person. O.R. I 26-28; O.R. II 381-82; Tr. VII 1594. The Tenth Circuit has "characterized a petitioner's potential for continued dangerousness, even if incarcerated, as 'perhaps [the] most important aggravating circumstance' that juries consider in weighing the death penalty." [147]*Littlejohn II*, 875 F.3d at 564 (quoting *John Grant v. Trammell*, 727 F.3d 1006, 1017 (10th Cir. 2013)). This "'most important aggravating circumstance'" was not alleged in Mr. Harris's case. *Id.* In *Wilson*, the Tenth Circuit found:

---

[147]In *Grant (Donald)*, 886 F.3d at 926 (quoting *Littlejohn II*, 875 F.3d at 560), the Tenth Circuit found that because the State argued "that Mr. Grant posed a continuing threat to society," "OCCA thus could have reasonably concluded that, in this instance, 'organic-brain-damage evidence would have been just as likely – if not more likely – to have had an aggravating effect rather than a mitigating effect on a sentencing jury.'"

> The murder for which Mr. Wilson was convicted was especially brutal. . . . It is not beyond reasonable possibility that, if it had been properly informed, the jury would have regarded [Mr. Wilson] . . . – as less culpable due to his mental illness. . . . Though some jurors may have been disinclined to employ mercy, it is equally as likely that at least one juror would have empathized with Mr. Wilson, given the additional insight into his mental state.

536 F.3d at 1095 (citation omitted).

### 2. Trial and Appellate Counsel's Failure to Present Additional Evidence of FASD, Including a Specific Diagnosis.[148]

Trial and appellate counsel were ineffective for failing to investigate and present additional evidence of FASD, including a specific diagnosis on the FASD spectrum, and how it would have affected Mr. Harris's brain and his behavior. Direct-appeal counsel was charged with raising trial counsel's ineffectiveness. *Evitts*, 469 U.S. at 397-98; *Neill*, 278 F.3d at 1057 n.5.

Appellate counsel's failure to present additional evidence of FASD, including reports from necessary experts, including Dr. Kenneth Lyons Jones, M.D., to OCCA prejudiced Mr. Harris because without them, OCCA was unable to find ineffective assistance of trial counsel. Under *Strickland*, "ineffective appellate assistance can be established on the basis of the demonstrable merit of the issue omitted by counsel on the petitioner's direct appeal." *Cargle*, 317 F.3d at 1205. "If the underlying issue was not valid, . . . counsel was not ineffective for failing to raise it on direct appeal." *English*, 241 F.3d at 1283. Here, "the underlying issue was . . . valid." *Id.* If appellate

---

[148]The preceding claim (Ground 5(D)(1)) related to trial counsel's ineffectiveness, which appellate counsel raised on direct appeal. This claim (Ground 5(D)(2)) relates to the ineffectiveness of both appellate counsel and trial counsel, which has not been presented to OCCA. Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below. In support of this claim, Mr. Harris presents a report from Dr. Kenneth Lyons Jones, M.D. (Att. 17). He anticipates obtaining additional expert reports and lay witness affidavits, which he will present to support this claim in an amended petition.

counsel had presented additional expert reports confirming and explaining Mr. Harris's FASD, there is "a reasonable probability" OCCA would have found ineffective assistance of trial counsel. *Neill*, 278 F.3d at 1057 n.5.

On direct appeal, OCCA highlighted the limited significance of Dr. Fabian's report. OCCA explained, "In Dr. Fabian's opinion, Appellant *may* suffer from a 'neurodevelopmental disorder' because his mother allegedly drank alcohol while pregnant with him." *Harris,* 450 P.3d at 963 (emphasis added). OCCA found, "In the end, Dr. Fabian could not conclusively point to prenatal alcohol exposure as the cause of Appellant's mild cognitive impairment. Rather, he appears to have concluded merely that prenatal exposure to alcohol *might have* contributed to that impairment." *Id.* Appellate counsel were ineffective in failing to hire appropriate experts who could have provided a specific diagnosis and confirmed that prenatal alcohol exposure contributed to Mr. Harris's impairment. Dr. Jones, retained by habeas counsel, has diagnosed Mr. Harris with Partial Fetal Alcohol Syndrome and Alcohol Related Birth Defects. Att. 17 at 2. Dr. Jones explained that neither Dr. Garner nor Dr. Russell, nor Dr. Fabian alone, could have diagnosed Mr. Harris with Partial Fetal Alcohol Syndrome. Instead, "a diagnosis of Partial Fetal Alcohol Syndrome as well as FAS and ARND require a careful physical examination by both a medical doctor such as myself who is an expert in the evaluation of the   physical features that are diagnostic of this disorder and a neuropsychologist such as Dr. Fabian who is an expert in the evaluation of the neurobehavioral and neuropsychological features of this disorder. Neither a medical doctor nor a neuropsychologist can diagnose FASD without the other." *Id.* at 2.

OCCA found, "[Dr. Fabian] conceded that Appellant might simply be suffering from 'Fetal Alcohol Effect,' considered to be a milder form of Fetal Alcohol Syndrome." *Harris*, 450 P.3d at

963. Had appellate counsel adequately investigated Mr. Harris's diagnosis by retaining a medical doctor in addition to Dr. Fabian, she could have confirmed that Mr. Harris does not have "Fetal Alcohol Effect." *Id.* An appropriate expert like Dr. Jones could have explained that Fetal Alcohol Effects is a "term that was previously used, but is no longer." Att. 17 at 2. He could have explained that the term is "synonymous with ARND [Alcohol Related Neurodevelopmental Disorder]," and confirmed that Mr. Harris does not have ARND but instead has diagnoses "[i]n between the two opposite ends of the spectrum." *Id.* at 2-3.

An appropriate expert also could have elaborated upon the impact of Mr. Harris's prenatal alcohol exposure on his life and behaviors. OCCA found, "[W]e do not find [Mr. Harris's] cognitive state was markedly unusual or debilitating; if it had been, it seems likely that Dr. Garner would have noticed it." *Harris*, 450 P.3d at 964. A report from an appropriate expert could have done so. Appropriate experts could have described how "unusual or debilitating" Mr. Harris's cognitive state was, and why a social worker like Dr. Garner might miss it. *Id.*

OCCA also displayed fundamental misunderstandings regarding FASD. For example, OCCA found that Dr. Russell "found Appellant's intellectual ability to be generally in the low-average range. She found no evidence of developmental disability." *Id.* at 963. An appropriate expert could have explained that people with FASD diagnoses can have "low-average" IQs and not be intellectually disabled. Dr. Jones could have explained, "the majority of individuals with either Fetal Alcohol Syndrome or Partial Fetal Alcohol Syndrome (85%) have a full Scale IQ within the normal range. Thus it is no surprise that Donnie's IQ was 87." Att. 17 at 2. If appellate counsel had presented additional expert reports confirming and explaining Mr. Harris's FASD, there is "a

reasonable probability" OCCA would have found ineffective assistance of trial counsel. *Neill*, 278

F.3d at 1057 n.5.

## E.    Conclusion.

In determining whether counsel's failures prejudiced Mr. Harris, all instances of counsel's

deficient performance should be cumulated. *Cargle,* 317 F.3d at 1208, 1212-1220. Individually and

cumulatively, Mr. Harris was prejudiced by counsel's failures in both stages. Had counsel

investigated and presented evidence to adequately challenge the State's case, there is a reasonable

probability he would have been acquitted of murder. And such first-stage failures, along with

counsel's second-stage failures, cumulated to deprive Mr. Harris of effective assistance in the

critical sentencing stage.

### GROUND SIX
## PROSECUTORIAL MISCONDUCT VIOLATED MR. HARRIS'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS.[149]

## A.    The Prosecutor Impugned Mr. Harris, His Counsel, and His Witness.

Mitigation witness Krystal Green testified she and Mr. Harris have an eight-year-old

daughter together, K.H., who was present in the courtroom. Tr. VII 1472-1473. Ms. Green answered

in the affirmative that she brings K.H. to visit Mr. Harris in jail. Tr. VII 1473. Ms. Green then

testified about their daughter, "She doesn't quite understand much, except that she asked me to tell

-- ask the court to let her dad come home. She doesn't realize that this a lot worse than what it is."

*Id.* Without asking to approach the bench, the prosecutor interjected into the proceedings for the jury

to hear, "Judge, at this time I'm going to make an objection as to subjecting this child to what we're

---

[149]Mr. Harris raised this claim as Proposition VII(B)(2) on pages 55-56 of his direct-appeal
brief.

fixing to talk about. That's borderline abuse." Tr. VII 1473-1474. Defense counsel began to make a record, noting the prosecutor had impugned counsel's sense of decency. Tr. VII 1474. The trial court responded, "Don't need remarks. Overruled." Tr. VII 1474.

The prosecutor conducted no cross-examination. Tr. VII 1471-75. After Ms. Green stepped down, defense counsel made a fuller record at the bench, stating the prosecutor had impugned counsel and client with the statement that "putting [K.H.] through this" was child abuse. Tr. VII 1475. Defense counsel further asked for a mistrial, characterizing the prosecutor's "outburst" as "[t]otally out of line," based on personal opinion, and, as the authority empowered to charge people with crimes, likely to carry special weight with the jury as a suggestion that the witness had broken the law. Tr. IV 1475-76.

In defending herself, the prosecutor stated she wasn't impugning counsel or client's "ability or credibility," but rather questioning the propriety of the witness subjecting her child to the capital proceedings. Tr. VII 1476. The court denied the requests for a mistrial, and no admonishment was given to the jury. Tr. VII 1476.

**B.    OCCA's Adjudication Was Legally and Factually Unreasonable.**

**1.    OCCA's Adjudication Was Legally Unreasonable.**

On direct appeal, Mr. Harris asserted a due process violation under *United States v. Young*, 470 U.S. 1, 18-19 (1985)  (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)) ("The prosecution's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."). In *Berger*, the Supreme Court had famously stated that, "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones." 295 U.S. at 88.

OCCA's sole legal analysis of the ground is found in its one-sentence conclusion, "[W]e find no outcome-influencing error here." *Harris*, 450 P.3d at 954. While broadly identifying the correct legal standard set forth in *Young*, under which courts must evaluate whether "the challenged argument seriously affected the fairness of the trial," 470 U.S. at 1049, OCCA did not reasonably apply it to Mr. Harris's case. A reasonable application would take into account the factors specifically counseled by *Young*: the special position and authority of the prosecutor, which were uniquely at issue here. As defense counsel pointed out, the prosecutor's suggestion of illegal conduct by a defense witness carries a unique risk of negatively influencing the jury. *Young*'s stated concern regarding the "imprimatur of the Government" was prominently put into play in light of the prosecutor's improper comment suggesting a crime being committed by the witness, and OCCA was unreasonable in failing to incorporate this reality into its reasoning.

OCCA also unreasonable applied clearly established federal law in its treatment of Mr. Harris's Eighth Amendment claim. Mr. Harris cited *Darden v. Wainwright*, 477 U.S. 168, 179-82 (1986), which examined whether improper prosecutorial comments deprived a defendant of a fair trial where they deprived the sentencing determination of the required Eighth Amendment reliability. OCCA did not analyze this constitutional violation. Thus, Mr. Harris must "show[] there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. *See also id.* at 102; *Johnson*, 568 U.S. at 293.

Here, there was no reasonable basis for OCCA to deny relief. The prosecutor argued that Mr. Harris's child's mother – a mitigation witness – was perpetrating an act of child abuse. Injecting such unreliability into the sentencing process implicates the Eighth Amendment. *See Woodson v. North Carolina*, 428 U.S. 280 (1976); *Gardner v. Florida*, 430 U.S. 349 (1977). The prosecutor's

statement also violated the Eighth Amendment to the extent, given the aspersion it baselessly cast on a mitigation witness, it "precluded [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record . . ." *Lockett*, 438 U.S. at 604.

**2.     OCCA's Adjudication Was Factually Unreasonable.**

Here, OCCA's analysis was rooted in multiple unreasonable factual determinations. OCCA denied the prosecutor's objection was an improper attack, instead supplying the unsupported characterization that it was a "rightful[] concern[] about emotional outbursts in front of the jury." *Harris*, 450 P.3d at 954. However, in her objection the prosecutor said nothing about such a concern. *See* Tr. VII 1473-74. Considering defense counsel expressed a concern about an "outburst of Ms. Nicholson" in their mistrial argument, *see* Tr. VII 1476, it is conceivable that OCCA's opinion was based on a flat misreading of the record.

OCCA further based its factual determination in an unreasonable view of the record, asserting that high-emotion, hyperbole, and the heat of argument can explain prosecutors "say[ing] things that are not entirely justified." 450 P.3d at 954. None of these assertions have any bearing in the reality of Mr. Harris's trial. The prosecutor's statement was an objection made during defense counsel's examination of a mitigation witness, not during argument. And as the prosecutor herself explained at the bench, it was not rooted in hyperbole or emotion, but in her belief that the witness's conduct was improper. OCCA's brief adjudication of this claim was inextricable from its unreasonable determination of the facts in light of what actually occurred at Mr. Harris's trial.

## GROUND SEVEN

**MR. HARRIS'S EXECUTION WOULD BE CONSTITUTIONALLY INTOLERABLE BECAUSE HE CAN MAKE A TRULY PERSUASIVE SHOWING THAT HE IS ACTUALLY INNOCENT.[150]**

### A.    Newly Presented Evidence of Innocence.

The fire at issue in this capital case was poorly investigated and Mr. Harris was prevented from effectively defending himself at trial. In addition to the many reasons to doubt the conviction that were presented in state court, Mr. Harris presents further evidence of innocence for the first time with this petition. The newly presented evidence of innocence includes the following, as reported by experts:

- State's Exhibit 9, the cigarette lighter alleged to have been the ignition source for the fire, "was not used to ignite an ignitable liquid fire." Att. 6 at 2-5.

- The specific electrical dangers that were present in the house and in Mr. Harris's room, as testified to by lay witnesses, could have led to a fire. Att. 6 at 7.

- A circle of fire (as observed) is inconsistent with the State's theory but is consistent with an accidental fire, including an electrical fire. Att. 6 at 6-7.

- Contrary to OSBI Agent Rogers's testimony and the State's argument, the components of gasoline identified in Mr. Harris's jeans and shoes "are also present in many carpets, plastics, and even athletic shoe soles." Att. 6 at 6.

- The patterns of burns on Ms. Ferguson and Mr. Harris are not consistent with the State's theory.[151]

---

[150] Counsel for Mr. Harris will be seeking a return to state court so that he may exhaust this claim. Despite OCCA's limits on successive post-conviction actions, there remain paths to merits consideration below. Further, Mr. Harris may discover additional evidence of innocence, which he will present in his amended petition as part of this same claim.

[151] Burn expert Dr. Khandelwal's report, which supports this claim, will be attached to Mr. Harris's amended petition.

Mr. Harris also presents critical impeachment material that undermines the testimony of key witnesses Agent Rust, Martha Johnson, and Barry Johnson. Att. 15, Ex. 1; Att. 16, Exs. 1, 2.

**B.      Executing an Actually Innocent Person Violates the Eighth and Fourteenth Amendments to the Federal Constitution.**

The United States Supreme Court has repeatedly recognized that an inmate alleging nothing other than innocence may make out a constitutional claim that warrants relief on collateral review. Most prominently, *Herrera v. Collins,* 506 U.S. 390, 417 (1993)*,* itself assumed "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *See also In re Davis*, 557 U.S. 952 (2009) (in remitting freestanding innocence claim, instructing that the "District Court should receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence"); *House v. Bell*, 547 U.S. 518, 555 (2006) (assuming without deciding the existence of a freestanding innocence claim). *Herrera* did not formally announce a standard for freestanding innocence claims because the Justices who recognized such claims were split between the majority and dissent. Nonetheless, six members of the Court expressly recognized that executing an actually innocent person would be unconstitutional.[152]

---

[152]See *Herrera*, 506 U.S. at 419 (O'Connor & Kennedy, JJ., concurring) (citations omitted) ("I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution. Regardless of the verbal formula employed-'contrary to contemporary standards of decency,' 'shocking to the conscience,' or offensive to a 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental-the execution of a legally and factually innocent person would be a constitutionally intolerable event."); *id.* at 428 (White, J., concurring) ("In voting to affirm, I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this

(continued...)

Courts of appeal "understand *Herrera* to leave open the possibility that, in a particular instance of newly discovered, highly persuasive evidence of innocence, emerging at a time when no state remedy remains available, a federal court might be able to issue a writ of habeas corpus under the Constitution to prohibit execution." *United States v. Sampson*, 496 F.3d 1, 27-28 (1st Cir. 2007). *See also Stockton v. Angelone*, 70 F.3d 12, 13-14 (4th Cir. 1995) (assuming possibility of free-standing actual innocence claim); *Spencer v. Murray*, 5 F.3d 758, 766 (4th Cir. 1993) (same); *Milone v. Camp*, 22 F.3d 693, 705 (7th Cir. 1994) (recognizing that *Herrera* left open possibility of actual innocence as a ground for granting habeas relief in capital cases); *Noel v. Norris*, 322 F.3d 500, 504 (8th Cir. 2003) (*Herrera* "left open the possibility" that a truly persuasive showing of actual innocence would render an execution unconstitutional); *Boyde v. Brown*, 404 F.3d 1159, 1168 (9th Cir. 2005) (assuming possibility of freestanding innocence claim on habeas review); *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) (stating in dicta that "affirmative proof of actual innocence based on newly discovered evidence could be a ground for federal habeas relief); *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000) ("As we have noted, . . . a majority of the Justices in *Herrera* would have supported a claim of free-standing actual innocence."). Newly discovered evidence may be a ground for federal habeas relief "when a defendant introduces affirmative proof of actual innocence based on newly discovered evidence," *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002), such as by presenting evidence "demonstrating he was elsewhere at the time of the murder," *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997), "new and reliable physical

---

[152](...continued)
case."); *id.* at 430 (Blackmun, Stevens, & Souter, JJ., dissenting) (citations omitted) ("Nothing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent.").

169

evidence, such as DNA, that would preclude any possibility of his guilt," *id.*, or DNA "test results [that] implicate a third party," *Cherrix v. Braxton*, 131 F. Supp. 3d 756, 766 (E.D. Va. 2001).

Although the Supreme Court has not announced the precise standard courts must apply when evaluating actual innocence claims, "the threshold showing . . . would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. The Supreme Court has surmised that the "extraordinarily high" standard articulated in *Herrera* likely "requires more convincing proof of innocence" than the "gateway standard" announced in *Schlup v. Delo,* 513 U.S. 298, 327 (1995).[153] *House* , 547 U.S. at 555. The Supreme Court has also opined that "a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the petitioner]'s innocence." *Id.* at 317.

The execution of Mr. Harris would violate three features of the Constitution. First, it would violate the Eighth Amendment's bar on cruel and unusual punishment, as incorporated by the Fourteenth Amendment. The Supreme Court has made clear that, to satisfy the Eighth Amendment's prohibition on cruel and unusual punishment, a punishment must serve a "legitimate penological goal." *Graham v. Florida*, 560 U.S. 48, 67 (2010). Because an execution is constitutional only insofar as it promotes the penological goals of retribution and deterrence, the execution of an actually innocent person does not pass muster under the Eighth Amendment. *See Kennedy v. Louisiana*, 554 U.S. 407, 441 (2008). Executing an innocent offender does not deter future offenses because it expresses no link between crime and punishment. *See, e.g., Gregg v. Georgia*, 428 U.S.

---

[153]*In Schlup*, the Supreme Court held that evidence of actual innocence could create a gateway allowing federal habeas review of a defaulted claim if the petitioner can "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 327.

153, 185 (1976) (discussing the deterrent role of the death penalty in "the cold calculus  that precedes the decision to [illegally] act"). Moreover, executing an innocent person lacks a retributive purpose because retribution is built around the idea that a guilty person deserves punishment. *See Kennedy*, 504 U.S. at 443 (explaining the goal of retribution as reflecting "society's and the victim's interests in seeing that the offender is repaid for the hurt he caused"). The constitutional rule against executing the innocent is a logical extension of the long tradition of Eighth Amendment jurisprudence restricting punishment to guilty offenders. *See*, *e.g., Robinson v. California*, 370 U.S. 660, 667 (1962).

Second, executing Mr. Harris would violate his Fourteenth Amendment substantive due process rights. State action violates the right to substantive due process if it "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). *See also Herrera*, 506 U.S. at 419 (O'Connor, concurring) (internal citations omitted). Mr. Harris's innocence would squarely place his execution into the conscience-shocking, arbitrary category of state action that the Due Process Clause deems impermissible.

Third, refusing additional process to a defendant with persuasive new evidence of innocence would violate Mr. Harris's Fourteenth Amendment procedural due process rights. The Due Process Clause proscribes state power to "regulate procedures under which its laws are carried out" when such procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 445 (1992) (quoting *Patterson v. New York*, 432 U.S. 197, 201-202 (1977)). A procedural due process violation can stem from the actions of any governmental branch, including the judiciary. *Mooney v. Holohan*, 294 U.S. 103, 112-113 (1935). To the extent that Mr. Harris retains a constitutional interest in his own life

even after the jury imposed his sentence, any process by which that life is taken has to conform to the dictates of procedural due process. Even though they are no longer entitled to a presumption of innocence, convicted defendants are still protected by the Constitution, and those sentenced to death must be continuously afforded heightened reliability and a "high regard for truth" in their proceedings. *See*, *e.g., Ford v. Wainwright*, 477 U.S. 399, 411 (1986). In devising procedure, therefore, states must heed "the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the fact finding determination." *Id.* at 417.

### <u>GROUND EIGHT</u>
**THE ACCUMULATION OF ERRORS VIOLATED MR. HARRIS'S RIGHTS TO DUE PROCESS AND A FAIR CAPITAL SENTENCING.**

Even if none of the previously discussed errors, viewed in isolation, necessitates reversal of Mr. Harris's conviction and sentence, the combined effect of these errors deprived him of a fair sentencing and requires the sentence to be reversed.[154] *Cargle*, 317 F.3d at 1200; *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). The cumulative effect of all the errors and omissions at the guilt and sentencing stages resulted in an invalid death sentence. *See Darks*, 327 F.3d at 1018 (finding that when assessing cumulative error, only first-stage errors are relevant to the conviction, but all errors are relevant to the ultimate sentence).

A reviewing court, presented with established errors at trial, must consider the cumulative impact of those errors in light of the totality of the evidence properly presented to the jury. *Gonzales v. McKune*, 247 F.3d 1066, 1077 (10th Cir. 2001)*, vacated on grounds of exhaustion*; *Rivera*, 900

---

[154]The State has sometimes argued there is no Supreme Court authority establishing a separate constitutional claim for cumulative error. The Tenth Circuit has addressed and resolved that argument against the State. *Hanson v. Sherrod*, 797 F.3d 810, 852 n.16 (10th Cir. 2015) (citing *Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003)).

F.2d at 1471. The Tenth Circuit has explained the "cumulative-error analysis merely aggregates all the errors . . . found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Hamilton v. Mullin*, 436 F.3d 1181, 1196 (10th Cir. 2006) (quoting *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir 2003)).

This is a case, like *Cargle*, in which the constitutional violations had a "synergistic" effect. 317 F.3d at 1221. Here, defense counsel's strategy was to undermine the State's theory that Mr. Harris intentionally started a fire. However, in state court, Mr. Harris was repeatedly prevented from effectively undermining this theory. The trial court refused Mr. Harris the opportunity to present a fire expert to dispute the State's theory. As a result, that expert was also unable to examine the cigarette lighter Mr. Harris had when he was arrested, which was alleged to be the ignition source for the fire. Trial counsel failed to present testimony from a fire expert or preserve the record on this issue. Then, on direct appeal, the State lost the lighter, rendering it unavailable for the defense expert to evaluate. Now that the lighter has been located, it is known that had the defense expert evaluated it, it would have been ruled out as the ignition source. Unable to present his own fire expert witness at trial, Mr. Harris was also prohibited from effectively cross-examining the State's fire marshal, due to the State's withholding of *Brady* material defense counsel could have used for impeachment and failure to correct the fire marshal's false testimony. Defense counsel also failed to utilize available evidence in cross-examination of this fire marshal and other witnesses against Mr. Harris who were deemed by OCCA to have given key testimony. Trial and appellate counsel both failed to investigate and present additional available evidence that would have refuted the State's theory: evidence Ms. Ferguson's burns were inconsistent with the State's theory that she was doused in gasoline and set

173

on fire. After Mr. Harris was, predictably, convicted, defense counsel failed to present compelling and available mitigating evidence, including that Mr. Harris has a Fetal Alcohol Spectrum Disorder.

If this Court finds none of the errors set forth in this petition, when considered individually, necessitates the granting of habeas relief, the Court should find the cumulative effect of all the errors described herein deprived Mr. Harris of his constitutional right to a fair trial and reliable sentence.

## REQUEST FOR RELIEF

For the reasons set out above, Mr. Harris respectfully requests this Court issue the Writ of Habeas Corpus.

Respectfully submitted,

*s/ Meghan LeFrancois*
MEGHAN LeFRANCOIS, OBA # 32643
THOMAS D. HIRD, OBA # 13580
Assistant Federal Public Defenders
Western District of Oklahoma
Capital Habeas Unit
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102
(405) 609-5975 (phone)
(405) 609-5976 (fax)
Meghan_LeFrancois@fd.org
Tom_Hird@fd.org

174

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of July, 2021, I electronically transmitted the attached document to the Clerk of Court using ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Ashley L. Willis
Assistant Attorney General

fhc.docket@oag.ok.gov
Ashley.willis@oag.ok.gov

*s/ Meghan LeFrancois*
MEGHAN LeFRANCOIS
Assistant Federal Public Defender

175